**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

LAS AMERICAS IMMIGRANT ADVOCACY CENTER, et al.,

    *Plaintiffs–Petitioners*,

               v.

KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, et al.,

    *Defendants–Respondents*.

Case No: 1:25-cv-00418

---

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 2

LEGAL STANDARD............................................................................................. 9

ARGUMENT ...................................................................................................... 10

   I.    Plaintiffs Gomez Lugo, Sequera, Castillo, and the Legal Service Organizations Have Standing to Seek the Relief Requested on Behalf of the Immigrant Detainees. ....................... 10

      A.   Plaintiffs Have Standing as Next Friends of the Immigrant Detainees. ....................... 10

      B.   Plaintiffs Have Third Party Standing........................................................ 15

   II.   Plaintiffs Are Likely to Succeed on the Merits.................................................. 17

      A.   The Government's Denial of Access to Counsel Violates the Detained Immigrants' Rights................................................................................................ 17

          1. The Government's Denial of Access to Counsel Violates the Detained Immigrants' Rights to Habeas Corpus............................................................................ 17

          2.  The Government's Denial of Access to Counsel Violates the Detained Immigrants' First Amendment Rights. ..................................................................... 17

          3. The Government's Ban on Access to Counsel Violates the Fifth Amendment Substantive Due Process Right Against Punishment for Civil Immigrant Detainees. 20

          4. The Government's Denial of Access to Counsel Violates the Immigrant Detainees' Statutory and Regulatory Rights to Counsel................................................. 22

      B.   The Government's Ban on Access to Counsel at Guantánamo Violates the Legal Service Organization's First Amendment Rights.................................................... 24

III.    The Government's Ban on Access to Counsel at Guantánamo Causes Plaintiffs

Irreparable Harm. .................................................................................................. 25

IV.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor. ....... 26

V.    Request for Temporary Restraining Order ...................................................... 27

VI.    The Court Should Not Require Plaintiffs to Provide Security Prior to the Temporary

Restraining Order. .................................................................................................. 28

CONCLUSION ................................................................................................................ 28

## TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ........................................................................... 9

*ACLU on behalf of Unnamed U.S. Citizen v. Mattis*,
  286 F. Supp. 3d 53 (D.D.C. 2017) ................................................................... 12, 13

*Al Odah v. United States*,
  346 F. Supp. 2d 1 (D.D.C. 2004) ........................................................... 1, 18, 19, 20

*Al-Joudi v. Bush*,
  406 F. Supp. 2d 13 (D.D.C. 2005) ..................................................................... 18

*Am. Foreign Serv. Ass'n v. Trump*,
  No. 1:25-cv-352 (CJN), 2025 WL 435415 (D.D.C. Feb. 7, 2025) ........................... 9

*American Civil Liberties Union Fund of Michigan v. Livingston Cty.*,
  796 F.3d 636 (6th Cir. 2015) ............................................................................. 24

*Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec. (AIJ)*,
  No. 22-cv-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ............................. passim

*Arroyo v. U.S. Dep't of Homeland Sec.*,
  No. SACV 19-815 JGB (SHKx), 2019 WL 2912848 (C.D. Cal. June 20, 2019) ........ 24

*Baires v. INS*,
  856 F.2d 89 (9th Cir. 1988) .............................................................................. 23

*Bell v. Wolfish*,
  441 U.S. 520 (1979) ......................................................................................... 22

*Block v. Rutherford*,
  468 U.S. 576 (1984) ......................................................................................... 21

*Case of the Hottentot Venus*,
  13 East 195 Eng. Rep. 344 (K.B. 1810) ............................................................ 14

*Casteneda-Delgado v. INS*,
    525 F.2d 1295 (7th Cir. 1975) ................................................................ 23

*Chlomos v. INS*,
    516 F.2d 310 (3d Cir. 1975) ................................................................ 24

*Coal. of Clergy v. Bush*,
    189 F. Supp. 2d 1036 (C.D. Cal. 2002) ................................................................ 14

*Coal. of Clergy v. Bush*,
    310 F.3d 1153 (9th Cir. 2002) ................................................................ 11, 12, 13

*Cobourne v. INS*,
    779 F.2d 1564 (11th Cir. 1986) ................................................................ 23

*DeLoach v. Bevers*,
    922 F.2d 618 (10th Cir. 1990) ................................................................ 19

*Demjanjuk v. Meese*,
    784 F.2d 1114 (D.C. Cir. 1986) ................................................................ 12

*Denius v. Dunlap*,
    209 F.3d 944 (7th Cir. 2000) ................................................................ 19

*Doe v. McHenry*,
    No. 1:25-cv-286-RCL, 2025 WL 388218 (D.D.C. Feb. 4, 2025) ................................................................ 9

*Does v. Bush*,
    No. CIV.A.05 313 CKK, 2006 WL 3096685 (D.D.C. Oct. 31, 2006) ................................................................ 14

*Exodus Refugee Immigr., Inc. v. Pence*,
    165 F. Supp. 3d 718 (S.D. Ind. 2016) ................................................................ 17

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................ 15

*Hamdi v. Rumsfeld*,
    294 F.3d 598 (4th Cir. 2002) ................................................................ 13

*Immigrant Defenders Law Ctr. v. Mayorkas*,
    No. CV 20-9893, 2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) ............................................ 25

*In re Guantanamo Bay Detainee Continued Access to Couns.*,
    892 F. Supp. 2d 8 (D.D.C. 2012) ...................................................................................... 18

*In re Guantanamo Bay Detainee Litigation*,
    577 F. Supp. 2d 143 (D.D.C. 2009) ............................................................................. 20, 22

*In re Primus*,
    436 U.S. 412 (1978) ......................................................................................................... 24

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004)............................................................................................. 21

*Jones v. Cunningham*,
    371 U.S. 236 (1963) ......................................................................................................... 14

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
    507 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................................... 23

*Lashbrook v. Hyatte,*
    758 F. App'x 539 (7th Cir. 2019) ...................................................................................... 19

*Lepelletier v. F.D.I.C.*,
    164 F.3d 37 (D.C. Cir. 1999) ............................................................................................ 16

*Leslie v. Att'y Gen.*,
    611 F.3d 171 (3d Cir. 2010) ............................................................................................. 23

*Lozada v. INS*,
    857 F.2d 10 (1st Cir. 1988) .............................................................................................. 23

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012).............................................................................................. 26

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ........................................................................................ 25

*NAACP v. Button*,
    371 U.S. 415 (1963) ......................................................................................................... 24

*Nunez v. Boldin*,
   537 F. Supp. 578 (S.D. Tex. 1982) ........................................................................ 26

*Orantes-Hernandez v. Thornburg*,
   919 F.2d 549 (9th Cir. 1990) ........................................................................ 23, 24

*P.J.E.S. by & through Escobar Francisco v. Wolf*,
   502 F. Supp. 3d 492 (D.D.C. 2020) ........................................................................ 28

*Pangea Legal Services v. U.S. Dep't of Homeland Sec.*,
   512 F. Supp. 3d 966 (N.D. Cal. 2021) ........................................................................ 26

*Pell v. Procunier*,
   417 U.S. 817 (1974) ........................................................................ 19

*Powers v. Ohio*,
   499 U.S. 400 (1991) ........................................................................ 15, 16

*Procunier v. Martinez*,
   416 U.S. 396 (1974) ........................................................................ 24

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ........................................................................ 26

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................ 20

*S. Poverty L. Ctr. v. Dep't of Homeland Sec.* (*SPLC*),
   No. 18-760, 2020 WL 3265533 (D.D.C. Jun. 17, 2020) ........................................................................ passim

*Sallier v. Brooks*,
   343 F.3d 868 (6th Cir. 2002) ........................................................................ 19

*Sanchez-Velasco v. Sec'y of Dep't of Corr.*,
   287 F.3d 1015 (11th Cir. 2002) ........................................................................ 12

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ........................................................................ 10

*Simms v. District of Columbia,*
    872 F. Supp. 2d 90 (D.D.C. 2012) ................................................................ 26, 28

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ................................................................................................ 17

*Torres v. U.S. Dep't of Homeland Sec.,*
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) .................................................... 19, 22, 27

*U.S. Dep't of Labor v. Triplett,*
    494 U.S. 715 (1990) ................................................................................................ 16

