## DECLARATION OF SHAYANA KADIDAL

I, Shayana Kadidal, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I have been a civil rights lawyer at the Center for Constitutional Rights for the last 24 years, working mainly on detention and surveillance cases in the national security context. I am a member in good standing of the bars of the State of New York and the District of Columbia, as well as ten federal courts including the United States Supreme Court. I received my law degree in 1994 from Yale Law School, where I was a member of the law journal, and was afterwards a law clerk to Judge Kermit V. Lipez of the United States Court of Appeals for the First Circuit. I have held a significant role on a large portion of CCR's post-9/11 litigation, including five cases that reached the Supreme Court. *See Rasul v. Bush,* 542 U.S. 466 (2004); *Boumediene v. Bush*, 553 U.S. 723 (2008); *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010); *Ziglar v. Abassi*, 582 U.S. 120 (2017); *Tanzin v. Tanvir*, 592 U.S. 43 (2020). I am currently senior managing attorney of CCR's Guantánamo litigation project, a position I have held since late 2006. In that capacity I have continuously held a Top Secret//SCI security clearance from the Justice Department since 2008. I have made approximately 29 visits to the base during that time.

**Geography and travel**

2. Guantánamo Bay Naval Station is located on a desolate, desertified patch of Southeastern Cuba, significantly farther from the mainland U.S. than the 90 miles that separate Havana from Miami Beach. During the era when battleships were the main means of projecting military power abroad, it was chosen as a prime location for a military base due to its natural deepwater harbor. Our government imposed a permanent lease on the base on Cuba when it was a colony of the United States following the Spanish-American War. The lease asserts that "the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the above described areas of land and water" that now constitute the base, but "on the other hand the Republic of Cuba consents that during the period of the occupation ... the United States shall exercise complete jurisdiction and control over and within said areas." The lease states that the lands and bay are conveyed for the limited purpose "for use as coaling or naval stations only, and for no other purpose."[1] Both parties must consent for the lease to end;[2] it is thus effectively a perpetual leasehold.

3. The more-or-less rectangular patch of land is bisected by the harbor. On the Western "Leeward" side of the bay are the main airport, with an 8000-foot runway capable of landing the largest of military transports, one hotel, one dining hall, a few housing facilities resembling motels, and a ferry landing. The ferry is the main means of connection between this side of the base and the Eastern "Windward" side, where the majority of the 10,000-plus troops, family members and foreign-national service workers stationed at Guantánamo year-round work and reside. The base resembles a small town, with a supermarket, several restaurants and chow halls, public schools, several medium-sized hotels for visitors, and housing tracts that would be famil-

---

[1] Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval stations; February 23, 1903, Article II, *available at* https://avalon.law.yale.edu/20th_century/dip_cuba002.asp.

[2] *Treaty Between the United States of America and Cuba; May 29, 1934*, Article III, *available at* https://avalon.law.yale.edu/20th_century/dip_cuba001.asp#:~:text=Signed%20at%20Washington%2C%20May%2029,States%20of%20America%2C%20and%20Mr..

iar from any suburb in America. On the far southeastern edge of the Windward side, a gated corner of the Naval Station contains the notorious detention camps for which the base is famous.

4. The two remaining functional detention facilities in Camp America are brick-and-mortar prisons built to blueprints from stateside prisons, known as Camps V and VI. Camp V currently houses fifteen alleged "law of war" detainees, held perpetually due to their supposed participation in a global armed conflict against the United States; its present capacity is under 100 beds. Camp VI was empty until ten Venezuelan immigration detainees were brought there on February 4, 2025. Camp VI opened in 2006 with a maximum capacity of 220 beds, including some double-bunked cells; its present capacity is approximately 200 detainees.

5. Travel to the base is by air, with two options currently available. The military commissions operate ad hoc flights calendared around the schedules for pretrial proceedings in the various pending cases. Those flights leave from Joint Base Andrews (formerly known as Andrews Air Force Base), located about 40 minutes east of downtown Washington D.C. These flights are typically on chartered civilian 737s, and reach the base in approximately three and a half hours. Only people with business with the military commissions (including civilian journalists covering the proceedings) are allowed to fly on those flights, however. All other routine travelers to the base[3] now must travel on a flight known as the "Rotator," a weekly flight that occurs every Friday and files a round trip circuit between Naval Air Station Jacksonville, Guantánamo, and Kingston, Jamaica (where many government guest-workers at the base hail from). From Kingston it then reverses direction and returns on the same route to Jacksonville by evening. In either event, whether traveling my military flight from Andrews or Rotator from Jacksonville, it typically takes a full day to a day and a half in transit to travel between New York and Guantánamo.

