# DECLARATION OF JOSÉ G. MIRANDA

I, José G. Miranda, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

## IRAP's Mission and Work on Guantanamo Bay

1. I am a licensed attorney and a member in good standing of the New York State Bar. I am a Supervising Attorney at the International Refugee Assistance Project (IRAP), where I have been working since 2021.

2. IRAP is a 501(c)(3) nonprofit legal organization that provides free legal representation to displaced people seeking safety worldwide. Our work includes direct legal services, impact litigation, and policy advocacy aimed at ensuring access to humanitarian protections.

3. As part of our work, IRAP has worked with individuals held at the Migrant Operations Center (MOC) at Guantánamo Bay, Cuba after being interdicted at sea by U.S. authorities, determined to fear return to the country they fled and warrant humanitarian protection. As detailed below, IRAP has represented one family while they were detained at the MOC and conducted extensive interviews with many individuals and families after they were resettled from the MOC. This work culminated in IRAP's report, *Offshoring Human Rights: Detention of Refugees at Guantánamo Bay*, which details the U.S. government's continued use of the MOC to evade legal obligations to refugees and asylum seekers. The report advocates for the humanitarian parole of vulnerable families and documents conditions at the MOC that obstruct meaningful access to counsel.

4. In 2022 and 2023, IRAP represented a family interdicted at sea by the U.S. Coast Guard in December 2021. We found out about the family through a former U.S. government official who was concerned for the family's wellbeing. The family, including two minor children, were held at the MOC, where they remained for over a year.

5. I filed Notices of Entry of Appearance (G-28s) on behalf of the family with the Department of Homeland Security (DHS) and Department of State (DOS) and repeatedly sought humanitarian parole or third-country resettlement for them. With one exception, we were only able to communicate with them on a monitored line. Despite our extensive advocacy, the family remained held at the MOC under substandard conditions, where:
    - Children were confined alongside adults and denied access to education;
    - Medical care for serious physical and mental health conditions was unavailable; and
    - Legal access was severely restricted, as detailed below, with only one confidential legal call permitted after multiple requests by both the family and IRAP.

6. IRAP's advocacy for this family led to broader efforts to challenge the U.S. government's offshore warehousing of asylum seekers at the MOC. IRAP's work has highlighted that Guantánamo remains shrouded in secrecy, where asylum seekers and refugees held at the MOC have significantly less legal protections than their counterparts detained in the U.S. mainland, and face significant barriers to communication and access to counsel.

## Systemic Barriers to Legal Access and Communication at the MOC

8. Immigrants held at the MOC are not provided attorneys or even information about finding one and must navigate an opaque, bureaucratic process with no guarantees of access to counsel. The U.S. government has failed to establish clear, standardized procedures for attorney-client communications, obstructing legal protections for individuals detained offshore.

9. In IRAP's experience, confidential attorney-client communications at the MOC are virtually nonexistent. Lawyers must request access on a case-by-case basis and can face months-long delays before being able to speak with clients confidentially. Even when legal calls are granted, there is no guarantee of confidentiality. We also had no reliable way to ensure that messages reached our clients, and they were not informed of any options to establish contact.

10. In the case of the family we represented discussed above, IRAP fought for months before securing a single, 30-minute phone call with our clients. Because the family were unaware of any formal policies or protocols to request a legal call and had been unsuccessful in their requests to MOC staff, my colleagues and I had to engage in extensive outreach to various officials at the State Department, Department of Homeland Security, and International Organization for Migration (IOM).

11. We spent months reaching out to various officials at the base and in the United States. The people we contacted either did not respond or said they could not share any information. We were told to talk to Base Command but not provided any contact information. The family made verbal and written requests at the MOC. Finally, after months of outreach and escalation to high-ranking government officials, we received an email stating that we would be granted one, 30-minute confidential call with our clients, would call us at a specific date and time.

12. Even after extensive advocacy, our clients shared that MOC staff were sitting directly outside the room and could be able to hear. We also were never able to schedule another confidential call with our clients.

13. In general, phone access at the MOC is strictly limited and inconsistently granted. Immigrants are typically allowed only 30 minutes of monitored phone time per week with family or others in the outside world, with no guarantee of regular access, and phone privileges can be revoked without explanation.

14. Phone access has even been used as a tool of retaliation. For example, when an individual attempted to raise concerns about conditions at the MOC, the U.S. government responded by cutting off phone access for everyone for 15 days. People had to tell their families that the phones were "down" to avoid further punishment when, in reality, access was being deliberately restricted. Another individual was told their phone privileges would be revoked if they contacted their lawyer or a journalist.

15. The government's restrictions on attorney-client communication prevent individuals from accessing legal counsel in a meaningful way. Without reliable and confidential communication, asylum seekers at the MOC are unable to fully understand or advocate for their legal rights, undermining fundamental due process protections.

17. The continued use of the MOC for detaining migrants interdicted at sea allows the U.S. government to circumvent international and domestic legal obligations to asylum seekers and others seeking protection from harm. There is no clear process for requesting asylum or other forms of protection. The absence of formalized procedures for seeking protection at the MOC leaves individuals in legal limbo, increasing the risk of unlawful deportation or prolonged detention.

18. IRAP's work has highlighted that Guantánamo remains shrouded in secrecy, where people seeking safety are deprived of meaningful legal protections. Under the Trump administration's plan to expand detention at Guantánamo, we are concerned that thousands of individuals will face the same unchecked barriers to justice, with restricted access to counsel, legal protections, and humanitarian safeguards.

19. On February 7, 2025, IRAP joined over a dozen other rights groups to demand access to the immigrants transferred from the United States to Guantánamo in a letter to the Department of Homeland Security, Department of Defense, and State Department. As of this writing, we have not received a response.

Executed this __10__ th day of February, 2025, in Queens, New York.