BRETT A. SHUMATE
*Principal Deputy Assistant Attorney General*
DREW ENSIGN
*Deputy Assistant Attorney General*
AUGUST FLENTJE
*Acting Director*
SARAH WILSON
*Assistant Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4700
Email: sarah.s.wilson@usdoj.gov

*Counsel for Respondents*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, *et al.*, <br><br> Respondents. | Civil Action No. 25-0418 |

## RESPONDENTS' OPPOSITION TO MOTION
## FOR TEMPORARY RESTRAINING ORDER

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

I.     Detention and Removal of Individuals with Final Orders of Removal ............................2

II.    Immigration Detention at NSGB .....................................................................................5

LEGAL STANDARD...........................................................................................................7

ARGUMENT .......................................................................................................................8

I.    Petitioners lack standing to seek the relief sought by the proposed TRO.. ........................9

     A.    The Organizational Petitioners have not pleaded a cognizable injury to themselves.........................................................................................................9

     B.    Petitioners cannot establish third-party standing ....................................................12

     C.    Petitioners cannot establish next-friend standing. .................................................16

II.    The Court lacks jurisdiction to impose broad restrictions on DHS's ability to transfer detainees to or from Guantanamo as part of its removal operations. ...................18

III.    Petitioners are not likely to prevail on the merits of their constitutional claims. ..............22

     A.    The detainees have not been deprived of constitutional rights to counsel or to seek habeas relief .......................................................................................22

     B.    Petitioners are not likely to prevail on their First Amendment claim asserted on behalf of the detainees ....................................................................................25

     C.    The Organizational Petitioners have not been denied any First Amendment rights. .....................................................................................................26

     D.    Petitioners are not likely to prevail on their substantive due process claim ..........29

IV.    The detainees do not have a statutory right to counsel .....................................................31

V.    The equities favor denial of the request for a temporary restraining order... ...................32

CONCLUSION.................................................................................................................34

CERTIFICATE OF SERVICE ......................................................................................35

# TABLE OF AUTHORITIES
## CASE LAW

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ................................................................................... 7

*Abdullah v. Obama,*
    753 F.3d 193 (D.C. Cir. 2014) .................................................................................... 7

*Adams v. Vance,*
    570 F.2d 950 (D.C. Cir. 1978) ............................................................................. 24, 32

*Adderley v. State of Fla.,*
    385 U.S. 39 (1966) ................................................................................................... 27

*Aguilar v. I.C.E.,*
    510 F.3d 1 (1st Cir. 2007) ........................................................................................ 21

*Akers v. Watts,*
    740 F. Supp. 2d 83 (D.D.C. 2010) .......................................................................... 29

*Ali v. District of Columbia,*
    278 F.3d 1 (D.D.C. 2002) ........................................................................................ 29

*Am. Immigr. Laws. Ass'n v. Reno,*
    18 F. Supp. 2d 38, 61 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) ......................... 27

*Am. Immigration Lawyers Ass'n v. Reno* (*AILA*),
    199 F.3d 1352 (D.C. Cir. 2000) ......................................................................... 3, 27

*Amatel v. Reno,*
    156 F.3d 192 (D.C. Cir. 1998) ................................................................................. 26

*Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.,*
    No. 22-cv-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ............................................ *passim*

*Arizona All. for Retired Ams. v. Mayes,*
    117 F.4th 1165 (9th Cir. 2024) ................................................................. 10, 11, 12

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ................................................................................................. 24

*Biwot v. Gonzales,*
    403 F.3d 1094 (9th Cir. 2005) ............................................................................ 15, 24

*Block v. Rutherford,*
    468 U.S. 576 (1984) ................................................................................................. 29

*Coal. of Clergy v. Bush,*
   310 F.3d 1153 (9th Cir. 2022) .............................................................................. 17

*Container Corp. of America v. Franchise Tax Bd.,*
   463 U.S. 159 (1983) ............................................................................................. 5

*Ctr. for Responsible Sci. v. Gottlieb,*
   346 F. Supp. 3d 29 (D.D.C. 2018) ....................................................................... 10

*Delaney v. District of Columbia,*
   659 F. Supp. 2d 185 (D.D.C. 2009) ..................................................................... 29

*Dep't of Homeland Sec. v. Thuraissigiam,*
   591 U.S. 103 (2020) ..................................................................................... 3, 23, 32

*Dep't of Navy v. Egan,*
   484 U.S. 518 (1988) ............................................................................................. 26

*Dep't of State v. Munoz,*
   602 U.S. 899 (2024) ............................................................................................. 14

*Doe v. Kelly,*
   878 F.3d 710 (9th Cir. 2017) .............................................................................. 29

*Dorfmann v. Boozer,*
   414 F.2d 1168 (D.C. Cir. 1969) ........................................................................... 7

*Edison C. F. v. Decker,*
   No. 20-cv-15455-SRC, 2021 WL 1997386 (D.N.J. May 19, 2021) ....................... 20

*FDA v. Alliance for Hippocratic Medicine,*
   602 U.S. 367 (2024) ................................................................................ 10, 11, 13

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,*
   566 U.S. 318 (2012) ............................................................................................. 30

*Gandarillas-Zambrana v. Bd. of Immigration Appeals,*
   44 F.3d 1251 (4th Cir. 1995) .............................................................................. 20

*Garcia Uranga v. Barr,*
   No. 20-3162-JWL, 2020 WL 4334999 (D. Kan. July 28, 2020) ...................... 23, 31

*Garland v. Aleman Gonzalez,,*
   596 U.S. 543 (2022) ....................................................................................... 19, 20

*Gill v. Whitford*,
  585 U.S. 48 (2018) ............................................................................................. 9

*Greater New Orleans Hous. Action Ctr. v. HUD*,
  639 F.3d 1078 (D.C. Cir. 2011) ......................................................................... 7

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*,
  456 F. Supp. 3d 28 (D.D.C. 2020) .................................................................... 28

*Haitian Refugee Ctr., Inc. v. Baker*,
  953 F.2d 1498 (11th Cir. 1992) ........................................................................ 25

*Hamama v. Adducci*,
  912 F.3d 869 (6th Cir. 2018) ............................................................................ 21

*Hatim v. Obama*,
  760 F.3d 54 (D.C. Cir. 2014) ........................................................................... 30

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................... 9

*Hernandez-Carrera v. Carlson*,
  547 F.3d 1237 (10th Cir. 2008) ........................................................................ 23

*In re Guantanamo Bay Detainee Continued Access to Couns.*,
  892 F. Supp. 2d 8 (D.D.C. 2012) ..................................................................... 27

*In re Primus*,
  436 U.S. 412 (1978) .......................................................................................... 28

*Innovation Law Lab v. McAleenan*,
  924 F.3d 503 (9th Cir. 2019) ........................................................................... 32

*Jennings v. Rodriguez*,
  583 U.S. 297 (2018) ..................................................................................... 4, 31

*Kowalksi v. Tesmer*,
  543 U.S. 125 (2004) ................................................................................... 12, 14

*Landon v. Plasencia*,
  459 U.S. 21 (1982) ........................................................................................... 32

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
  507 F. Supp. 3d 1 (D.D.C. 2020) ......................................................... 23, 31, 23

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................. 9, 13

*Lyon v. ICE,*
    171 F. Supp. 3d 961 (N.D. Cal. 2016) .................................... 24

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................. 7

*McConnell v. Fed. Election Comm'n,*
    540 U.S. 93 (2003) ................................................................. 13

*Muthana v. Pompeo,*
    985 F.3d 893 (D.C. Cir. 2021) ............................................... 18

*NAACP v. Button,*
    371 U.S. 415 (1963) ............................................................... 28

*Nelson v. District of Columbia,*
    928 F. Supp. 2d 210 (D.D.C. 2013) ....................................... 29

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................ 7, 32

*Noel v. Chapman,*
    508 F.2d 1023 (2d Cir. 1975) ................................................. 13

*Pension Benefit Guaranty Corporation v. LTV Corp.,*
    496 U.S. 633 (1990) .............................................................. 4, 5

*Perry Education Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ................................................................. 27

*Powers v. Ohio,*
    499 U.S. 400 (1991) ............................................................... 12

*Privacy Info. Ctr. v. Dep't of Justice,*
    15 F. Supp. 3d 32 (D.D.C. 2014) ............................................. 8

*Rafeedie v. I.N.S.,*
    880 F.2d 506 (D.C. Cir. 1989) ............................................... 25