*Ukrainian American Bar Ass'n v. Baker,*
    893 F.2d 1374 (D.C. Cir. 1990) ............................................................................ 25

*United States v. Saucedo–Velasquez,*
    843 F.2d 832 (5th Cir. 1988) ................................................................................ 23

*United States v. TDC Mgmt. Corp.,*
    263 F. Supp. 3d 257 (D.D.C. 2017) ...................................................................... 17

*Valdez v. Rosenbaum,*
    302 F.3d 1039 (9th Cir. 2002) .............................................................................. 19

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ........................................................................................ 10, 12

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................... 9, 10

*Youngberg v. Romero,*
    457 U.S. 307 (1982) ................................................................................................ 21

*Zuniga v. Barr,*
    946 F.3d 464 (9th Cir. 2019) ................................................................................ 23

**Statutes**

28 U.S.C. § 2242 ........................................................................................................ 10

8 U.S.C. § 1229a(b)(4)(A) ..................................................................................... 22

8 U.S.C. § 1362 ..................................................................................................... 22

## Regulations

8 C.F.R. § 1003.16(b) ............................................................................................ 22

8 C.F.R. § 1240.3 .................................................................................................. 23

28 C.F.R. § 540.102 .............................................................................................. 21

28 C.F.R. § 540.19(a) ............................................................................................ 21

28 C.F.R. § 543.13(a)-(b) ...................................................................................... 21

Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in

the Caribbean Region, 67 Fed. Reg. 69,985, 69,985 (2002) ....................................... 2

## Other Authorities

C. Todd Lopez, *First Flight of Illegal Aliens Arrives at Guantanamo*. U.S. Dep't of Defense, (Feb. 5, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4055497/first-flight-of-illegal-aliens-arrives-at-guantanamo ............................................................ 2

Camilo Montoya-Galvez & Eleanor Watson, *Trump Officials Eye Daily Migrant Detainee Fights to Guantanamo Bay*, CBS News (Feb. 6, 2025), https://www.cbsnews.com/news/trump-officials-eye-daily-migrant-detainee-flights-to-guantanamo-bay ................................................ 3

CNN NewsSource, *Department of Defense Posts Video of Migrants Arriving at Guantanamo Bay*, (Feb. 9, 2025), https://www.live5news.com/2025/02/09/department-defense-posts-video-migrants-arriving-guantanamo-bay/ ............................................................................ 3

Courtney Kube, et al., *Trump Admin Plans to Use Notorious Guantánamo Detention Facility and Nearby Tents to Hold Immigrants,* NBC News (Feb. 5, 2025), https://www.nbcnews.com/politics/national-security/trump-admin-plans-use-notorious-guantanamo-detention-facility-nearby-t-rcna190707 ................................................... 3

Hamed Aleaziz et al., *U.S. Is Holding Migrants in Cells That Once Held Al Qaeda Suspects*, N.Y. Times (Feb. 5, 2025), https://www.nytimes.com/2025/02/05/us/politics/migrants-trump-guantanamo-prison.html ............................................................................................... 3

Hamed Aleaziz, *Inside the Secretive Facility Housing Migrants at Guantánamo Bay*, N.Y. Times
(Sept. 19, 2024), https://www.nytimes.com/2024/09/19/us/politics/migrants-guantanamo-bay-
cuba-detention.html ................................................................................................................... 2

News Release, Department of Homeland Security, PHOTO RELEASE: DHS Releases Images of
the First Flight of Criminal Aliens to Guantanamo Bay (Feb. 4, 2025),
https://www.dhs.gov/news/2025/02/04/dhs-releases-images-first-flight-criminal-aliens-
guantanamo-bay [https://perma.cc/2RP3-9WP2]........................................................................ 3

R.J. Sharpe,
*The Law of Habeas Corpus* 237 (3d. ed. 2011) ....................................................................... 14

Silvia Foster-Frau, *Why Lawyers Worry Migrants Sent to Guantanamo Are in A 'Legal Black
Hole*,' Washington Post, Feb. 9, 2025,
https://www.washingtonpost.com/immigration/2025/02/08/guantanamo-migrants-trump-
deportations-noem ................................................................................................................... 17

The White House, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to
Full Capacity" (Jan. 29, 2025), https://www.whitehouse.gov/presidential-
actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-
full-capacity [https://perma.cc/ZJA4-KDS2] ............................................................................. 3

Tricia McLaughlin, @TriciaOhio, X (Feb. 7, 2025, 11:58 AM),
https://x.com/TriciaOhio/status/1887908693112480253 [https://perma.cc/73AB-TH6B]......... 9

## INTRODUCTION

This request for a Temporary Restraining Order ("TRO") is a limited one: it seeks only that legal service organizations be permitted access to immigrant detainees recently moved from the United States to the Naval Base at Guantánamo Bay, Cuba ("Guantánamo").

For the first time in U.S. history, the federal government has moved noncitizens apprehended and detained on immigration charges inside the United States to Guantánamo. At present, the detainees have no means of communicating with attorneys, their families, or the outside world. And the government has not announced any protocols for allowing attorney access in the future. The administration has stated, moreover, that it plans to send as many as 30,000 immigrant detainees from U.S. soil to Guantánamo.

When detained within the United States, immigrant detainees have the right to access counsel. And legal service organizations, such as the Plaintiffs-Petitioners ("Plaintiffs") here, have access to such detainees. That is established law. The government cannot eviscerate those rights simply by creating a legal black hole on an island in Cuba. Remarkably, these detainees now have less access to counsel than the military detainees at Guantánamo who have been held under the laws of war in the aftermath of September 11. *See Al Odah v. United States*, 346 F. Supp. 2d 1, 5 (D.D.C. 2004) (holding that the 9-11 detainees have a right to counsel).

Fundamental principles of constitutional and federal law—and indeed the entire premise of a legal regime based on the rule of law—forbid our government from detaining people without access to legal counsel. This Court's immediate intervention is thus warranted to ensure that the government does not continue to hold these detainees incommunicado. Determining what rights, if any, that they may wish to assert, once given access to counsel, is for another day—but access to counsel must first be assured.

Accordingly, Plaintiffs—four legal organizations and the family members of three detainees held at Guantánamo—respectfully seek a TRO requiring Defendants to permit attorney–client communication for the immigrant detainees transferred from inside the United States to Guantánamo. As with the military detainees, in-person visitation must be permitted, as well as immediate and confidential video conferences or telephone calls while the government expeditiously arranges physical access to the Base.

## FACTUAL AND PROCEDURAL BACKGROUND

The government has previously used Guantánamo to detain military detainees after September 11, 2001, under the laws of war. It has also used Guantánamo to house migrants interdicted on the high seas outside of U.S. territorial jurisdiction while they are screened for and await refugee resettlement.[1] Because those migrants are interdicted beyond the territorial reach of the United States, the government has treated them as legally distinct from noncitizens who are apprehended and detained in the United States.

Until very recently, the government had never held at Guantánamo immigrants who were originally apprehended and detained in the United States. That changed on February 4, when the U.S. government sent a flight carrying ten immigrant detainees from Fort Bliss, Texas, to Guantánamo.[2] The transfers were carried out pursuant to a January 29, 2025 memorandum issued by President Trump directing the Secretary of Defense and the Secretary of Homeland Security "to take all appropriate actions to expand the Migrant Operations Center ["MOC"] at Naval Station

---

[1] Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region, 67 Fed. Reg. 69,985, 69,985 (2002); Hamed Aleaziz, *Inside the Secretive Facility Housing Migrants at Guantánamo Bay*, N.Y. Times (Sept. 19, 2024), https://www.nytimes.com/2024/09/19/us/politics/migrants-guantanamo-bay-cuba-detention.html.

[2] C. Todd Lopez, *First Flight of Illegal Aliens Arrives at Guantanamo*. U.S. Dep't of Defense, (Feb. 5, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4055497/first-flight-of-illegal-aliens-arrives-at-guantanamo.