**Pervasive classification and its consequences for attorney access**

6. After the Supreme Court decided *Rasul v. Bush* in the summer of 2004, recognizing that foreign nationals held there without charge had the right to challenge their detention in *habeas corpus* proceedings, the government initially did not want to allow attorney access to the putative law-of-war detainees held there pursuant to the Authorization for the Use of Military Force (AUMF). It proposed that the content of habeas review should be confined to judicial review of an administrative record created in its own hastily-initiated and conducted Combatant Status Review Tribunals (CSRTs), proceedings where a detainee was not afforded access to counsel or the evidence marshalled against him. (Roughly 90% of detainees were found to be "enemy combatants" through this process.)

7. After it became clear that the district courts would not tolerate blocking attorney access, the government then tried to subject all attorney-client meetings at the base to monitoring for intelligence gathering purposes. *See Al Odah v. United States*, 346 F. Supp. 2d 1, 10 n.11 (D.D.C. 2004) (quoting a government attorney's oral argument assertion that "'[t]here could be important intelligence insights derived from these [attorney-client] communications that would not be derived from the interrogations that have occurred thus far ... I don't understand why the

---

[3] These typically include civilian contractors to the military, habeas attorneys, official human rights observers, visiting family members of soldiers, and soldiers visiting the mainland on personal vacation leave.
   There were formerly a number of civilian charter airlines servicing Guantanamo with smaller places, but the military ceased authorizing those flights some years ago.

court would think that problematic if the information is not going to be used to test the legality of [Petitioners'] detention.'").

8. This Court rejected that extraordinary demand. Instead, Judge Kollar-Kotelly's October 2004 opinion in *Al Odah* set the conditions for attorney access that now govern in the Guantánamo law-of-war cases: habeas attorneys would have unmonitored access to detainees in exchange for presumptive classification of their meeting notes, subject to classification review by a walled-off Privilege Review Team (PRT). The PRT is composed of intelligence and Justice Department officials who are not (and will not ever be) involved in litigation respecting these detainees. *Id*. at 3 n.2. The written notes from such meetings are considered presumptively classified by the government, as are the very contents of the communications exchanged during such meetings, *id*. at 13—meaning that if a lawyer has a great idea in the middle of the night about a factual point discussed in a meeting, she cannot scribble it down on a notepad on her nightstand, but instead has to travel to the Secure Facility built to house the classified records in all of the Guantánamo habeas cases (there is only one), located in Crystal City, Virginia, and commit it to paper there.

9. The initial protective order, hashed out before this Court after months of litigation, was thus the product of a trade-off: the Court rejected the government's proposal for real-time monitoring of attorney-client meetings but, in exchange, allowed for classification of meeting notes, subject to subsequent classification review. *Id*. at 13. The current version of the protective order in effect in these cases reflects this judicially-imposed bargain. *See* Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, *In re Guantanamo Detainee Litig.*, 577 F. Supp. 2d 143, 148 (D.D.C. Sept. 11, 2008). A set of Counsel Access Procedures are appended to the Protective Order, and incorporated into it by reference. *Id*. at 156-64.

10. The central premises of this pervasive classification regime were twofold. First, there was an assumption that the government's factual case supporting detainability would contain classified intelligence information. Second, and more unconventionally, it was presumed that our clients carried classified information around inside their heads—what had been done to them (*e.g.* classified "enhanced interrogation" torture techniques), where those things had been done to them (*i.e.* which countries cooperated), the layout of the facilities in which they had been detained and interrogated,[4] and similar information concerning other detainees they may have encountered along the way. The baseline assumption here—that a client's own statements can be classified even though the client lacks security clearance and has not received the information directly from the government—created absurd results as the litigation has matured. For example, after *Boumediene*, the government has insisted that a client's own draft declaration, sent to his lawyer for review, be classified such that parts of it could not be shown to the client again during meetings. It goes without saying that none of these information-security concerns apply to the immigration detainees rendered from the United States to Guantánamo.