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 481 (1999) ..................................................... 19, 21, 33

*Rosa v. McAleenan*,
    583 F. Supp. 3d 850 (S.D. Tex. 2019) .................................................................................. 31

*S. Poverty L. Ctr v. U.S. Dep't of Homeland Sec.*,
    No. CV 18-760 (CKK), 2020 WL 3265533 (D.D.C. June 17, 2020) .............................. 24, 29

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ............................................................................................ 7

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ......................................................................................................... 10

*Silverman v. Rogers*,
    437 F.2d 102 (1st Cir. 1970) ............................................................................................ 13

*Swartz v. Rogers*,
    254 F.2d 338 (D.C. Cir. 1958) ......................................................................................... 13

*Turkmen v. Ashcroft*,
    No. 02-CV-2307 (JG), 2006 WL 1662663 (E.D.N.Y. June 14, 2006) ............................... 24

*Turner v. Safley*,
    482 U.S. 78 (1987) ..................................................................................................... 24, 26

*Ukrainian-Am. Bar Ass'n, Inc. v. Baker*,
    893 F.2d 1374 (D.C. Cir. 1990) .................................................................................. 27, 28

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ........................................................................................................... 2

*United States ex rel. Turner v. Williams*,
    194 U.S. 279 (1904) ......................................................................................................... 25

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ........................................................................................................... 8

*Van Dinh v. Reno*,
    197 F.3d 427 (10th Cir. 1999) ......................................................................................... 20

*Veitch v. Danzig*,
    135 F. Supp. 2d 32 (D.D.C. 2001) ..................................................................................... 8

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................................... 12, 14

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)..................................................................... 16

*Wood v. United States*,
  175 F. App'x 419 (2d Cir. 2006) ............................................. 20

*Zadvydas v. Davis*,
  533 U.S. 678 (2001)............................................................ *passim*

## FEDERAL STATUTES

6 U.S.C. § 202(5) ............................................................................. 2

8 U.S.C. § 1103(a)(3) ....................................................................... 2

8 U.S.C. § 1158 ................................................................................ 3

8 U.S.C. § 1182(a)(6)(C) ................................................................. 3

8 U.S.C. § 1182(a)(7) ....................................................................... 3

8 U.S.C. § 1182(d)(5)(A) .................................................................. 4

8 U.S.C. § 1225 ....................................................................... 23, 31

8 U.S.C. § 1225(b) ............................................................................ 4

8 U.S.C. § 1225(b)(1) ....................................................................... 3

8 U.S.C. § 1225(b)(1)(A)(i) .............................................................. 3

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................. 3

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................. 3

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ................................................. 1, 3

8 U.S.C. § 1225(b)(1)(B)(v) ............................................................. 3

8 U.S.C. § 1229a ......................................................................... 3, 4

8 U.S.C. § 1229a(a)(1) ................................................................... 31

8 U.S.C. § 1231 ....................................................................... 19, 27

8 U.S.C. § 1231(a) ............................................................................................................ 4

8 U.S.C. § 1231(a)(6) ...................................................................................................... 23

8 U.S.C. § 1231(g) ........................................................................................................... 19

8 U.S.C. § 1252 ............................................................................................................... 18

8 U.S.C. § 1252(a)(1) ........................................................................................................ 3

8 U.S.C. § 1252(a)(2)(B)(ii) ............................................................................... 1, 2. 20, 21

8 U.S.C. § 1252(f) ......................................................................................................... 1, 2

8 U.S.C. § 1252(f)(1) ....................................................................................................... 19

8 U.S.C. § 1252(g) ..................................................................................................... 1, 2, 21

8 U.S.C. § 1362 .................................................................................................... 23, 31, 32

28 U.S.C. 2242 ................................................................................................................ 16

## FEDERAL REGULATIONS

8  C.F.R. § 1241.1 ........................................................................................................... 31

8 C.F.R. § 208.30(f) ........................................................................................................... 3

8 C.F.R. § 1003.16 ..................................................................................................... 31, 32

## MISCELLANEOUS

The White House, "*Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity*" (Jan. 29, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/ last visited Feb. 20, 2025 ........................................................................ 1

The White House, *Protecting the American People Against Invasion*, (Jan. 20, 2025) available at https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/ last visited Feb. 20, 2025 ............................................................... 2

## INTRODUCTION

On January 29, 2025, the President directed the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at the Guantanamo Bay Naval Station (NSGB) to allow for the housing of "high-priority criminal aliens unlawfully present in the United States."[1] Since that time, a total of 178 detainee who have been ordered removed from the United States have been moved to Guantanamo in route to completing their repatriation to their home country. These detainees are all subject to final orders of removal to Venezuela, have not been granted any relief or protection from removal, and are at NSGB for staging for final removal. Exhibit A, Declaration of Juan Agudelo at ¶ 10; *see generally* Exhibit B, Declaration of Juan Agudelo (relating to named detainees) (Agudelo Detainee Declaration). Accordingly, their detention is authorized by the Immigration and Nationality Act (INA). *See* 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV) (authorizing detention pending removal on an expedited removal order); 1231(a)(2), (6) (authorizing detention pending removal on removal orders entered following "full" removal proceedings). The Department of Homeland Security (DHS) has broad discretion to decide where to house immigration detainees when staging, finalizing, and implementing a removal operation. *See* 8 U.S.C. § 1252(a)(2)(B)(ii), (f), (g). Nonetheless, Petitioners, three family members of NSGB detainees and four immigrant advocacy associations, bring this request for a temporary restraining order on behalf of all immigration detainees transferred to NSGB. Among their many requests, Petitioners seek unrestricted access to counsel,

---

[1] The White House, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity" (Jan. 29, 2025), https://www.whitehouse.gov/presidentialactions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-fullcapacity/.

in-person visits, and 72-hour notice before immigration detainees can be moved on to or off of the NSGB.

The emergency request should be denied. Petitioners lack standing to bring these claims as third-parties or next friends. Even if the immigrant detainees were before this Court as Petitioners, the proposed temporary restraining order (TRO) seeks extraordinary relief that far exceeds the Court's authority because Congress expressly barred federal courts from interfering with the execution of removal orders. *See* 8 U.S.C. § 1252(a)(2)(B)(ii), (f), (g). To the extent the Court has jurisdiction to consider Petitioners' claims regarding counsel access, that access has been provided by the United States to the three individual detainees and preliminary access procedures have been developed for others at the facility. Petitioners' claims are also premised on an overstated framing of the limited rights of immigration detainees with final orders of removal, who are staged for final transfer and in the midst of a removal operation. The public equities support the enforcement of final orders of removal and deference to the Executive's judgment regarding how to best effectuate timely removals to a country that is now accepting removals, but has been notoriously resistant to taking back its own citizens. Agudelo Declaration at ¶ 11. Accordingly, the motion should be denied.

## BACKGROUND

### I.    Detention and Removal of Individuals with Final Orders of Removal.

The Executive Branch has extensive constitutional authority in the field of immigration, and Congress has further conferred broad statutory discretion over the administration and enforcement of the nation's immigration laws. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). Prior to January 20,

2025,[2] applicants for admission who were intercepted at entry or shortly after unlawfully entering the United States could be subject to an expeditious process to remove them from the United States under 8 U.S.C. § 1225(b)(1) as described herein. Under this process—known as expedited removal—applicants for admission arriving in the United States (as designated by the Secretary of Homeland Security) who entered illegally and lack valid entry documentation or make material misrepresentations shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (a)(7); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107-110 (2020) (discussing expedited removal); *Am. Immigration Lawyers Ass'n v. Reno* (*AILA*), 199 F.3d 1352, 1354-55 (D.C. Cir. 2000) (same). They will remain subject to a final order of expedited removal if they do not manifest a fear of return, or if they manifest fear but are unable to show that the fear is credible. *See* 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B)(v); 8 C.F.R. § 233.15(b)(4). Individuals subject to a final order of expedited removal can be lawfully detained until they are removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Individuals subject to final orders of expedited removal have very limited due process rights with respect to their admission to the United States. *See Thuraissigiam*, 591 U.S. at 138-40.