Guantanamo Bay to full capacity . . . ."[3] President Trump declared his intention to detain as many as 30,000 noncitizens at Guantánamo.[4]

These transfers began even while government lawyers were reportedly still reviewing the legality of transferring noncitizens from immigration detention facilities in the United States to Guantánamo,[5] and debating which government agency would have custody of those noncitizens there.[6] The government circulated multiple photographs and a video of the first ten individuals— showing their faces—as they were transferred via military aircraft.[7] Aside from representing that the immigrants were of Venezuelan nationality and alleging they were members of a gang, the government provided no other information regarding their identities, their immigration statuses or

---

[3] The White House, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity" (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity [https://perma.cc/ZJA4-KDS2].

[4] Hamed Aleaziz et al., *U.S. Is Holding Migrants in Cells That Once Held Al Qaeda Suspects*, N.Y. Times (Feb. 5, 2025), https://www.nytimes.com/2025/02/05/us/politics/migrants-trump-guantanamo-prison.html.

[5] Courtney Kube, et al., *Trump Admin Plans to Use Notorious Guantánamo Detention Facility and Nearby Tents to Hold Immigrants,* NBC News (Feb. 5, 2025), https://www.nbcnews.com/politics/national-security/trump-admin-plans-use-notorious-guantanamo-detention-facility-nearby-t-rcna190707.

[6] Camilo Montoya-Galvez & Eleanor Watson, *Trump Officials Eye Daily Migrant Detainee Fights to Guantanamo Bay*, CBS News (Feb. 6, 2025), https://www.cbsnews.com/news/trump-officials-eye-daily-migrant-detainee-flights-to-guantanamo-bay.

[7] *See, e.g.*, News Release, Department of Homeland Security, PHOTO RELEASE: DHS Releases Images of the First Flight of Criminal Aliens to Guantanamo Bay (Feb. 4, 2025), https://www.dhs.gov/news/2025/02/04/dhs-releases-images-first-flight-criminal-aliens-guantanamo-bay [https://perma.cc/2RP3-9WP2]; CNN NewsSource, *Department of Defense Posts Video of Migrants Arriving at Guantanamo Bay*, (Feb. 9, 2025), https://www.live5news.com/2025/02/09/department-defense-posts-video-migrants-arriving-guantanamo-bay/ ("Defense Secretary Pete Hegseth posted a video on social media of migrants arriving at Naval Station Guantanamo Bay in Cuba. He said it was the first flight of high-threat criminal migrants living in the United States illegally to arrive at Guantanamo Bay. It is unclear exactly what crimes they allegedly committed.").

the postures of their immigration proceedings, the legal authority under which they were transferred to and detained at Guantánamo, or how long the government planned to hold them there.[8]

On February 6 and 7, the government sent two more flights of Venezuelan nationals to Guantánamo, bringing the total number of immigrant detainees previously held inside the United States to an estimated three dozen.[9] Since then, the government has reportedly sent more detainees. The government has indicated that it plans to send daily flights to Guantánamo, with the goal of detaining 30,000 people in a massive and makeshift immigration detention complex on the island.[10] The current group of immigrants is reportedly being held in a facility known as Camp 6, one of two medium-security military detention facilities on the base, where the U.S. government has previously held individuals under the law of war.[11] The bulk of the detainees will reportedly be held on the other side of the island in the MOC. Compl. ¶ 39 (describing facilities at Guantánamo); Declaration of José G. Miranda ("Miranda Decl.") ¶¶ 8-14 (describing MOC).

Plaintiff Ms. Eucaris Carolina Gomez Lugo is the next friend and sister of Tilso Ramon Gomez Lugo, a Venezuelan national who, upon information and belief, was transferred by the government from an immigration detention facility in Texas to Guantánamo. Declaration of Gomez Lugo ("Gomez Lugo Decl."), ¶¶ 2, 9, 11. On February 4, Ms. Gomez Lugo saw photographs and a video of immigrant detainees transported to Guantánamo, and immediately recognized her brother, with whom she and her family have not had contact since February 1. *Id.* at ¶¶ 9-11. She believes it is in the best interest of her brother to have access to legal counsel. *Id.*

---

[8] *Supra* n.5.

[9] *Supra* n.4.

[10] *Supra* n.7.

[11] *Supra* n.2.

¶¶ 14-15. She wishes to retain the services of the legal service organizations named in this case to represent her brother. *Id*. ¶ 15.

Plaintiff Ms. Angela Carolina Sequera is the mother of Yoiker David Sequera, a Venezuelan national who, upon information and belief, was detained in the United States during his removal proceedings and transferred by the government from an immigration detention facility in Texas to Guantánamo. Declaration of Angela Carolina Sequera ("Sequera Decl.") ¶¶ 2-3, 6-8. Ms. Sequera was in near-daily contact with her son and last spoke to him on February 8, 2025, when he was at the El Paso Processing Center. She was shocked to receive a call the next day from another person detained at that detention facility, stating that her son had been notified that he would be transferred to Guantánamo. *Id.* ¶¶ 6-8. Ms. Sequera has made numerous calls to Immigration and Customs Enforcement ("ICE") in an effort to locate her son and speak with him, to no avail. *Id.* ¶ 20. She is distraught over the lack of information about her son's whereabouts. *Id.* ¶ 11. Ms. Sequera wishes to retain the services of the legal service organizations named in this case to represent her son. *Id.* ¶ 12.

Plaintiff Ms. Yajaira Del Carmen Castillo Rivera is the older sister of Luis Alberto Castillo Rivera, a Venezuelan national who, upon information and belief, was detained at the El Paso Processing Center after entering the United States, and was transferred by the government to Guantánamo. Declaration of Yajaira Del Carmen Castillo Rivera ("Castillo Decl."), ¶¶ 2-5. Ms. Castillo spoke regularly with her brother, and last heard from him on February 3, 2025, when he told her he believed he would soon be released from custody. But when Ms. Castillo later saw online photos of people being transferred to Guantánamo, she immediately recognized her brother. Castillo Decl. ¶ 4. Since then, she has received no information about where her brother is, or how to talk with him. *Id.* ¶ 6. She is deeply worried about her brother, and wishes to retain the services

of the legal service organizations named in this case to represent her brother. *Id.* ¶ 7.

Plaintiff Legal Service Organizations are four Texas- and Florida-based legal nonprofit organizations that advocate for and vindicate the rights of immigrants in the United States, including detained immigrants, asylum seekers, and others seeking humanitarian protections. *See* Declaration of Edna Yang ("Am. Gateways Decl."), ¶¶ 3-5; Declaration of Paul Chavez ("AI Justice Decl."), ¶¶ 3-5; Declaration of Jennifer Babaie ("Las Americas Decl."), ¶¶ 2, 4-5; Declaration of Javier Hidalgo ("RAICES Decl."), ¶¶ 2-3. To further their missions, these organizations provide direct legal representation, Know Your Rights trainings on the immigration process, assistance with parole, bond and other means of seeking release from detention (including habeas), civil rights complaints regarding conditions of confinement, and otherwise advocate on behalf of detained immigrants. Am. Gateways Decl. ¶¶ 7-13; AI Justice Decl. ¶¶ 3-5, 9-10; Las Americas Decl. ¶¶ 4-7; RAICES Decl. ¶¶ 4-5, 7-11.

The Legal Service Organizations seek to consult with and provide legal services to detained immigrants at Guantánamo who were originally apprehended and detained on U.S. soil. Am. Gateways Decl. ¶¶ 15; AI Justice Decl. ¶¶ 9-12; Las Americas Decl. ¶¶ 12, 15; RAICES Decl. ¶¶ 10-11, 17 The Legal Services Organizations are especially concerned that immigrants detained at Guantánamo may be deprived of their rights, including that they may have been erroneously denied access to the asylum process; that the government may be seeking to deport them to a country where they will be persecuted or tortured; that they may be at risk of unlawful detention; and, they may be subject to punitive conditions and mistreatment. Am. Gateways Decl. ¶¶ 14, 20-21; AI Justice Decl. ¶¶ 6, 8-12; Las Americas Decl. ¶¶ 9, 17, 22; RAICES Decl. ¶¶ 13, 22.