11. In order to conduct a client meeting at Guantánamo, an attorney (or paralegal, or foreign-language interpreter) representing an AUMF detainee must obtain the level of security clearance required by the government. (The Protective Order itself leaves discretion over the level of clearance to the government,[5] and, of course, the decision whether to grant any individual a clearance is ultimately entirely in the government's discretion.) For most AUMF detainees, this is a Secret-level clearance; for a small group of 12 remaining "high value detainees" who

---

[4] *See Al Odah*, 346 F. Supp. 2d at 9.
[5] *See* 577 F. Supp. 2d at 148, section D.16.a.

were held and tortured in CIA black sites, a specialized version of the basic protective order applies, and the government insists on counsel and other litigation participants having Top Secret//Sensitive Compartmented Information (TS//SCI) clearances. Both Secret and Top Secret//SCI clearance requires attorneys (and others) to submit to an invasive background check. The government also mandates that such individuals hold U.S. citizenship.[6]

12. The higher level of clearance required to visit clients who have been thru the CIA's black sites is ascribed to the greater sensitivity of the information stored in their heads: the once-highly-classified "enhanced interrogation [torture] techniques," the nature and subject-matter of any questions that might have been posed by CIA and foreign-country interrogators, and the diplomatically-sensitive fact that otherwise-civilized countries participated in the CIA's program of systematic torture.

13. Guantánamo Bay is considered a forward-operating base, and a theater clearance form is an additional requirement for anyone to enter the base. Even civilian non-lawyer human rights monitors who are allowed to visit the base to observe the military commission hearings in person must have a theater clearance. That "area clearance" is issued at the discretion of the military, but the application form is minimal, asking for only the barest of identifying information *See* SECNAV Form 5512. Journalists travel under similar terms and restrictions.

14. The conditions under which the actual meetings take place are unfamiliar in many ways to conditions attending prison visits stateside. At Guantánamo, even an attorney's physical papers are subject to contraband search. No electronic devices are permitted in meetings whatsoever.

15. Meetings have at times taken place inside the prison buildings themselves—that is, in meeting rooms located inside of Camps V and VI. However, for most of the span of the Guantánamo habeas litigation, attorney meetings have taken place in Camp Echo, a set of metal huts located outside the perimeter of Camps V and VI. Meeting a client at Guantanamo therefore does not require access to the actual prison buildings. Civilian journalists lacking security clearances have toured and photographed the exterior and interior of Camps V and VI; their photographs have been determined to be unclassified and cleared for public release. In short, there is nothing confidential about the physical layout of the two prison buildings (Camps V and VI) that would necessarily be revealed to an attorney visiting a client at the base in the ordinary course of events.

**Telecommunications access to detainees**

16. Starting under the Obama Administration, telecommunications access to our clients at the base became available. More than a decade ago, the military began allowing us to place unclassified ("unsecured") phone calls to low-value AUMF detainees from our desks on ordinary, unsecured phone lines. Counsel are required to take the calls from a closed office; everyone in the room (*i.e.* on the call) needs to have a security clearance, and their names and clearance status must be indicated on the official call request form. The base administration (Joint Task Force (JTF)-Guantánamo) initiates the calls from a room within the camps into a civilian commercial telephone operator on the mainland on a toll free number.

17. The content of unclassified calls is monitored in real time by a privilege review team member (walled off from the litigation), who sits across a glass divider from the detainee in the phone rooms at Guantánamo and requests that counsel halt the course of the conversation if it

---

[6] Dual citizenship is sufficient.

veers close to possibly-classified topics (for instance, discussion of a client's pre-detention activities). The very availability of unsecured calls indicates that the government's has, in practice, relaxed its former position that *everything* known to our clients is presumptively classified.

18. Fully classified calls have also been available for many years. They are not monitored by a privilege review team member. However, they require counsel to travel to use the encrypted phone facilities at the Secure Facility for Guantánamo litigation located in Crystal City, Virginia. Thanks to recent changes in the presumptive classification of information in the heads of High Value Detainees, we expect secured call capacity to be made available to us shortly for the former CIA detainees as well.

19. Classified video calls ("VTC") have been made available for military commission defense teams, and in certain other exceptional circumstances at the government's discretion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of February 2025.

Shayana Kadidal