If the applicant for admission manifests a fear of return and the asylum officer determines that they have a credible fear, the officer may refer them to removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f). These removal proceedings provide more extensive procedures than expedited removal, *compare* 8 U.S.C. § 1229a *with* § 1225(b)(1),

---

[2] *See* Protecting the American People Against Invasion, https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/ (Jan. 20, 2025).

including a right to appeal to the Board of Immigration Appeals (Board) and a federal appellate court. 8 U.S.C. § 1252(a)(1). An applicant for admission who demonstrates a credible fear "shall be detained for further consideration of the application for asylum."[3] 8 U.S.C. § 1225(b)(1)(B)(ii); *Jennings*, 583 U.S. at 297 ("Read most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded.").

For anyone with a final order of removal entered following removal proceedings held under 8 U.S.C. § 1229a, Congress has authorized detention under 8 U.S.C. § 1231(a) while the government works to execute the removal order. Section 1231(a)(6), as interpreted by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678, 699-701 (2001), limits post-final-order detention to the period reasonably necessary to accomplish removal. 533 U.S. at 701. The Court determined that six months is a presumptively reasonable period of time to allow the government to complete removal after the removal period has commenced. *Id*. at 701. Once the six-month period has lapsed, and "the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, [then] the Government must respond with evidence sufficient to rebut that showing." *Id*.

"This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. In making this assessment, the Supreme Court has counseled immigration habeas courts to apply "[o]rdinary principles of judicial review" in order to "give

---

[3] The only exception to § 1225(b)(1)'s detention mandate is found in 8 U.S.C. § 1182(d)(5)(A), which allows DHS to parole applicants for admission into the United States for "urgent humanitarian reasons or significant public benefit." *See Jennings*, 583 U.S. at 300 (holding that the existence of § 1182(d)(5)(A)'s "express exception to detention implies that there are no other circumstances under which aliens detained under § 1225(b) may be released").

expert agencies decisionmaking leeway in matters that invoke their expertise" and "recognize [the] Executive Branch['s] primacy in foreign policy matters." *Id.* at 700 (citing *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 651-652 (1990); *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)). Specifically, the Supreme Court instructed habeas courts to "listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise." *Zadvydas*, 533 U.S. at 700.

## II.    Immigration Detention at NSGB

On January 29, 2025, the President issued a Memorandum ordering DHS and the Department of Defense (DoD) to take all necessary steps to expand the Migrant Operations Center in NSGB to allow for the housing of "high-priority criminal aliens unlawfully present in the United States."[4] DoD acted swiftly to comply with the President's Order by creating the Joint Task Force Southern Guard (JTF-SG). Exhibit C, Declaration of Col. Jennifer Venghaus at ¶¶ 3, 6-10. In addition to JFT-SG, NSGB hosts a variety of missions including maritime security, humanitarian assistance, and joint operations, including Joint Task Force Guantanamo (JTF-GTMO), which is the JTF responsible for the safe and humane custody of law-of-war detainees.[5] Venghaus Declaration at ¶ 3. NSGB's unique geographic location provides strategic advantages, enhancing U.S. defense capabilities in the region and serving as a critical forward operating base for various military and humanitarian activities. Venghaus Declaration at ¶ 4.

---

[4] *See n*ote 1.
[5] In addition to immigration detainees, NSGB currently hosts 15 law-of-war detainees. It also regularly houses migrants interdicted at sea with humanitarian protection concerns, who stay at NSGB on a voluntary basis rather than returning to their countries of origin. Respondents understand these populations to be outside the scope of the present dispute.

JTF-SG currently consists of approximately 985 personnel, which includes JTF-SG staff, medical, security, engineer, and logistics personnel. Venghaus Declaration at ¶ 10. As of February 19, 2025, 178 immigration detainees, all of whom have final orders of removal to Venezuela, had been transferred to NSGB as a staging point in route to completing their removals. Agudelo Declaration at ¶¶ 6, 10. The detainees are housed in two areas of the base, with the higher-threat immigration detainees housed in Camp VI and the lower-threat detainees housed in and around the Migrant Operations Center (MOC). Venghaus Declaration at ¶¶ 11-14.

DHS has developed standards and procedures applicable to immigration detainees at NSGB. Agudelo Declaration at ¶¶ 12-16; Venghaus Declaration at ¶¶ 21-22. Although DHS and DoD have no record of any detainee making a requested to speak to counsel prior to filing of this suit, on February 19, 2025, DHS posted written notice, in English and Spanish, of the procedure for detainees to request to place a private, unmonitored telephone call to counsel. Venghaus Declaration at ¶ 17, 21; Agudelo Declaration at ¶ 12-16. For detainees housed at Camp VI, counsel calls are conducted in a building adjacent to Camp VI. Venghaus Declaration at ¶ 23. It has six telephones in six separate rooms, each with a table and chair. Venghaus Declaration at ¶ 23. During the calls, guards maintain line of sight through the use of video monitoring (which does not include sound). Venghaus Declaration at ¶ 23. The building is a short walk from the main Camp VI building and requires two escorts for each Camp VI detainee. Venghaus Declaration at ¶ 23. For detainees housed at the MOC, counsel calls occur from a private room. Agudelo Declaration at ¶ 16.

Retained counsel for the detainees are also able to make requests for phone calls to their clients. Venghaus Declaration at ¶ 25; Agudelo Declaration at ¶ 14. Detainees have the ability to send and receive legal mail through the process used by law-of-war detainees. Venghaus

Declaration at ¶ 27; Agudelo Declaration at ¶ 14, 17. DHS and DoD will continue to assess the operational needs of the mission and make adjustments to procedures as needed.  For example, DoD and DHS are not presently offering the opportunity for in-person visits to immigration detainees at NSGB but will continue to evaluate whether to extend this option in light of significant logistical challenges, the availability of alternative means of counsel communication, and the anticipated short duration of immigration detainee stays at NSGB. Venghaus Declaration at ¶ 29.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)); *Abdullah v. Obama*, 753 F.3d 193, 197–98 (D.C. Cir. 2014) (same). The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer*, 742 F.3d at 1038. "[W]hen a plaintiffs has not shown a likelihood of success on the merits, we need not consider the other factors." *Greater New Orleans Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

The D.C. Circuit has expressly cautioned that "[t]he power to issue

a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted). Heeding this caution, where, as here, the requested injunction is "mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act," the Court requires the moving party to "meet a higher standard than in the ordinary case by showing a clear entitlement to relief to avoid extreme or very serious damage." *See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) ("*EPIC II*") (collecting cases); *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 & n.2 (D.D.C. 2001) (holding that where "a ruling would alter, not preserve, the *status quo*," the plaintiff "must meet a higher standard than were the injunction he sought merely prohibitory," in light of the Supreme Court's holding that "'[t]he purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held'" (alteration in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))).

## ARGUMENT

Petitioners are not likely to succeed in securing their requested relief and cannot show that the requested relief is in the public's interest. First, Petitioners lack standing to bring claims challenging a third party's access to counsel and the courts. Second, the Court lacks jurisdiction to award Petitioners the sweeping relief sought by their motions due to the Court's limited authority over removal operations and transfer decisions. Third, Petitioners' claims fail on the merits as the detainees are not entitled to the burdensome and operationally infeasible measures sought by the motion. Finally, the TRO is not in the public interest as it undermines DHS's ability to fulfill its statutory duty to effect removal for those who have been determined to be removable consistent with the INA. Accordingly, Petitioners' motion should be denied.

I.    **Petitioners lack standing to seek the relief sought by the proposed TRO.**

Petitioners, three family members of detainees and four immigration organizations, assert claims on behalf of detainees who are not themselves part of this litigation. Because detainees at the NSGB have the ability to assert claims on their own behalf, there is no basis for allowing Petitioners to bring the case as organizational plaintiffs, third parties, or next friends.

### A. The Organizational Petitioners have not pleaded a cognizable injury to themselves.

The Organizational Petitioners broadly describe their mission as advocating for "the rights of immigrants in the United States." Pets. Mot. at 6. Nothing in the President's Memorandum, however, directly regulates any legal advocacy organization or implicates their legally protected interests in any way. At most, the Organizational Petitioners claim an indirect impact from the Memorandum's effect on detainees whom they seek to engage as prospective clients. But that is simply not the type of "invasion of a legally protected interest" sufficient to support Article III standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Importantly, at the time of filing the complaint and TRO motion, the Organizational Petitioners did not represent any individual at NSGB, nor did they represent any immigration detainees at NSGB prior to the beginning of this removal operation. *See* Agudelo Detainees Decl. ¶¶ 11, 27.