Since flights to Guantánamo began on February 4, the Legal Service Organizations have had clients transferred from ICE detention locations without any notice, and clients have been told

by ICE that they would be sent to Guantánamo. Am. Gateways Decl. ¶¶ 17-18; Las Americas Decl. ¶¶ 11, 13-14, 18-20; RAICES Decl. ¶¶ 15, 18. The Legal Service Organizations have expended significant staff time and resources to track their clients' locations, request information from detention centers and ICE officials regarding the location of their clients, follow up with concerned family members, advocate against transfers, adjust existing protocols and training, and attempt communication with individuals transferred to Guantánamo. Am. Gateways Decl. ¶¶ 17-18, 22-24; AI Justice Decl. ¶¶ 14-15; Las Americas Decl. ¶¶ 11, 14, 18-21; RAICES Decl. ¶¶ 15 19-20. The Legal Service Organizations wish to communicate with detained immigrants at Guantánamo to advise them of their rights and offer legal services for those who wish to retain them. Am. Gateways Decl. ¶¶ 14-15, 20-21; AI Justice Decl. ¶¶ 14-15; Las Americas Decl. ¶¶ 11, 14, 18-21; RAICES Decl. ¶¶ 15, 19-20.

By bringing them to Guantánamo from immigration detention facilities inside the United States, the government is holding Mr. Gomez Lugo, Mr. Sequera, Mr. Castillo, and the other detained immigrants in a legal black box. Plaintiffs' counsel have made repeated attempts to contact Mr. Gomez Lugo, including multiple inquiries via email and phone to the El Paso Processing Center in Texas, two detention facilities near Miami, Florida, and ICE deportation officers. Decl. of My Khanh Ngo ("Ngo Decl.") ¶¶ 4-10. Although ICE's own online Detainee Locator stated that Mr. Gomez Lugo was at the El Paso Processing Center until the morning of February 10, counsel confirmed with ICE that he had been transferred from El Paso to Miami on February 4. *Id*. ¶¶ 3-5. On February 10, an ICE deportation officer at the ICE Miami Field Office stated that Mr. Gomez Lugo was still in ICE custody but was "in transit." ICE would not provide counsel any further details of Mr. Gomez Lugo's location or any means of communicating with him. *Id*. ¶¶ 10, 14.

Similarly, when Ms. Sequera learned that her son had been told he would be transferred to Guantánamo, ICE's online detainee locator continued to show Mr. Sequera's location as the El Paso Processing Center. Sequera Decl. ¶ 10. However, on February 10, an ICE employee informed counsel during a telephone conversation that Mr. Sequera may no longer be at the facility and advised counsel to call back the next day. Ngo Decl. ¶ 11. On February 11, counsel received confirmation over email that Mr. Sequera was no longer at the El Paso Processing Center. *Id*. ¶ 12. Later that morning, the ICE detainee locator was updated to reflect that he was in ICE custody in "Florida" and directed the viewer to call the ICE field office for the detainee's detention facility. *Id*. Counsel made repeated calls to both the ICE field offices in Plantation, Florida, and El Paso, Texas, but was unable to reach anybody to confirm Mr. Sequera's location. *Id*. ¶ 14. ICE has not provided counsel with any information on how to contact Mr. Sequera. *Id*.

Counsel has also attempted to locate and contact Mr. Castillo. On February 11, ICE's online detainee locator stated that he was in ICE custody in "Florida," and also directed the viewer to call the ICE field office for the detainee's location. *Id*. ¶ 13. Counsel made repeated calls, but was unable to reach anyone to confirm Mr. Castillo's location. *Id*. ¶ 14.

Plaintiff Legal Service Organizations have also made multiple inquiries to local ICE detention facilities and offices, as well as through the ICE's Online Detainee Locator System to inquire about the location of clients believed to have been transferred to Guantánamo, to no avail. Am. Gateways Decl. ¶¶ 18, 22; Las Americas Decl. ¶¶ 11, 18; RAICES Decl. ¶¶ 15, 19. And despite an urgent request on February 7 from civil rights groups, including the Plaintiff Legal Services Organizations, for information about and access to the transferred immigrants, the government has not provided any information to Plaintiffs or the public regarding the detainees' conditions of confinement, including protocols or procedures for attorney–client communication.

The government provided no direct response to the letters' signatories.[12]

Mr. Gomez Lugo, Mr. Sequera, Mr. Castillo, and the other detained immigrants flown to Guantánamo from the United States have not had any means to contact their family, attorneys, or anyone else in the outside world. They are thus being held in conditions with less access to counsel than immigrants detained in U.S. Immigration and Customs Enforcement facilities in the United States, incarcerated individuals in Federal Bureau of Prisons ("BOP") custody, and even law-of-war prisoners at Guantánamo.

## LEGAL STANDARD

To obtain a temporary restraining order or a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *see Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (CJN), 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025). The standards for issuing a temporary restraining order and a preliminary injunction are "the same." *Doe v. McHenry*, No. 1:25-cv-286-RCL, 2025 WL 388218, at *2 (D.D.C. Feb. 4, 2025).

Courts in this Circuit have traditionally applied these factors on a sliding scale, where a stronger showing on some factors can compensate for a weaker showing on others. *See id.* The Court of Appeals has suggested, but not decided, that a likelihood of success on the merits may be

---

[12] DHS Assistant Secretary Tricia McLaughlin, however, posted a response referencing the letter on the social media site X, formerly known as Twitter, stating that "If the AMERICAN Civil Liberties Union cares more about highly dangerous criminal aliens that include murderers and vicious gang members than they do about American citizens then they should change their name." Tricia McLaughlin, @TriciaOhio, X (Feb. 7, 2025, 11:58 AM), https://x.com/TriciaOhio/status/1887908693112480253 [https://perma.cc/73AB-TH6B].

required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22)*.* Under either approach, Plaintiffs are entitled to a TRO.

## ARGUMENT

**I.    Plaintiffs Gomez Lugo, Sequera, Castillo, and the Legal Service Organizations Have Standing to Seek the Relief Requested on Behalf of the Immigrant Detainees.**

**A.    Plaintiffs Have Standing as Next Friends of the Immigrant Detainees.**

Ms. Gomez Lugo, Ms. Sequera, Ms. Castillo, and the Legal Service Organizations have next friend standing to seek access to counsel for the detained immigrants. Next friend standing has "long been an accepted basis for jurisdiction in certain circumstances," *Whitmore v. Arkansas*, 495 U.S. 149, 162 (1990), and is codified in the federal habeas statute, 28 U.S.C. § 2242 (allowing application for the writ to be "signed and verified by the person for whose relief it is intended *or by someone acting in his behalf*" (emphasis added)). Next friend standing allows an individual or organization to pursue a habeas petition on behalf of a detained person where that person is unable to seek judicial relief on his own behalf. *Whitmore*, 495 U.S. at 161–63. The Supreme Court has identified two requirements for next friend standing: first, that the detained person cannot prosecute the action on his own behalf, including because of inaccessibility; and second, that the next friend is "truly dedicated to the best interests" of the detainee. *Id.* at 163–64. Plaintiffs satisfy both criteria.

First, the detained immigrants cannot seek judicial relief on their own behalf because the government is holding them under secret conditions at a military prison facility in Guantánamo and has entirely denied them access to counsel and to the outside world. The government has not updated its online detainee locator system to reflect the detention of individuals at Guantánamo. ICE's online detainee locator system, located at https://locator.ice.gov/odls/, states only that Mr. Gomez Lugo, Mr. Sequera, and Mr. Castillo are in ICE custody, listed under Florida, and directs

the viewer to "Call Field Office." Ngo Decl. ¶¶ 10, 12-13. However, despite repeated calls to ICE field offices in Plantation, Florida, and El Paso, Texas, counsel has been unable to reach anyone to confirm the location for Mr. Gomez Lugo, Mr. Sequera or Mr. Castillo, or obtain information on how to contact any of them. *Id.* ¶ 14.  The government has not notified Ms. Gomez Lugo, Ms. Sequera, or Ms. Castillo of their family member's detention at Guantánamo or notified family members or counsel for any of the other immigrant detainees transferred there, despite repeated attempts to locate them via telephone and email inquiry to immigration detention facilities and ICE deportation officers. Gomez Lugo Decl. ¶¶ 3, 15; Sequera Decl. ¶¶ 8, 10; Castillo Decl. ¶ 6; Ngo Decl. ¶¶ 10, 12-14.