The Organizational Petitioners claim they are concerned about the general plight of NSGB immigration detainees, including the possibility that some may be "erroneously denied access to the asylum process." Pets. Mot. at 6. But to allege a concrete injury, an unregulated organizational plaintiff must allege "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). As the Supreme Court has made clear, "a mere interest in a problem, no matter how longstanding the interest and no matter how qualified

the organization is in evaluating the problem, is not sufficient by itself" to confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (internal quotation marks omitted). Nor may organizational standing "be premised on a broadly stated mission or goal." *Arizona All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1177 (9th Cir. 2024).

The Organizational Petitioners go on to note that they have "expended significant staff time and resources to track their clients' locations, request information from detention centers . . . , follow up with concerned family members, advocate against transfers, adjust existing protocols and training, and attempt communication" with transferred individuals, Pets. Mot. at 7—in short, the kinds of actions an advocacy organization would typically be expected to take in furtherance of their stated missions. The Organizational Petitioners contend they will have to "divert additional resources" as they respond to the implementation of the President's Memorandum, *id.* at 15, but that does not alter the fact that the alleged actions and related expenditures are ones they have elected to undertake as a continuation of their core activities.

An organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024). Instead, "something about the challenged action itself—rather than the organization's response to it—must make the organization's task more difficult." *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018) (cleaned up). Thus, even if the Organizational Petitioners here might have had to shift resources "from one set of pre-existing activities in support of their overall mission to another, new set of such activities," they could not establish organization injury based on an alleged diversion of resources. *Arizona All.*, 117 F.4th at 1180.

These standing requirements are not limited to pure issue-advocacy organizations but apply equally to direct services organizations that expend money and other resources as the result of a policy. Even for such organizations, courts may "not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities." *Arizona All.*, 117 F.4th at 1177 (explaining that the Supreme Court in *Alliance* foreclosed "[e]ven the narrowest reading of [the Ninth Circuit's] organizational standing precedents [that] allowed Petitioners to satisfy Article III using the [] frustration-of-mission and diversion-of-resource theories"). To hold otherwise would impermissibly allow organizations to "manufacture [their] own standing" to challenge any policy that touches on their mission. *See Alliance*, 602 U.S. at 394.

Finally, Petitioners are foreclosed from even raising any diversion-of-resource claim to the extent it is grounded on the notion of a "total blackout on information." Pets. Mot. at 15. Petitioners' theory is that they are unable to recruit clients at NSGB. But this theory cannot be squared with the reality that none of these organizations made any effort to represent the individuals during their removal proceedings and have instead stepped in only in the midst of an ongoing removal operation.  And as explained in more detail below, there simply is no "wholesale restriction of attorney-client communication," Pets. Mot. at 15, as Petitioners contend. The NSGB operation is meant to be a temporary stopover, and access procedures are being developed consistent with that mission.  Importantly, detainees at NSGB now have the ability to make calls to counsel in a private space and to send and receive legal mail. Venghaus Declaration at ¶¶ 23-27; Agudelo Declaration at ¶¶ 12-17.

Without the "blackout" policy that Petitioners posit, the Organizational Petitioners cannot demonstrate the requisite impairment of their ability to contact prospective clients. To the extent

they rely on the potential diversion of litigation and advocacy services they may *opt* to provide NSGB detainees, such allocation of resources is consistent with their core missions as legal service providers who regularly advocate on behalf of immigration detainees, which thus cannot establish organizational standing. *Arizona All.*, 117 F.4th at 1180.

In sum, any right the Organizational Petitioners might have to bring this suit would have to fall under the rubric of third-party or next-friend standing. Petitioners, however, all fail to meet the prerequisites to claim standing under either theory, for the reasons stated below.

## B.    Petitioners cannot establish third-party standing.

A plaintiff ordinarily "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). There may be "circumstances where it is necessary to grant a third party standing to assert the rights of another," *Kowalksi v. Tesmer*, 543 U.S. 125, 129–30 (2004), but those are "limited, and usually only found in three contexts: attorney-client, vendor-vendee, and employer-employee," *Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. 22-cv-3118, 2023 WL 1438376, at *9 (D.D.C. Feb. 1, 2023) (citing *Kowalski*, 543 U.S. at 129). Here, the Organizational Petitioners assert third-party standing to bring suit on behalf of unidentified detainees— "prospective clients," in their words—but they have not shown that they could meet any of the requirements for third-party standing, whether (1) "injury in fact," (2) "a close relation to the third party," or (3) "some hindrance to the third party's ability to protect his or her own interests." Pets. Mot. at 15–17; *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

"In the organizational context, the first question"—whether a party asserting third-party standing has sustained an injury in fact—"is the same as organizational standing." *Ams. for Immigrant Just.*, 2023 WL 1438376, at *9. As explained in the prior section, the Organizational

Petitioners conjecture that they will have to expend and "divert" significant time and resources as a consequence of the transfer of immigration detainees to NSGB, but the Supreme Court has decisively foreclosed the use of any frustration-of-mission or diversion-of-resource rationale to establish an organization's standing. *See Alliance*, 602 U.S. at 394.

As for the individuals named in this case—Ms. Gomez Lugo, Ms. Sequera, and Ms. Castillo—Petitioners assert that they have sustained "concrete injury because they are . . . unable to contact and communicate with their brothers and son." Pets. Mot. at 16. From this statement, it is not evident that they have posited a "legally protected interest" necessary to establish an injury in fact to themselves." *See Lujan*, 504 U.S. at 560; *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (dismissal warranted on standing grounds where Petitioners' claimed injury was "not to a legally cognizable right"). At most, the crux of their argument appears to be that they have been deprived of some right to familial association. But there is no statutory or constitutional right to familial association with a person being removed from the United States. On the contrary, various cases over the years have established that neither United States citizens nor lawful permanent residents have any constitutional rights with respect to the removal of their spouses or other family members. *See, e.g.*, *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958) (reasoning that while "deportation would put burdens upon the marriage," it "would not in any way destroy the legal union which the marriage created"); *Noel v. Chapman*, 508 F.2d 1023, 1027 (2d Cir. 1975) (holding that "wives as resident aliens have no constitutional right to keep [their husbands] [in the United States] on the theory that the integrity of the family is protected by equal protection principles"); *Silverman v. Rogers*, 437 F.2d 102, 107 (1st Cir. 1970) (refusing to enjoin the deportation of a deportee who was married to a United States citizen and rejecting the claim that the action would "destroy[]" the "validity of their marriage"). To the extent the individual

13

Petitioners might seek any "special solicitude" for their family members or the "unity of [their] family," the Supreme Court has made clear that "such solicitude is a matter of legislative grace rather than fundamental right." *See Dep't of State v. Munoz*, 602 U.S. 899, 916 (2024).

On the second prong, while the Supreme Court has held that a "close relation" can exist between an attorney and an *existing* client, the Court also clarified that an "*existing* attorney-client relationship is, of course, quite distinct from the *hypothetical* attorney-client relationship." *Kowalksi*, 543 U.S. at 131. The Court, for that matter, has expressly disapproved the notion that "lawyers generally have third-party standing to bring in court the claims of future unascertained clients." *Id.* at 134 (internal quotation marks omitted). That is just the situation presented here: other than the three detainees identified in this suit, the Organizational Petitioners do not have a "close relationship" with any "prospective client" who might be subject to transfer to NSGB; "indeed, they have no relationship at all."[6] *Id.* at 131.

Third, Petitioners are also unable to meet the "hindrance" requirement for third-party standing. Whether immigration detainees at NSGB are hindered from asserting their own rights and interests depends on whether any alleged "communications restrictions . . . prevent sufficient access to judicial process." *See Ams. for Immigrant Just.*, 2023 WL 1438376, at *11. As the agency has attested, there are now procedures in place for detainees at NSGB to seek legal counsel and communicate with their attorneys in a private space. Venghaus Declaration at ¶¶ 18-20; 23-27; Agudelo Declaration at ¶ 12-16; Agudelo Detainees Declaration ¶¶ at 13, 29, 38. Thus, Petitioners

---

[6] To the extent the Organizational Petitioners (or others) end up representing any other immigration detainees at NSGB, those individuals—like the three identified detainees—would then be able to assert their own rights and interests, obviating any need for another party to try to claim third-party standing on their behalf. *See Warth*, 422 U.S. at 499 (holding that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," and that the Court in most cases does not "look favorably upon third-party standing").

cannot show that the immigration detainees are being denied "sufficient access to judicial process" such that the organizations must be accorded third-party standing.