Second, Plaintiffs are dedicated to the detained immigrants' best interests. Ms. Gomez Lugo and Ms. Castillo are dedicated to the best interests of their detained brothers, as is Ms. Sequera for her son. Gomez Lugo Decl. ¶¶ 14-15; Castillo Decl. ¶ 7; Sequera Decl. ¶ 11. And the Legal Service Organizations are committed to upholding the constitutional and statutory rights of immigrants and refugees. Am. Gateways Decl. ¶¶ 14, 20-21, 23; AI Justice Decl. ¶¶ 3, 6, 14, 16; Las Americas Decl. ¶¶ 9, 12, 15-17; RAICES Decl. ¶¶ 6, 11, 21. As "institution[s] with an established history of concern for the rights of individuals in the detainees' circumstances," there is no doubt that Legal Service Organizations are "truly dedicated to the best interest of the detainees." *Coal. of Clergy v. Bush*, 310 F.3d 1153, 1167 (9th Cir. 2002) (Berzon, J., concurring). The Legal Service Organizations have provided legal representation to hundreds of asylum seekers and other noncitizens, including those with final orders who are detained pending removal. Am. Gateways Decl. ¶¶ 7-14; AI Justice Decl. ¶¶ 3-4, 8-9; Las Americas Decl. ¶¶ 15, 19-21; RAICES Decl. ¶ 5. And they have written to the government requesting access to the detainees to inform them of their rights and afford them the opportunity of legal representation. Am. Gateways Decl.

¶ 19; AI Justice Decl. ¶ 17; Las Americas Decl. ¶ 23; RAICES Decl. ¶ 17. This request has been

"met with silence." *ACLU on behalf of Unnamed U.S. Citizen v. Mattis*, 286 F. Supp. 3d 53, 58

(D.D.C. 2017) (Chutkan, J.); *see* Am. Gateways Decl. ¶ 19; AI Justice Decl. ¶ 17; Las Americas

Decl. ¶ 23; RAICES Decl. ¶ 17.

 Notably, next friend standing does not require an existing personal relationship (although

it if did, of course Ms. Gomez Lugo and Ms. Castillo have one with their brothers and Ms. Sequera

with her son). *See, e.g.*, *Mattis*, 286 F. Supp. 3d at 58–60. The Supreme Court did not adopt any

such requirement in *Whitmore*, 495 U.S. at 163–64, and the D.C. Circuit has not adopted one,

either.[13] Instead, the "contours" of any requisite relationship for next friend purposes "must

necessarily adapt to the circumstances facing each individual detainee." *Coal. of Clergy*, 310 F.3d

at 1162 (panel op.) (cautioning against an overly rigid interpretation of "significant relationship"

and adopting a flexible approach). In particular, no prior relationship with a detainee is required

where, as here, "none is practically possible." *Id.* at 1167 (Berzon, J., concurring); *see Mattis*, 286

F. Supp. 3d at 59; *cf. Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986) (Bork, J., sitting

as a single Circuit Judge) (construing federal habeas statute to vest jurisdiction in the D.C. Circuit

for a detainee being held in an unknown location because "it is essential that [the] petitioner not

be denied the right to petition for a writ of habeas corpus").

 A recent case in this Court is highly instructive. In *Mattis*, news reports indicated that the

U.S. military had detained a U.S. citizen in Iraq as an alleged "enemy combatant," without access

to counsel or the outside world. *See* 286 F. Supp. 3d at 55. The ACLU, relying only upon the news

---

[13] *See, e.g.*,  *Mattis*, 286 F. Supp. 3d at 58; *see also Sanchez-Velasco v. Sec'y of Dep't of Corr.*,
287 F.3d 1015, 1026 (11th Cir. 2002) (explaining that a significant relationship is but "*one means*
by which the would-be next friend can show true dedication to the best interests of the person on
whose behalf he seeks to litigate" (emphasis added)).

reports, and without knowledge of the citizen's identity or any previous connection to him, filed a habeas petition as his next friend, "requesting the court to order the Defense Department to allow counsel for the ACLU[] to meet and confer with the detainee so that they may advise him of his legal rights and provide him with legal assistance," if he desired it. *Id.* The government opposed the ACLU's next friend standing on two grounds, both of which the Court rejected. *Id.* at 60.

First, the government argued that the ACLU could not meet *Whitmore*'s first prong— dedication to the detainee's best interests—because it "ha[d] not conferred or met" with him. *Id.* at 57–58. But the Court rejected that argument, finding it "disingenuous at best, given that the Department is the sole impediment to the ACLU[]'s ability to meet and confer with the detainee." *Id.* at 58.

Second, the government argued that the ACLU could not meet *Whitmore*'s second prong because "a significant relationship—i.e., such as that of a close family member or previous attorney—is necessary in order to establish next friend standing." *Id.* at 59. The Court rejected that argument, agreeing with Judge Berzon's opinion in *Coalition of Clergy* that next friend standing is satisfied in the absence of an existing significant relationship where (1) a petitioner demonstrates a commitment to the real party's best interests and makes reasonable attempts to establish a relationship, and (2) the circumstances preclude the real party's representation by other means. *Id.* (discussing *Coal. of Clergy*, 310 F.3d at 1168 (Berzon, J., concurring)). The Court was satisfied that the ACLU had met both of those elements. *Id.*[14]

---

[14] By contrast, judges have denied next friend standing in the absence of a significant relationship to the detainee only in instances where detainees had other means of securing representation and accessing the courts. *See, e.g.*, *Hamdi v. Rumsfeld*, 294 F.3d 598, 606 (4th Cir. 2002) (next friend standing denied to public defender where detainee's father had already filed a petition); *Coal. of Clergy*, 310 F.3d at 1162 (next friend standing denied where group had made no "effort to even communicate with the detainees); *id.* at 1167 (Berzon, J., concurring) (group was "ad-hoc" and lacked an "established history of concern for the rights of individuals in the

Finally, it would upend the purpose of habeas corpus if the government could, through its refusal to provide access, undermine any claim to next friend standing. Flexibility has always been essential to ensure that the fundamental purpose of habeas corpus is maintained. *See, e.g.*, *Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (habeas "never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty") As the district court in *Coalition of Clergy* explained:

> [T]he mere failure of a "next friend" to establish direct communication with the prisoner and obtain explicit authorization from him [cannot be] enough to preclude 'next friend' petitioners. . . . If it were, then there would be an incentive for the government to keep all captives, even United States citizens, incommunicado.

*Coal. of Clergy v. Bush*, 189 F. Supp. 2d 1036 (C.D. Cal. 2002). Similarly, as one treatise presciently warned: "If third parties were not allowed to initiate proceedings a captor acting unlawfully would only have to hold his prisoner in especially close custody to prevent any possibility of recourse to the courts." R.J. Sharpe, *The Law of Habeas Corpus* 237 (3d. ed. 2011). For hundreds of years, courts have thus recognized that in circumstances that preclude the intervention of a next friend with a preexisting relationship, habeas jurisdiction should not be defeated as a result. *See, e.g.*, *Case of the Hottentot Venus*, 13 East 195, 104 Eng. Rep. 344 (K.B. 1810) (providing next friend status to a society seeking to represent the interests of Saartje Baartman, a woman who the society alleged had been abducted and detained under the name "Hottentot Venus").

---

detainee['s] circumstances"); *Does v. Bush*, No. CIV.A.05 313 CKK, 2006 WL 3096685, at *5 (D.D.C. Oct. 31, 2006) (next friend standing denied to counsel where detainees had already "been able to file petitions before the Court in large numbers," and "ha[d] been appointed counsel").

### B.    Plaintiffs Have Third Party Standing.

Relatedly Plaintiffs also have third-party standing to assert claims on behalf of the detained immigrants. To establish third-party standing, a party must demonstrate (1) an "injury in fact" that gives them a "sufficiently concrete interest in the outcome," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect [their] own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (cleaned up). Plaintiffs meet all three requirements.