Petitioners claim that there may have been a delay in the location information provided by ICE's Online Detainee Locator System for the individual Petitioners, yet they also note that counsel was able to communicate with ICE personnel to receive updates for some of those individuals, and their suggestion that they should be able to "access [prospective] clients either by telephone or in-person within 24-48 hours" is not an entitlement created by any law nor is it any evidence of a "total ban on attorney-client communication" with respect to detainees who may be transferred to NSGB. Compl. at 25; Declaration of Jennifer Babaie, ¶ 10.

To the extent there are any reported issues with the communications policies, technology, or access at NSGB, those are operational challenges that the agencies are working to address in these early stages of the Memorandum's implementation. At bottom, Petitioners take issue with the fact that "the government has not announced any protocols for allowing attorney access," and then leap from that premise to contend that Respondents have imposed a blank prohibition on all communications with NSGB that they believe will persist into the future. Pets. Mot. at 1. But their pleadings are out of date with this developing operation and now refuted by the communications protocols that DHS has established for NSGB immigration detainees. It is simply not true that access to counsel is being "unconstitutionally restricted." *See Americans for Immigrant Just.*, 2023 WL 1438376, at *11. The three identified detainees have communicated with attorneys, Agudelo Detainees Declaration ¶¶ at 13, 29, 38, and even if the agency is not facilitating in Petitioners' preferred way, that is insufficient to confer third-party standing on them. *See Zadvydas*, 533 U.S. at 694 ("nature of [due process] protection[s] may vary depending upon status and circumstance");

*Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (access to counsel violated only when conditions are "tantamount to denial of counsel").

    **C.**    **Petitioners cannot establish next-friend standing.**

    Petitioners do not have next-friend standing to bring detention-related claims on behalf of immigration detainees transferred to NSGB. For next-friend standing—which arose out of the habeas context and is codified in the habeas statute at 28 U.S.C. § 2242—Petitioners must meet several requirements: First, they must provide "an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). Second, they must demonstrate that they are "truly dedicated to the best interests of the person on whose behalf [they] seek[] to litigate." *Id.* Additionally, the Supreme Court has noted *in dicta* that a next friend plaintiff "must have some significant relationship with the real party in interest." *Id.* at 163–64. Petitioners do not satisfy these conditions.

    Petitioners argue that immigration detainees transferred to NSGB are inaccessible, based largely on their representations that ICE has not updated the location of those individuals in a timely manner and that "repeated attempts to locate them via telephone and email inquiry" were not met with a response from ICE officials. Pets. Mot. at 10–11.  Those isolated experiences, however frustrating, were time-limited and do not amount to the kind of "inaccessibility, mental incompetence, or other disability" required to find that a detainee cannot prosecute his own habeas case, and in any case are trumped by the agency's clear showing that detainees at NSGB now have a meaningful avenue to communicate with counsel. Nor is it fair to compare the situation to the one faced by this Court in crafting habeas procedures for Guantanamo law-of-war detainees – the three individuals here were afforded a full panoply of rights (including robust counsel access) prior

to their arrival at NSGB to challenge their removals, they did not prevail in those challenges, and they are now in the midst of repatriation operation. This is not like the situation that led to elaborate representation procedures for law-of-war detainees at Guantanamo. In sum, because immigration detainees at NSGB can confer with their attorneys by telephone under a defined set of agency protocols, NSGB immigration detainees can avail themselves of legal services to advance their own interests and prosecute any legal claims. Venghaus Declaration at ¶¶ 23-27; Agudelo Declaration at ¶ 12-17.

With respect to the "best interests" requirement, the Organizational Petitioners assert that they meet it as institutions "'with an established history of concern for the rights of individuals in the detainees' circumstances.'" Pets. Mot. at 11 (quoting *Coal. of Clergy v. Bush*, 310 F.3d 1153, 1167 (9th Cir. 2022) (Berzon, J., concurring). That language, however, is drawn from an out-of-circuit concurrence, and, in any case, that opinion did not go so far as to treat an organization's "established history of concern" as determinative of next-friend standing. Instead, the concurrence merely noted that an institution with such an established history "would be *more likely* to be able to show that it is truly dedicated to the best interests of the detainees than a group *without* that history and with more broad ranging interests and background." *Coal. of Clergy*, 310 F.3d at 1167 (emphases added). Even if the Organizational Petitioners could readily show a longstanding commitment to assisting immigration detainees in the particular circumstances presented here, the analysis would need to account for other factors, including whether there is a "significant relationship" to those individuals.

As courts have recognized, the "existence of a significant relationship enhances the probability that a petitioner is a suitable next friend, *i.e.*, that a petitioner knows and is dedicated to the [detainee's] individual best interests." *Id.* at 1162. And the "more attenuated the relationship

between petitioner and [detainee], the less likely a petitioner can know the best interests of the [detainee]." *Id.* Here, the Organizational Petitioners did not demonstrate an existing relationship with any immigration detainee transferred to NSGB.[7] They claim to want to initiate contact with such individuals to "afford them the opportunity of legal representation," Pets. Mot. at 11, but that precatory interest that only arose in the midst of the removal process is a far cry from a "significant relationship" that informs the next-friend-standing analysis. And while they now represent three detainees, this relationship does not justify extending next-friend standing to every detainee at NSGB.

As for the individual Petitioners, while they may possess a stronger claim to being "truly dedicated to the best interests" of their detained family members, they can not show that their detained family members are unable to prosecute their own habeas cases. In fact, each of the identified detained family members has retained counsel. *See Muthana v. Pompeo*, 985 F.3d 893, 901 (D.C. Cir. 2021 ("Next friend standing is a narrow exception to Article III standing, which requires that a party assert his own rights in alleging an injury in fact."). Thus, even if the individual Petitioners could establish that their family members at NSGB wish for them to bring a habeas suit on their behalf, it would be limited to an action seeking access to counsel. They would not have next-friend standing to pursue the wide-ranging relief requested in their TRO motion and in the complaint, particularly now that counsel has been retained.

## II.    The Court lacks jurisdiction to impose broad restrictions on DHS's ability to transfer detainees to or from Guantanamo as part of its removal operations.

---

[7] One Organizational Petitioner has since communicated with three detainees. *See* Agudelo Detainees Declaration ¶¶ at 13, 29, 38. Respondents were informed that the three individuals have retained the Organization.

Petitioners' claims further fail because this Court lacks jurisdiction to grant Petitioners' far-reaching requests for relief, in particular to require the government to provide 72-hour notice before transferring an immigration detainee in or out of NSGB. At their core, those requests seek to dictate how the Secretary exercises her broad discretion in executing removal orders and conducting removal operations. The requested order would interfere with the express authority accorded to the President and his officers to manage the removal process, in violation of multiple provisions in 8 U.S.C. § 1252.

Section 1252(f)(1) bars the injunctive relief sought by Petitioners. That provision states "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" all statutory provisions governing the inspection, apprehension, examination, exclusion, or removal of aliens. 8 U.S.C. § 1252(f)(1). As the Supreme Court has held, § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."[8] *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); *see* 8 U.S.C. § 1252(f)(1).

---

[8] Though the Supreme Court has noted that "§ 1252(f)(1) 'prohibits federal courts from granting classwide injunctive relief' but 'does not extend to individual cases,'" the fact that the instant action is not styled as a class action does not change the fact that this Court is unable to order injunctive relief here; that is, this action does not fall into § 1252(f)(1)'s "individual case" exception. *See Aleman Gonzalez*, 596 U.S. at 550 (citing *Reno*, 525 U.S. at 481–82). The language of the proposed TRO shows that Petitioners view their request for relief as applying to more than just "individual cases." *See id.* Petitioners' request for relief would require Respondents to (1) "provide all known counsel for *immigrants* detained in the United States . . . 72-hour notice of their clients' planned transfer to Guantanamo" and (2) "provide Petitioners' counsel . . . notice of any planned transfer . . . of *a detainee* to a country other [than] the United States." *See* TRO at 27 (emphasis added). Petitioners' use of the general terms "immigrants" and "a detainee," rather than specific references to the Petitioners themselves, indicates that they are seeking programmatic relief as to two distinct classes: "immigrants" to be transferred to Guantanamo and "detainees" to be transferred from Guantanamo. *See id.* Thus, there is no doubt that longstanding Supreme Court precedent articulating § 1252(f)(1)'s prohibition on injunctive relief applies in full force to Plaintiff's 72-hour blanket notice request for all immigrants transferred to Guantanamo.