First, they have injuries in fact. In the organizational context, this element is satisfied by showing harm to the organization. *See Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec. (AIJ)*, No. 22-cv-3118, 2023 WL 1438376, at *9 (D.D.C. Feb. 1, 2023). Organizational injury is established where (1) defendants' "action or omission to act injured the [organization's] interest" and (2) "the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack,* 808 F.3d 905, 919 (D.C. Cir. 2015) (cleaned up). The Legal Service Organizations satisfy both prongs. As set forth more fully in their declarations, the government's total blackout on information about the detained immigrants inhibits their ability to access prospective clients, thereby "thwart[ing]" their ability to provide "litigation and advocacy . . . for those in government custody." *S. Poverty L. Ctr. v. Dep't of Homeland Sec. (SPLC),* No. CV 18-760 (CKK),, 2020 WL 3265533, at *12–13 (D.D.C. June 17, 2020); *see also AIJ*, 2023 WL 1438376, at *7 (holding that a legal organization whose access to potential clients has been hindered by government action has organizational standing to challenge such action); Am. Gateways Decl. ¶¶ 15-18, 20-21; AI Justice Decl. ¶¶ 8-16; Las Americas Decl. ¶¶ 11-22; RAICES Decl. ¶¶ 15, 19-21. As a result of this impairment, the organizational plaintiffs must divert additional resources to combat the harm. They must expend more time and financial and logistical resources to determine the identities of the detained immigrants and attempt to communicate with them. *See SPLC*, 2020 WL 3265533, at

*13; Am. Gateways Decl. ¶¶ 15, 22-24; AI Justice Decl. ¶¶ 14-15; Las Americas Decl. ¶¶ 11, 18-21; RAICES Decl. ¶¶ 19-20. Likewise, Ms. Gomez Lugo, Ms. Sequera, and Ms. Castillo have suffered concrete injury because they are, respectively, unable to contact and communicate with their brothers and son. Gomez Lugo Decl. ¶ 3; Sequera Decl. ¶ 11-12; Castillo Decl. ¶ 6-7.

Second, Plaintiffs have a "close relation" to the detained immigrants because there is "an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 44 (D.C. Cir. 1999). As to Ms. Gomez Lugo and Ms. Castillo, they are by definition closely related to their brothers, and the same is true for Ms. Sequera as to her son. Gomez Lugo Decl. ¶ 2; Castillo Decl. ¶ 2; Sequera Decl. ¶ 3.

In addition, the Legal Service Organizations share the same interest as the detained immigrants in obtaining access to counsel to facilitate legal representation. *See Powers*, 499 U.S. at 413; Am. Gateways Decl. ¶¶ 14-15, 20-21, 23; AI Justice Decl. ¶¶ 6, 9-10, 12; Las Americas Decl. ¶¶ 9, 22; RAICES Decl. ¶¶ 6, 13, 21. Moreover, the Supreme Court has found a close relationship where the challenged government activity prevents a prospective client "from entering into a relationship with [the attorney], to which relationship the [client] has a legal entitlement (typically a constitutional entitlement)." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720–21 (1990) (Scalia, J.) (finding third party standing based on constitutional rights of prospective client); *see also AIJ*, 2023 WL 1438376, at *9 n.8 (citing *Triplett*, 494 U.S. at 721). The Legal Services Providers have undertaken efforts to obtain information about individuals detained at Guantánamo, including attempts to locate them in ICE's Online Detainee Locator System, and via multiple email and phone inquiries to detention facilities and detention officers. Am. Gateways Decl. ¶¶ 18, 22; AI Justice Decl. ¶ 14; Las Americas Decl. ¶¶ 11, 18, 20; RAICES Decl. ¶¶ 15, 18-19. They therefore "actively seek" to establish an attorney–client relationship with the detained immigrants,

but the government's actions—including refusal to provide location of detainees, respond to inquiries, or provide means of attorney-client communication—have frustrated these efforts. Am. Gateways Decl. ¶¶ 18, 22; AI Justice Decl. ¶ 14; Las Americas Decl. ¶¶ 11, 18, 20; RAICES Decl. ¶¶ 15, 18-19; *cf. AIJ*, 2023 WL 1438376, at *10 (finding lack of close relation because organization did *not* maintain or actively seek an attorney–client relationship).

Third, as discussed above, the detained immigrants are hindered in their ability to protect their own rights. Where "communications restrictions . . . prevent sufficient access to judicial process," the rights of third-party detainees "are *in fact* hindered." *AIJ*, 2023 WL 1438376, at *11; *see also SPLC I*, 2020 WL 3265533, at *14. All of the immigrant detainees easily satisfy this "relatively low threshold" because they have *no* contact with the outside world, let alone access to judicial process. *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016); Am. Gateways Decl. ¶¶ 15-18; AI Justice Decl. ¶ 7; Las Americas Decl. ¶ 13; RAICES Decl. ¶¶ 14-15. "[S]ystemic practical challenges to pursuing one's own rights" or the "'imminent mootness' of a case" are additional hindrances that can justify third-party standing. *United States v. TDC Mgmt. Corp.*, 263 F. Supp. 3d 257, 274 (D.D.C. 2017) (quoting *Singleton v. Wulff*, 428 U.S. 106, 117 (1976)). Both factors are present here. The government has blocked them from contacting their families or counsel who can assist them in pursuing legal claims. Ngo Decl. ¶¶ 10, 14; Am. Gateways Decl. ¶¶ 16-19; AI Justice Decl. ¶¶ 6-7, 11-14; Las Americas Decl. ¶¶ 11-20; RAICES Decl. ¶¶ 18-19. *See SPLC I*, 2020 WL 3265533, at *14.

## II.    Plaintiffs Are Likely to Succeed on the Merits.

### A.  The Government's Denial of Access to Counsel Violates the Detained Immigrants' Rights.

#### 1.    The Government's Denial of Access to Counsel Violates the Detained Immigrants' Right to Habeas Corpus.

For two decades, this Court has held that where military prisoners at Guantánamo have a right to access the courts through applications for writs of habeas corpus, they "cannot be expected to exercise this right" in a meaningful way "without the assistance of counsel." *Al Odah*, 346 F. Supp. 2d at 8; *see Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 22 (D.D.C. 2005) ("[A]ccess to the Court means nothing without access to counsel."). That principle has been so widely accepted in this Court that, when years later, the government sought to alter established counsel access procedures for the military detainees at Guantánamo, this Court was "somewhat nonplussed as to why the counsel-access issue [wa]s being re-litigated at all." *In re Guantanamo Bay Detainee Continued Access to Couns.*, 892 F. Supp. 2d 8, 16 (D.D.C. 2012) (discussing *Al Odah*, 346 F. Supp. 2d at 5–14); *see id.* at 15 n.10 ("Indeed, the Government agrees that 'the right to counsel attaches to the prisoner's right of access to the courts.'" (quoting government counsel at a hearing)). In fact, this Court has held that a Guantánamo petitioner's right to counsel to pursue habeas relief is so elemental that it even applies where petitioners "are not actively litigating habeas petitions." *Id.* at 16–18.

The same principle—applied in cases of prisoners captured *outside* the United States and held under wartime authority—unquestionably applies here to civil immigration detainees brought to Guantánamo from *inside* the United States. "[I]t is emphatically the duty of the Courts to assure access to habeas relief," and "'petitioners' access to attorneys is not a matter of Government discretion.'" *Id.* at 19 (quoting *Al Odah*, 346 F. Supp. 2d at 10). The government may not unilaterally deny access to counsel to the detained immigrants at Guantánamo, yet that is precisely what it is doing.

2.    **The Government's Denial of Access to Counsel Violates the Detained Immigrants' First Amendment Rights.**

The wholesale restriction of attorney–client communication violates the First Amendment rights of the immigrant detainees. The First Amendment guarantees all persons—even prisoners—freedom of speech. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974). "The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association, and petition." *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000). Under "clearly established First Amendment rights of association and free speech," detainees have the right to "retain and consult with an attorney," *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990); *Lashbrook v. Hyatte,* 758 F. App'x 539, 541 (7th Cir. 2019) ("The First Amendment protects a prisoner's right to consult with an attorney."). Detainees have a First Amendment right to "communicate with persons outside prison walls," *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002); and barriers to legal communication between a prisoner and counsel merit "heightened concern" given the "import for the prisoner's legal rights." *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2002).

When a detainee has a right to counsel, the government cannot impose conditions of confinement that unnecessarily burden that right. *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1067 (C.D. Cal. 2019) (holding that allegations of "overly-restrictive" policies hindering immigrant detainees' ability to "hire and consult with an attorney" sufficiently stated a First Amendment claim to "communicate with the outside world"); *see also Al Odah*, 346 F. Supp. 2d at 9 (holding that government may not "inappropriately burden th[e] [attorney–client] relationship" for Guantánamo law-of-war detainees).