One of those "specified statutory provisions" is 8 U.S.C. § 1231, which authorizes the detention and removal of individuals ordered removed and specifies the government's discretion, among other things, to determine where to detain individuals who have been ordered removed. 8 U.S.C. § 1231(g) ("The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."). The actions taken pursuant to the President's Memorandum to transfer and detain immigration detainees, including at NSGB, fall within that grant of discretionary authority to agencies under § 1231(g); at the same time, a coercive 72-hour notice requirement would "restrain" and impinge on the government's ability to carry out those critical administrative functions. *See Aleman Gonzalez*, 596 U.S. at 550; *see also Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (Section "1252(f) forecloses jurisdiction to grant class-wide injunctive relief to restrain operation of §§ 1221–31 by any court other than the Supreme Court. It is therefore apparent that a district court has no jurisdiction to restrain the Attorney General's power to transfer aliens to appropriate facilities by granting injunctive relief in a *Bivens* class action suit."). Such an injunction is plainly prohibited under § 1251(f)(1) and the Court should decline to grant it. *See Aleman Gonzalez*, 596 U.S. at 550.

Section 1252(a)(2)(B)(ii) similarly strips the Court of jurisdiction to grant Petitioners' request, where it provides that "no court shall have jurisdiction to review . . . any other decision or action of the [Executive] the authority for which is specified under this subchapter to be in the discretion of the [Executive]." 8 U.S.C. § 1252(a)(2)(B)(ii). As with § 1252(f)(1), the executive authority under § 1231(g) to decide the location of detention for individuals detained pending removal implicates the review bar in § 1252(a)(2)(B)(ii). Under § 1231(g), DHS "necessarily has the authority to determine the location of detention of an alien in deportation proceedings," including to transfer detainees from one detention site to another. *Gandarillas-Zambrana v. Bd. of*

*Immigration Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995). And courts throughout this country have recognized that determinations regarding the location of confinement for individuals subject to removal orders are within the discretion of the Executive Branch. *See, e.g.*, *Van Dinh*, 197 F.3d at 433; *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (holding that the "Attorney General was not required to detain [petitioner] in a particular state" given the Attorney General's "statutory discretion" under § 1231(g)); *Edison C. F. v. Decker*, No. 20-cv-15455-SRC, 2021 WL 1997386, at *6 (D.N.J. May 19, 2021) ("Congress has provided the Government with considerable discretion in determining where to detain aliens pending removal or the outcome of removal proceedings." (citing § 1231(g)(1))). Because a strict 72-hour transfer notice with respect to Guantanamo would interfere with that discretion to arrange for the detention of individuals subject to final orders of removal, Petitioners' request cannot be granted under § 1252(a)(ii)(B)(2).

Lastly, this Court does not have jurisdiction to grant Petitioners' desired relief under section 1252(g), which strips courts of jurisdiction over, among other things, claims arising from the execution of removal orders. *See* Pets. Mot. at 27 (requesting that Respondents provide 72-hour notice prior to transferring individuals to or from Guantanamo); 8 U.S.C. § 1252(g) ("no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to . . . execute removal orders against any alien under this chapter"). The transfer and detention of the detainees at issue—who all have final orders of removal—for the purpose of effectuating their removals are plainly actions taken to "execute removal orders against" them. *See id.*; *see also Hamama v. Adducci*, 912 F.3d 869, 874 (6th Cir. 2018) ("Under a plain reading of the text of the statute, the Attorney General's enforcement of long-standing removal orders falls squarely under the Attorney General's decision to execute removal orders and is not subject to judicial review." (citing *Reno v. Am.-Arab Anti-Discrimination*

*Comm.*, 525 U.S. 471, 483 (1999))). By requesting that the Court order the government to provide a 72-hour notice of transfer in all cases, Petitioners are asking the Court to ignore § 1252(g)'s unambiguous preclusion of judicial review in cases like this. *See Hamama*, 912 F.3d at 874. The Court should decline this exceptional request.

In evaluating whether § 1252(g) applies to certain claims, courts must also look past "creative labeling and consider the fundamental nature of the claims asserted." *Aguilar v. I.C.E.*, 510 F.3d 1, 17 (1st Cir. 2007). Though Petitioners frame their invitation for judicial review as a "request" for a 72-hour transfer notice rather than an explicit plea for judicial review of how the government executes removal orders, the Court must look past this "creative labeling." *See id.* The "fundamental nature" of Petitioners' request is for a removal and detention process that features certain procedural protections not found in the Constitution or any statute—in essence, a process more to their liking. *See id.* Such "creative" framing is untenable, given § 1252(g)'s unambiguous proscription of judicial review over the actions immigration officials necessarily take to execute removal orders.

## III.    Petitioners are not likely to prevail on the merits of their constitutional claims.

Petitioners' merits arguments are premised on the government's imposition of a "total ban" on attorney access to NSGB immigration detainees. Pets. Mot. at 17-25 (also referring to the government's policy as a "wholesale restriction," "blanket denial," "total denial," a "complete lack of access," "no access at all," a "complete ban," a "complete abridgment"). That premise is not correct. Detainees have access to counsel, *see* Agudelo Detainees Declaration ¶¶ at 13, 29, 38, which precludes a showing of likely success on merits.

**A.    The detainees have not been deprived of constitutional rights to counsel or to seek habeas relief.**

Petitioners have not established a constitutional violation warranting emergency relief. As a factual matter, Petitioners have not established that any immigration detainee has sought and been denied counsel or the right to seek habeas relief since being transferred to NSGB. Venghaus Declaration at ¶ 17; Agudelo Declaration at ¶ 15. And as a legal matter, the available procedures adequately safeguard the limited rights of the NSGB immigration detainees.

Critically, the detainees have not been deprived of a constitutional right to access counsel. Detainees with final orders of removal do not have the same due process protections to access counsel as individuals applying for relief or protection as a part of their removal proceedings. Although every individual within the jurisdiction of the United States is entitled some level of due process, "the nature of protection[s] may vary depending upon status and circumstance[s]." *Zadvydas*, 533 U.S. at 694; *see Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 39 (D.D.C. 2020), *dismissed sub nom. Las Americas Immigrant Advoc. Ctr. v. Mayorkas*, No. 20-5386, 2024 WL 3632500 (D.C. Cir. Aug. 1, 2024) (noting that "claims of [due process] constitutional violations…[are] not always fully available to every claimant"); *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1254 (10th Cir. 2008) ("[I]t is not at all clear that removable aliens benefit from precisely the same advantages of due process as do citizens or lawful permanent resident aliens.").

Here, the detainees—none of whom are currently petitioners in this case and all of whom have final, executable removal orders issued after the completion of administrative proceedings—possess only a limited right to access counsel, as they have already exhausted their right to challenge removability and removal to their home country. *See Zadvydas*, 533 U.S. at 694; *Garcia Uranga v. Barr*, No. 20-3162-JWL, 2020 WL 4334999, at *7 (D. Kan. July 28, 2020) (finding no

due process violation when an individual detained under § 1231(a)(6) did not have his attorney present for 90-day Post Order Custody review); 8 U.S.C. § 1362; *see* Agudelo Detainees Declaration ¶¶ at 10, 26, 36. And due process affords no access to counsel for applicants for admission in expedited removal proceedings under 8 U.S.C. § 1225. *See Las Americas Immigrant Advoc. Ctr.*, 507 F. Supp. 3d at 39 (D.D.C. 2020) (citing *Thuraissigiam*, 591 U.S. at 109). Because Petitioners only allege that the government has violated their constitutional right of access to counsel based on an alleged blanket "ban on access" (Pets. Mot. at 24), and there is neither an absolute ban on access nor is there an absolute constitutional right to such access, the court should deny any emergency relief.