The government's total ban on attorney–client communication violates the detained immigrants' First Amendment rights. The government's blanket denial of attorney access at Guantánamo lacks any reasonable relation to legitimate governmental interests. As noted, even

post-9/11 detainees held by the military at Guantánamo can communicate with counsel. Declaration of Shayana Kadidal ("Kadidal Decl.") ¶¶ 8-19; *In re Guantanamo Bay Detainee Litigation*, 577 F. Supp. 2d 143, 156–60 (D.D.C. 2009); *Al Odah*, 346 F. Supp. 2d at 12–13, 15. And this Court has rejected as "thinly supported" the government's national security justifications for denying counsel and placing restrictions on confidential attorney communications, even for the alleged enemy combatants at Guantánamo. *Al Odah*, 346 F. Supp. 2d at 10.

Nor can the government claim that it lacks the infrastructure to support attorney access, including telephone calls and videoconferencing. Kadidal Decl. ¶¶ 16-19. The base has established a rigorous attorney-access protocol that accounts for unique national security issues raised by the detention of alleged enemy combatants. *See, e.g.*, *In re Guantanamo Bay Detainee Litigation*, 577 F. Supp. 2d at 156–60; *Al Odah*, 346 F. Supp. 2d at 12–13, 15. In comparison, attorney–client communication in the civil immigration detention context does not require consideration of factors such as the management of classified information. Kadidal Decl. ¶ 10. There is simply no basis for denying detained immigrants their First Amendment right to access counsel.

### 3.    The Government's Ban on Access to Counsel Violates the Fifth Amendment Substantive Due Process Right Against Punishment for Civil Immigrant Detainees.

The government's total denial of attorney access also violates the detainees' Fifth Amendment due process right to be free from punishment in civil detention. The framework for due process challenges to the denial of attorney access is fully set forth in a pair of decisions by Judge Kollar-Kotelly. *See SPLC,* 2020 WL 3265533, and *AIJ*, 2023 WL 1438376.

Immigration detention is "'undisputedly civil—*i.e.*, non-punitive in nature.'" *SPLC*, 2020 WL 3265533, at *18 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 187 (D.D.C. 2015)). Those held in immigration detention therefore have a due process right not to be subjected to any

"condition, practice, or policy [that] constitutes punishment." *Block v. Rutherford,* 468 U.S. 576, 583 (1984); *see also SPLC*, 2020 WL 3265533, at *18.

As Judge Kollar-Kotelly's decisions make clear, immigrants in civil detention have at least the same rights against punitive conditions of confinement as those detained pending a criminal trial, and that includes the right not to have their access to counsel eliminated. *SPLC*, 2020 WL 3265533, at *18–19 & n.6; *Youngberg v. Romero*, 457 U.S. 307, 315-16 (1982); *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004). Indeed, where civil detainees are subjected to more restrictive conditions, including restrictions on counsel access, than convicted prisoners, there is a "presumption" that the restrictions are unconstitutional. *AIJ*, 2023 WL 1438376, at *12. Here, the government cannot overcome that presumption given its total elimination of the immigrant detainees' access to counsel.

The attorney access conditions for civil immigrant detainees at Guantánamo "are equal to or worse than conditions experienced by inmates convicted of a criminal offense," and the government cannot show that the restrictions "are rationally related to a non-punitive purpose and those conditions are not excessive." *Id.* at *12–13. The immigrants at Guantánamo are totally cut off from the outside world. In contrast, Federal BOP regulations and policy guarantees that at a minimum, its prisons provide attorney visits in a "private conference room, if available," 28 C.F.R. § 543.13(a)-(b), allow confidential legal mail, 28 C.F.R. § 540.19(a), and facilitate at least some unmonitored legal telephone calls, 28 C.F.R. § 540.102; Ngo Decl. Ex. D at 10–12.[15] This stark comparison establishes a presumption that government's denial of attorney access is unconstitutional punishment. *See SPLC*, 2020 WL 3265533, at *30 (holding that evidence that

---

[15] Exhibit D is a copy of the BOP policy regarding telephone calls, which were until recently available on the BOP website. Plaintiffs submit a copy of this policy that the BOP produced in FOIA litigation on January 31, 2025. Ngo Decl. ¶ 18.

attorney access in ICE detention is worse than in BOP custody "supports that these conditions [in ICE detention] are likely to be punitive"); *Torres*, 411 F. Supp. 3d at 1064 (same based on comparison to pretrial and prison facilities).

The government has provided no justification for the complete lack of attorney access to immigrants detained at Guantánamo, and it is hard to imagine what legitimate purpose that might serve. Insofar as the government may have legitimate non-punitive goals for a complete denial of access, those purposes "could be accomplished in so many alternative and less harsh methods." *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979); *see also SPLC*, 2020 WL 3265533, at *30. The government cannot therefore defeat the presumption of unconstitutional punishment because it cannot "establish that the conditions are rationally related to a non-punitive purpose and those conditions are not excessive." *AIJ*, 2023 WL 1438376, at *12. Here, the restrictions on communication with the outside world are so severe that the government has "effectively blocked attorney-access *in toto*, [and] there is no constitutionally sufficient justification to avoid finding such a restriction 'excessive' and, therefore, punitive." *Id.* at *17.

Multiple "alternative and less harsh methods"—short of *no access at all*—"are available that equally serve the institution's legitimate interests." *Id.* at *12 (quotation marks and citations omitted). The fact that, under rulings from this Court, the Department of Defense is providing attorney access to post-9/11 detainees shows that the government is capable of providing access to counsel to people detained on the base. *See also In re Guantánamo Bay Detainee Litigation*, 577 F. Supp. 2d at 156–63 (describing attorney access); Kadidal Decl. ¶¶ 8-19.

### 4.    The Government's Denial of Access to Counsel Violates the Immigrant Detainees' Statutory and Regulatory Rights to Counsel.

The Immigration and Nationality Act ("INA") and its implementing regulations enshrines the right to counsel of choice. *See* 8 U.S.C. §§ 1229a(b)(4)(A), 1362; 8 C.F.R. §§ 1003.16(b),

1240.3; *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 11 (D.D.C. 2020) (recognizing "a number of procedural guarantees [including] . . . representation by counsel"). This statutory right is not confined to a noncitizen's formal "removal proceedings;" instead, "[t]he INA gives non-citizens the right to be represented by an attorney in most [aspects of] immigration proceedings as long as the government does not have to bear the expense." *Zuniga v. Barr*, 946 F.3d 464, 469 (9th Cir. 2019) (holding that individuals have a statutory right to counsel in reasonable fear proceedings). Thus, multiple courts recognize how "fundamental" this right to counsel is to vindicate the other rights that noncitizens have pursuant to the INA and the fairness of those proceedings. *See Leslie v. Att'y Gen.*, 611 F.3d 171, 181-92 (3d Cir. 2010); *Orantes-Hernandez v. Thornburg*, 919 F.2d 549, 554 (9th Cir. 1990) (citing *Lozada v. INS*, 857 F.2d 10, 13 (1st Cir. 1988); *United States v. Saucedo–Velasquez*, 843 F.2d 832, 834–35 n. 2 (5th Cir. 1988); *Cobourne v. INS*, 779 F.2d 1564, 1566 (11th Cir. 1986); *Casteneda-Delgado v. INS*, 525 F.2d 1295, 1300 (7th Cir. 1975)).

The right to counsel clearly protects more than the retainer on paper; the "right [to counsel] must be respected in substance as well as in name." *Orantes-Hernandez*, 919 F.2d at 554 (quoting *Baires v. INS*, 856 F.2d 89, 91 n.2 (9th Cir. 1988)). In order to mean anything, the right to counsel must protect certain rights and procedures to fully access and effectuate that right. For instance, the statutory right to counsel includes the right to be informed of the right to counsel and of the availability of free legal services. *Leslie*, 611 F.3d at 182 (noting that these procedures are "manifestly designed to protect [the] fundamental statutory and constitutional right to counsel," as an immigrant may have difficulty locating and accessing counsel and may only be able to obtain counsel through low-cost or free legal services).