Furthermore, the requested relief is beyond what due process requires to remedy the asserted harms. Pets. Mot. at 27; *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (finding that access to counsel is violated only when conditions are "tantamount to denial of counsel"). Most notably, in-person visits with attorneys (*see* Pets. Mot. at 27) are not a constitutional requirement when other means of communication are available. *See Lyon v. ICE*, 171 F. Supp. 3d 961, 983 (N.D. Cal. 2016) (challenging only protocols for telephone access because the location of the facilities makes in-person visits "impractical at best," making telephonic access "critical"); *S. Poverty L. Ctr v. U.S. Dep't of Homeland Sec.*, No. CV 18-760 (CKK), 2020 WL 3265533, at *21 (D.D.C. June 17, 2020) (finding that communication via technology can satisfy due process in absence of in-person visitation during COVID-19). In this instance, requiring in-person visits would "deeply intrude[] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), such as administering detention facilities, *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) ("the operation of [detention] facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."); *Turner v. Safley*, 482 U.S. 78, 84-85

(1987). Because an alternative means of speaking with counsel remains open to detainees, Petitioners cannot show that there has been a constitutional deprivation based on the current unavailability of in-person attorney conferences. *Lyon*, 171 F. Supp. 3d at 983; *cf. Turkmen v. Ashcroft*, No. 02-CV-2307 (JG), 2006 WL 1662663, at *49 (E.D.N.Y. June 14, 2006), *aff'd in part, vacated in part, remanded*, 589 F.3d 542 (2d Cir. 2009) (finding facts showing total "communications blackout" prior to immigration court hearings was sufficient to state a claim for relief).

Furthermore, and as discussed, the detainees at NSGB are in the midst of the removal process after the completion of removal proceedings. *See* Agudelo Detainees Declaration ¶¶ at 10, 26, 36. Any claims that the government must extend the removal process so that detainees could potentially wish to contact counsel and potentially seek to raise additional claims are not found in the Constitution and are in tension with the statute's 90-day removal period. 8 U.S.C. § 1231(a)(1)(A).

Similarly, the court should reject Petitioners' assertion that detainees are being denied access to habeas relief. Petitioners fail to claim with any specificity—much less show—that the government is "unilaterally deny[ing] access to counsel to the detained immigrants at Guantanamo." Pets. Mot. at 18. This vague and incorrect assertion falls short of establishing that detainees are unable to bring habeas claims. Detainees have tools to file a habeas petition, including the ability to send and receive legal mail, seek legal representation, and to make confidential telephone calls to counsel. Venghaus Declaration at ¶¶ 23-27; Agudelo Declaration at ¶¶ 11-16; Agudelo Detainees Declaration ¶¶ at 13, 29, 38. Petitioners have therefore failed to show a likelihood of success on the merits of their due-process claim.

B.    **Petitioners are not likely to prevail on their First Amendment claim asserted on behalf of the detainees.**

Petitioners assert that the detainees have a right to "hire and consult an attorney" under the First Amendment's freedom of speech, Pets. Mot. at 19, an argument which lacks merit on several grounds. Critically, the First Amendment does not grant unfettered free speech rights in this context. *See Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1511 n.6 (11th Cir. 1992) (interdicted Haitians at Guantanamo and on Coast Guard ships lacked First Amendment rights); *Rafeedie v. I.N.S.*, 880 F.2d 506, 517 (D.C. Cir. 1989) ("The chilling effect of a pending exclusion proceeding is not one of which Rafeedie, as an alien, may complain."); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (excludable alien is not entitled to First Amendment rights, because "[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law").

Nevertheless, even if the Court identifies a protected First Amendment interest, Petitioners' claim lacks merit because the restrictions are reasonable. Under the Supreme Court's test in *Turner v. Safley*, courts uphold detention regulations as long as they are "reasonably related to legitimate penological interests," considering (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and 4) "the absence of ready alternatives" *Turner*, 482 U.S. at 107; *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998) (noting that the first factor "looms especially large"). Petitioners characterize the restrictions as a "total ban on attorney-client communication," Pets. Mot. at 19, which is simply not the case, as detainees do have access to phones to seek legal representation and speak with their attorneys. Agudelo

Detainees Declaration ¶¶ at 13, 29, 38.  And while the calls are not without temporal restrictions, this is to ensure all detainees have access and that calls with counsel are unmonitored.  Furthermore, limiting unmonitored calls to only those between client and counsel is reasonable given the national security concerns that could arise in sharing the specifications of a United States Navy base. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (recognizing the Government's "compelling interest in withholding national security information from unauthorized persons") (citation omitted).  Given that detainees are not precluded from contacting legal representation and speaking with retained counsel and that any restrictions are reasonably related to the government's interest in maintaining the military operations onsite, they have alleged no free speech violation under *Turner*.

### C.    The Organizational Petitioners have not been denied any First Amendment rights.

Petitioners' claim alleging a violation of the Organizational Petitioners' First Amendment right to represent and advise immigration detainees fails on the merits.  Pets. Mot. at 24-25.  As a threshold point, the Organizational Petitioners have not been deprived of access to speak to three named individuals.  *Cf.* Pets. Mot. at 25.  Indeed, the Organizations made no contact or request to speak with the individuals—whom they did not represent at the time to TRO was filed—prior to filing the Complaint and TRO.  And since that time, Respondents arranged for phone calls between the counsel and the three individuals. Venghaus Declaration at ¶¶ 18-20; Agudelo Detainees Declaration ¶¶ at 13, 29, 38.

In any event, the government "does not infringe a third party's First Amendment right to associate with a detainee by holding the detainee for a short period of time during which the third party is unable to contact him." *Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1381 (D.C. Cir. 1990); *Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 61 (D.D.C. 1998), *aff'd*, 199 F.3d

1352 (D.C. Cir. 2000). In any place other than a public forum, the government may limit communication as long as doing so is "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983); *Adderley v. State of Fla*., 385 U.S. 39, 41 (1966) (finding that "jails [which are] built for security purposes are not [public forums]"). Indeed, "[t]o admit everyone who would like to advise the alien . . . and to communicate their offers of assistance would impose a substantial burden upon the Government." *Ukrainian-Am. Bar Ass'n, Inc.*, 893 F.2d at 1381.

All of the detainees at NSGB who are undergoing the removal process are properly in the custody of DHS-ICE pursuant to 8 U.S.C. § 1231. Agudelo Declaration ¶¶ at 5, 6. And, unquestionably, the facilities at NSGB are not public forums. *In re Guantanamo Bay Detainee Continued Access to Couns.*, 892 F. Supp. 2d 8, 24 (D.D.C. 2012) (noting requirement for security clearances to access the premises). Thus, the government is not required to provide access to potential legal service providers as long as the restrictions are reasonable and not content-based. *Perry Education Ass'n,* 460 U.S. at 46. Critically, any limits on the means by which attorneys can communicate with detainees have absolutely no bearing on the content of that communication. *See Ukrainian-Am. Bar Ass'n, Inc*., 893 F.2d at 1381; *Am. Immigr. Laws. Ass'n*, 18 F. Supp. 2d at 61. In contrast, Petitioners define the contours of their First Amendment interest by relying on cases that considered content-based regulations on attorney speech and conduct in public forums. *NAACP v. Button*, 371 U.S. 415, 428-29 (1963) (considering statute prohibiting solicitation of legal business on behalf of an organization); *In re Primus*, 436 U.S. 412, 428 (1978) (considering constitutionality of ethical rules against soliciting legal business on behalf of an advocacy

organization).  Such cases are not probative, given that NSGB is not a public forum, nor do the restrictions here relate whatsoever to the content of the attorneys' speech.

Notwithstanding Petitioners' footnote to the contrary, the D.C. Circuit's binding decision in *Ukrainian American Bar Association* presents facts almost identical to the situation at hand. 893 F.2d at 1381.  There, the plaintiff-attorney learned from a news report that a noncitizen had jumped off a Soviet ship into the Mississippi river and—without any prior attorney-client relationship to that individual or any other detained noncitizen—alleged a First Amendment right of access to detainees for the purpose of offering free legal assistance.  *Id.* at 1376-77.  This Court rejected any such "right of access," noting specifically that "lawyers have no special first amendment status—that is independent of the alien's right to counsel." *Id.* at 1382 (also rejecting a carve out for pro bono lawyers).  This analysis clearly applies here: the legal services organizations do not have a First Amendment right to access the detainees separate from any right any detainees have to access retained counsel. *Cf. Nat'l Immigr. Project of Nat'l Laws. Guild*, 456 F. Supp. 3d at 28 (noting that "access to counsel is a "right is held by their clients, not the attorneys that make up [a legal organization's] membership"). As discussed, NSGB detainees have access to retained counsel, as well as notice regarding how to obtain counsel, and thus there is no First Amendment violation. Venghaus Declaration at ¶¶ 21-28; Agudelo Declaration at ¶¶ 11-16. Finally, even if the Court were to find that the Legal Service Organizations have some First Amendment interest, it follows that they must make the same showing as a detainee: "that an actionable claim . . . which [the detainee] desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented. . . ." *Ali v. District of Columbia*, 278 F.3d 1, 8 (D.D.C. 2002); *see also Nelson v. District of Columbia*, 928 F. Supp. 2d 210, 215 (D.D.C. 2013) (denying inmate's conclusory allegation that lack of unfettered communication with his

lawyer adversely affected his sentencing proceeding); *Akers v. Watts*, 740 F. Supp. 2d 83, 96 (D.D.C. 2010) (holding that First Amendment right of access claim must allege "actual prejudice or injury" as a result of the government's deprivation); *Delaney v. District of Columbia*, 659 F. Supp. 2d 185, 196 (D.D.C. 2009) (a denial of access claim "may be brought where (1) systemic official action frustrates a plaintiff in preparing and filing suits . . . or (2) official action precludes a claim resulting in the loss or inadequate settlement of a meritorious case or the loss of the opportunity to bring suit."). Notably, here, the Petitioners have not argued that specific prejudice resulted from any restrictions to accessing the detainees; indeed, such an argument would be speculative and hypothetical, given that no attorney-client relationship existed between them at the time of filing the TRO and they have since spoken to the clients they have retained.