Courts have held that even transfers far away from counsel, in a way that impedes representation, violates this right to counsel. *See, e.g.*, *Orantes-Hernandez*, 919 F.2d at 564; *Chlomos v. INS*, 516 F.2d 310, 312-14 (3d Cir. 1975); *Arroyo v. U.S. Dep't of Homeland Sec.*, No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019). Here, there is not just an impediment but a total ban. For the same reasons discussed above, there is no justification for the government to completely deny the immigration detainees their statutory and regulatory right to counsel.

**B.    The Government's Ban on Access to Counsel at Guantánamo Violates the Legal Service Organization's First Amendment Rights.**

The government's complete ban on attorney–client communication also violates the First Amendment rights of the Legal Service Organizations, who seek to provide legal counsel to Mr. Gomez Lugo, Mr. Sequera, Mr. Castillo and other detained immigrants held at Guantánamo who desire their services. The First Amendment protects a lawyer's ability to advise people of their legal rights and solicit prospective litigants. *NAACP v. Button*, 371 U.S. 415, 428-29 (1963). For legal service organizations, "litigation is not a technique of resolving private differences; it is a form of political expression and political association." *In re Primus*, 436 U.S. 412, 428 (1978) (citations omitted). Policies or actions that unreasonably impede communication between attorneys and incarcerated people violate counsel's First Amendment right of expression. *Procunier v. Martinez*, 416 U.S. 396, 408–09 (1974); *American Civil Liberties Union Fund of Michigan v. Livingston Cty.,* 796 F.3d 636, 644 (6th Cir. 2015).

The First Amendment's protections extend to all stages of communication between attorneys and prisoners, including prior to representation. *ACLU of Mich.*, 796 F.3d at 644-45; *Immigrant Defenders Law Ctr. v. Mayorkas*, No. CV 20-9893, 2023 WL 3149243 at *35 (C.D.

Cal. Mar. 15, 2023).[16] There is no justification for the complete abridgement of the right to counsel, much less one weighty enough to override the First Amendment. Accordingly, the Legal Service Organizations' First Amendment rights have been violated.

### III. The Government's Ban on Access to Counsel at Guantánamo Causes Plaintiffs Irreparable Harm.

Plaintiffs are likely to suffer irreparable harm in the absence of emergency relief. "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted); *see also Americans for Immigrant Just.*, 2023 WL 1438376, at *17, 20 (finding irreparable injury where legal service organization demonstrated likelihood of success on the merits that its clients were denied attorney access). Plaintiffs have shown that the government's restrictions on attorney access violate immigrant detainees' constitutional rights. *See* Gomez Lugo Decl. ¶¶ 12, 14-15; Sequera Decl. ¶¶ 8, 11-12; Castillo Decl. ¶¶ 2, 6-7.

The government's total ban on attorney–client communication causes acute harm to immigrants detained at Guantánamo. Immigrant detainees have been transported to an isolated island Naval base, currently held in a prison previously used for post-9/11 military detainees, guarded by military troops, without the ability to contact anyone in the outside world.[17] They are being held incommunicado, without any recourse to challenge any constitutional violations.

---

[16] *Ukrainian American Bar Ass'n v. Baker*, 893 F.2d 1374 (D.C. Cir. 1990), is inapposite. There, the court concluded that there was "no affirmative [First Amendment] right to the government's assistance in identifying and furnishing information to potential clients." *Id.* at 1381. Here, the Legal Service Organizations challenge the government's direct restriction on their ability to communicate with Mr. Gomez Lugo, Mr. Sequera, and Mr. Castillo, who, through their next friends, seek their services, and any other detainees who express a desire for their counsel.

[17] Silvia Foster-Frau, *Why Lawyers Worry Migrants Sent to Guantanamo Are in A 'Legal Black Hole*,' Washington Post, Feb. 9, 2025, https://www.washingtonpost.com/immigration/2025/02/08/guantanamo-migrants-trump-deportations-noem.

The government's ban on attorney access also harms the Legal Service Organizations by hindering them from providing legal representation to detained immigrants, which is central to their organizational missions. *See Pangea Legal Services v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 975 (N.D. Cal. 2021) ("Organizations can establish irreparable injury by showing ongoing harms to their organizational missions, including the organizational mission of representing [] asylum seekers." (cleaned up)); *see also SPLC*, 2020 WL 3265533, at *32. The Legal Service Organizations are impeded in their representation of detained immigrants at Guantánamo because of the government's wholesale failure to provide any means of attorney-client communication. Am. Gateways Decl. ¶¶ 17-18, 20-24; AI Justice Decl. ¶¶ 8-16; Las Americas Decl. ¶¶ 9-22; RAICES Decl. ¶¶ 13-16, 18-22. These harms demonstrate a likelihood of irreparable injury that will continue without relief.

**IV.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.**

The balance of equities and the public interest merge in cases against the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citations omitted). Where the government's ban on attorney access deprives detained immigrants of their constitutional rights and subjects them to irreparable harm, both factors tip in Plaintiffs' favor. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quotation marks and citations omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same) (citations omitted).

The public—and therefore the government—has an interest in protecting the rights of people in detention and ensuring the rule of law. *See Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (such protection "goes to the very heart of the principles and moral precepts upon

which this country and its Constitution were founded"); *Torres*, 2020 WL 3124216, at *9 ("[T]he public has an interest in the orderly administration of justice . . . .").

Finally, the relief sought is narrowly tailored to remove the unconstitutional barriers to access to counsel and is not an undue burden for the government. As discussed above, the government has established counsel access at Guantánamo even for the alleged enemy combatants.

## V.    Request for Temporary Restraining Order

Plaintiffs respectfully request that the Court issue a Temporary Restraining Order that Defendants provide Plaintiffs with the following:

- Scheduled, timely, free, confidential, and unmonitored legal telephone and/or videoconference calls, with accommodations for interpretation;

- Sufficient private, confidential in-person visitation spaces to conduct timely in-person visits, with access to telephonic language interpretation;

- A method for immigrants detained at Guantánamo to place timely, free, confidential, and unmonitored outgoing legal calls;

- A method for timely and confidential document exchange, including communication via fax, email, or electronic signature platforms; courier service; and mail;

- Make publicly available information and protocols for attorney-client communication at Guantánamo via in-person meeting, telephone, videoconference, fax, email, mail, and courier service, via Defendant Immigration and Customs Enforcement's website, and be provided in English and Spanish to all immigrants detained by Defendants at Guantánamo;

- Specifically identify the location of a detainee held at Guantánamo as "Guantánamo" in Defendant Immigration and Customs Enforcement's Online Detainee Locator System within 24 hours of their transfer to Guantánamo;

- Provide all known counsel for immigrants detained in the United States with 72-hour notice of their clients' planned transfer to Guantánamo;

- Provide Plaintiffs' counsel with 72-hour notice of any planned transfer from Guantánamo of a detainee to a country other the United States.

**VI.     The Court Should Not Require Plaintiffs to Provide Security Prior to the Temporary Restraining Order.**

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." However, "courts in this Circuit have found the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal quotation marks, citation, and alterations omitted). District courts exercise this discretion to require no security in cases brought by indigent and/or incarcerated people, and in the vindication of immigrants' rights. *See, e.g. P.J.E.S. by & through Escobar Francisco v. Wolf,* 502 F. Supp. 3d 492, 520 (D.D.C. 2020). This Court should do so here.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' Motion.

Dated: February 12, 2025

Respectfully submitted,

/s/ *Lee Gelernt*

Eunice H. Cho (D.C. Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th floor
Washington, DC 20005
(202) 546-6616
echo@aclu.org

My Khanh Ngo*
Kyle Virgien*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Deepa Alagesan (D.D.C. Bar No. NY0261)
Kimberly Grano (D.D.C. Bar No. NY0512)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (516) 838-7044
dalagesan@refugeerights.org
kgrano@refugeerights.org

Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz*
Noor Zafar*
Omar C. Jadwat*
Wafa Junaid*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org
wjunaid@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.D.C. Bar No.
454248)
J. Wells Dixon*
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, Floor 7
New York, NY 10012
T: (212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

*Pro bono representation certificates
forthcoming*

29