### D. Petitioners are not likely to prevail on their substantive due process claim.

When it is alleged that a detainee in immigration detention has been deprived of liberty without due process, "the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment." *S. Poverty L. Ctr.,* No. CV 18-760 (CKK), 2020 WL 3265533, at *18 (quoting *Block v. Rutherford*, 468 U.S. 576, 583 (1984)). To prevail on a claim, the detainee must establish either a "subjective intent to punish" or "that a restriction is unreasonable or excessive relative to the Government's proffered justification." *Americans for Immigrant Just*., No. CV 22-3118 (CKK), 2023 WL 1438376, at *11; *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017). While restrictions on communications can constitute punitive detention where "alterative and less harsh methods are available," those methods must "equally serve the institution's legitimate interests." *Americans for Immigrant Just*., No. CV 22-3118 (CKK), 2023 WL 1438376, at *12. If the detainee can establish that his conditions of confinement are equal to or worse than conditions experienced by inmates convicted of a criminal offense, the burden shifts to the

government to establish that the conditions are "rationally related to a non-punitive purpose and… not excessive." *Id.*

Here, Petitioners again rely on a mischaracterization of the counsel access procedures to support their claim, stating that there has been a "total elimination of … access to counsel" and that detainees are "cut off from the outside world." Pets. Mot. at 21. Petitioners contend that, in this context, substantive due process requires that Respondents provide "attorney visits in a private conference room, if available," "legal mail," and facilitate at least some unmonitored legal telephone calls." *Id.* NSGB immigration detainees have access to legal mail and DoD and DHS are facilitating unmonitored legal telephone calls. Venghaus Declaration at ¶¶ 23-28; Agudelo Declaration at ¶¶ 11-16. Although DoD and DHS are not presently facilitating in-person attorney visits, Petitioners acknowledge that the in-person visits need only be facilitated "if available." Pets. Mot. at 21. Moreover, restrictions on in-persons visits are not excessive and are rationally related to a non-punitive purpose because they further the government's interest in securing the detention and military facilities at this United States Navy Base. *See Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) ("Prison security…is beyond cavil a legitimate governmental interest"); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012) ("The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials"). To the extent that immigration detainees are at NSGB for only a short period prior to removal, in-person access provides little additional benefit and adds significant costs and obstacles to facilitate. *See* Venghaus Declaration at ¶ 29.

IV.    **The detainees do not have a statutory right to counsel.**

Although 8 U.S.C. § 1362 and 8 C.F.R. § 1003.16 recognize a right to representation at no expense to the government "in any removal proceeding before an immigration judge and in any appeal proceeding" therefrom, this provision does not extend to detainees with final orders of removal.  *See* 8 U.S.C. § 1229a(a)(1) (defining "removal proceedings" as the process of "deciding the inadmissibility or deportability of an alien"); 8 C.F.R. § 1241.1 (stating that "[a]n order of removal made by the immigration judge at the conclusion of proceedings…shall become final upon dismissal of an appeal by [the Board], upon waiver of appeal … [or], upon expiration of the time allotted for an appeal …"); *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018) (distinguishing between detention and the end of removal proceedings).

As a result, the INA no longer affords any right to retained counsel after the conclusion of removal proceedings. *See Garcia Uranga*, No. 20-3162-JWL, 2020 WL 4334999, at *7 (finding no right for noncitizen detained under § 1231 to have attorney present at 90-day Post Order Custody review); *cf. Rosa v. McAleenan*, 583 F. Supp. 3d 850, 883 (S.D. Tex. 2019) (finding no statutory right to access counsel for noncitizen in Customs and Border Protection custody until he either applies for asylum or expresses a fear of persecution because the "[c]ourt would have to graft into the statute a right for aliens to access counsel at a point previously unrecognized in the law."). Moreover, at least some of the NSGB detainees are subject to expedited removal orders and therefore did not have a statutory right to counsel even when their expedited removal proceedings were ongoing. *See* 8 U.S.C. § 1225; *Las Americas Immigrant Advoc. Ctr.*, 507 F. Supp. 3d at 39 (D.D.C. 2020) (citing *Thuraissigiam*, 591 U.S. at 109). Because the NSGB immigration detainees all have final orders of removal, they are no longer "in removal

proceedings" or appealing therefrom, and are not covered by the statutory and regulatory language of 8 U.S.C. § 1362 and 8 C.F.R. § 1003.16.

**V.      The equities favor denial of the request for a temporary restraining order.**

The balance of harms and the equities strongly favor the government as the requested relief (transfer restrictions in particular) would undermine the government's discretion to manage its limited detention resources to execute final removal orders, and to conduct sensitive foreign policy affairs, including repatriation discussions. To the extent the Court deems an order of relief appropriate here, it should be very narrowly tailored to account for the government's weighty interest and discretion, as well as the sensitivity of directing resources at NSGB, "a key operational and logistics hub for the Department of Defense." Venghaus Declaration at ¶ 3.

An injunction would undermine the Executive's discretion to allocate and marshal its limited detention resources in support of a high-level Executive priority, the removal of individuals subject to lawfully entered final orders of removal. Given the evidence that access protocols are in place, the allegations here should not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), including the "efficient administration of the immigration laws at the border," like the enforcement of expedited removal orders. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (citing *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). "There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and 'permit[s] and prolong[s] a continuing violation of United States law.'" *Nken v. Holder*, 556 U.S. 418, 436 (2009) (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525

U.S. 471, 490 (1999)). Here the "interest in prompt removal may be heightened" . . . "if, for example, the alien[s] [are] particularly dangerous." *Id*.

The proposed order's restrictions on the government's ability to complete the removal operation also risks interfering with sensitive repatriation negotiations and other foreign political issues involved in the execution of hundreds of removal orders. *See* Agudelo Declaration ¶ at 11. The Courts consistently recognize Executive Branch primacy in foreign policy matters, *Zadvydas*, 533 U.S. at, 700, and this Court should not overstep by preventing the Executive from taking its final step in these repatriation efforts.

Finally, if this Court were to conclude that any relief is warranted, such relief should be narrowly crafted to afford maximum Executive discretion and avoid forced reallocation of resources at NSGB. As an important DoD hub, the NSGB is home to many sensitive missions and operations that are conducted in an environment with unique limitations. Venghaus Declaration at ¶ 3. Any order should therefore be carefully crafted to avoid having an operational impact on other NSGB missions.

## CONCLUSION

The Court should deny the motion for a temporary restraining order.

Dated: February 20, 2025                    Respectfully submitted,


                                            BRETT A. SHUMATE
                                            *Principal Deputy Assistant Attorney General*
                                            DREW ENSIGN
                                            *Deputy Assistant Attorney General*
                                            AUGUST FLENTJE
                                            *Acting Director*


                                    By: <u>*/s/ Sarah Wilson*</u>
                                            SARAH WILSON
                                            *Assistant Director*
                                            U.S. Department of Justice, Civil Division
                                            Office of Immigration Litigation
                                            P.O. Box 878, Ben Franklin Station
                                            Washington, DC 20044
                                            Tel: (202) 532-4700
                                            Email: sarah.s.wilson@usdoj.gov

                                            *Counsel for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that February 20, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: _/s/ Sarah Wilson_
    SARAH WILSON
    United States Department of Justice