# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*,

*Plaintiffs–Petitioners*,

v.

KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, *et al.*,

*Defendants–Respondents*.

Case No: 1:25-cv-00418-CJN

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 2

   A.  Detainees at Guantánamo Retain The Right To Pursue Legal Claims. .............................. 2

   B.  The Government Has Blocked Attorney Access At Guantánamo. ....................................... 4

   C.  The Government's New Access Protocols Are Not Sufficient. ............................................ 5

       1. Problems For Detainees Who Lack Counsel Upon Arrival At Guantánamo. ................ 5

       2. Problems For Represented Detainees. ........................................................................ 8

   D.  Detainees Are Held At Guantánamo Based On False Narratives Of Public Safety. ........ 10

ARGUMENT ........................................................................................................................... 11

   I.   Plaintiffs Have Standing To Seek The Relief Sought In The Proposed TRO. ................. 11

   II.  Plaintiffs Are Likely To Succeed On The Merits. ............................................................. 14

       A. Defendants Are Violating Detainees' Right To Seek Habeas Corpus. ......................... 14

       B. Attorney Access Restrictions Violate the Detainees' First Amendment Rights. ......... 15

       C. Defendants Violate Detained Immigrants' Fifth Amendment Substantive Due Process Right Against Punishment. ............................................................................ 16

       D. Defendants Violate Detainees' Statutory Right To Counsel. ........................................ 18

       E. Defendants' Restrictions On Attorney Access Violate The Plaintiff Organizations' First Amendment Rights. ............................................................................................. 20

   III.  The Balance of Equities and Public Interest Support Granting the TRO. ....................... 21

CONCLUSION ........................................................................................................................ 22

## TABLE OF AUTHORITIES

**CASES**

*Al Odah v. United States*,
   346 F. Supp. 2d 1 (D.D.C. 2004) ............................................................................ 14

*Al-Amin v. Smith*,
   511 F.3d 1317 (11th Cir. 2008) .............................................................................. 21

*Am. C.L. Union Found. ex rel Unnamed U.S. Citizen v. Mattis*,
   286 F. Supp. 3d 53 (D.D.C. 2017) ......................................................................... 13

*Americans for Immigrant Just. v. DHS*,
   No. CV 22-3118 (CKK), 2023 WL 1438376 (D.D.C. Feb. 1, 2023)............... 11, 12, 13, 16, 17

*Arizona All. for Retired Americans v. Mayes*,
   117 F.4th 1165 (9th Cir. 2024)............................................................................... 11

*Benjamin v. Fraser*,
   264 F.3d 175 (2d Cir. 2001).................................................................................... 15

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
   471 F. Supp. 3d 25 (D.D.C. 2020) ......................................................................... 12

*Coal. of Clergy, Laws., & Professors v. Bush*,
   310 F.3d 1153 (9th Cir. 2002)................................................................................ 13

*Demery v. Arpaio*,
   378 F.3d 1020 (9th Cir. 2004)................................................................................ 15

*Does v. Bush*,
   No. Civ. A. 05-313 (CKK), 2006 WL 3096685 (D.D.C. Oct. 31, 2006).................................. 14

*Equal Rts. Ctr. v. Post Properties, Inc.*,
   633 F.3d 1136 (D.C. Cir. 2011) ............................................................................. 11

*FDA v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024) ......................................................................................... 11, 12

*Garcia Uranga v. Barr*,
   No. 20-3162-JWL, 2020 WL 4334999 (D. Kan. July 28, 2020) ............................. 19

*Haitian Refugee Ctr., Inc. v. Baker*,
   953 F.2d 1498 (11th Cir. 1992)............................................................................... 15

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ............................................................................................. 11, 12

*In re Guantanamo Bay Detainee Continued Access to Couns.*,
   892 F. Supp. 2d 8 (D.D.C. 2012) ............................................................................... 14

*In re Guantanamo Bay Detainee Litig.*,
   577 F. Supp. 2d 143 (D.D.C. 2008) ....................................................................... 9, 17

*In re Kumar*,
   402 F. Supp.3d 377 (W.D. Tex. 2019) ........................................................................ 15

*Johnson by Johnson v. Brelje*,
   701 F.2d 1201 (7th Cir. 1983) .................................................................................... 16

*Johnson v. Galli*,
   596 F. Supp. 135 (D. Nev. 1984) ................................................................................ 16

*Johnson-El v. Schoemehl*,
   878 F.2d 1043 (8th Cir. 1989) .................................................................................... 16

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004) ...................................................................................... 17

*Jones v. Brown*,
   461 F.3d 353 (3d. Cir. 2006) ...................................................................................... 21

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
   507 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................... 20

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ...................................................................................... 22

*Lewis v. Casey*,
   518 U.S. 343 (1996) .................................................................................................... 21

*Procunier v. Martinez*,
   416 U.S. 396 (1974) .................................................................................................... 20

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) .................................................................................... 22

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................................. 21

*Rafeedie v. I.N.S.*,
    880 F.2d 506 (D.C. Cir. 1989) ................................................................................... 15

*Rosa v. McAleenan*,
    583 F. Supp. 3d 850 (S.D. Tex. 2019) .............................................................. 19, 20

*S. Poverty L. Ctr. v. DHS*,
    No. 18-0760, 2020 WL 3265533 (D.D.C. June 17, 2020) ........................... 12, 13, 21

*Torres v. DHS*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ..................................................................... 17

*Turner v. Safley*,
    482 U.S. 78 (1987) ..................................................................................................... 15

*Ukrainian-Am. Bar Ass'n, Inc. v. Baker*,
    893 F.2d 1374 (D.C. Cir. 1990) ................................................................................ 21

*United States ex rel. Turner v. Williams*,
    194 U.S. 279 (1904) ................................................................................................... 15

*Whitman-Walker Clinic, Inc. v. HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................. 12

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................................................. 13, 14

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................................................... 2, 15

**STATUTES**

8 U.S.C. § 1101(a)(15)(t)(IV) ........................................................................................... 2

8 U.S.C. § 1101(a)(15)(U) ................................................................................................. 2

8 U.S.C. § 1154(a)(1)(A)(iii) ............................................................................................. 2

8 U.S.C. § 1225(b)(1)(B)(iv) ........................................................................................... 19

8 U.S.C. § 1229a ......................................................................................................... 18, 19

8 U.S.C. § 1229a(a)(1) ..................................................................................................... 18

8 U.S.C. § 1229a(b)(4)(A) ............................................................................................... 19

8 U.S.C. § 1229a(c)(6) ........................................................................................... 18

8 U.S.C. § 1229a(c)(6)(7) ........................................................................................ 2

8 U.S.C. § 1254a ...................................................................................................... 2

8 U.S.C. § 1362 ....................................................................................................... 18

## REGULATIONS

28 C.F.R. § 543.13(a) .............................................................................................. 16

8 C.F.R. § 1003.16(b) ............................................................................................. 18

8 C.F.R. § 241.4(h)(2) ............................................................................................ 19

## OTHER AUTHORITIES

@US-TRANSCOM, X.com (Feb. 23, 2025, 1:14 PM),
   https://x.com/us_transcom/status/1893726139153105198?s=46&t=T83ZueYlz3A6ljIjd74F_g
   [https://perma.cc/WV3F-QCAZ] ................................................................................ 2

Camilo Montoya-Galvez, *U.S. Sending Nonviolent, "Low-Risk" Migrants to Guantánamo,
   Despite Vow to Detain "the Worst" There*, CBS News (Feb. 12, 2025),
   https://www.cbsnews.com/news/Guantánamo-bay-migrants-trump. ........................................ 10

Carol Rosenberg and Charlie Savage, *Here Are the Names of 53 Migrants Taken to Guantanamo
   Bay*, N.Y. Times, Feb. 12, 2025, https://www.nytimes.com/2025/02/12/us/politics/gitmo-
   migrants-list.html. ........................................................................................ 3

ICE, Attorney Information and Resources, https://www.ice.gov/detain/attorney-information-
   resources [https://perma.cc/WY79-GM53] ("Locating a Detained Alien"). .................... 6, 9, 17

ICE, Performance-Based National Detention Standards 2011 ("PBNDS") (2016) § 5.7(V)(J)
   (Visits by Legal Representatives); § 6.4(II) (Legal Rights Group Presentations,
   https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf
   [https://perma.cc/C3HZ-8C2Z]. .......................................................................... 6

PBNDS § 5.6(III)(V)(A), (D) (Telephones and Telephone Services; Detainee Access) .............. 6

PBNDS §§ 5.7(V)(J)(7)-(8) (Pre-Representational Meetings and Form G-28 and Attorney/Client
   Meetings). ................................................................................................ 6

Silvia Foster-Frau et al., *Relatives and Record Cast Doubt on Guantanamo Migrants Being
   'Worst of the Worst'*, Washington Post (Feb. 16, 2025), *available at*
   https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-

deportations-venezuela/ .......................................................................................................... 10

The White House, *Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity* (Jan. 29, 2025) ................................................................................................... 10

## INTRODUCTION

At every turn, the government stresses that it has now implemented an attorney access system. That emphasis is understandable. It would have been untenable for the government to defend a policy that allowed it to take individuals off U.S. soil and send them to a military base in Cuba with no access to the outside world, including to attorneys. The question, then, is whether the access Defendants now claim to be providing is legally sufficient. It is not. Among other things, Defendants will not even confirm which detainees are at Guantánamo; have imposed unreasonable limits on calls; barred timely exchange of legal documents; and prohibited in-person visits.

The government also claims Plaintiffs failed to seek access and chastises Plaintiffs for "mischaracteriz[ing]" Guantánamo as a total "blackout," perhaps intending to suggest that this case was unnecessary. Defs.' Opp. Br. ("Opp.") 31, 11, ECF No. 14.[1] But Plaintiffs did seek access. Before filing, Plaintiffs wrote Defendants asking for legal access and protocols. Defendants did not respond directly, but instead posted a comment on social media, which they also provided to the press, deriding Plaintiffs' request. Pls.' TRO Mem. ("Mot.") 9 & n.12, ECF No. 3-2. Plaintiffs also unsuccessfully attempted, before and after filing this case, to locate individuals who they believed may have been sent to Guantánamo. Insofar as Plaintiffs learned the names of some of the initial detainees, it was only because the government took the unprecedented step of posting detainee pictures online. Indeed, it was only in the government's February 20 opposition papers in which they announced that, one day before, they had instituted a barebones attorney access system. Any suggestion that this lawsuit was unnecessary, or that Plaintiffs were off base in calling Guantánamo a black box, is misplaced.

Finally, as the Court is aware, late on the night of February 20, Defendants provided official

---

[1] Page citations are to the pagination in the brief.

notice that, within hours of filing their opposition brief, they had transferred all immigrant detainees off Guantánamo (an action Defendants presumably were aware would occur when they filed their brief). Notice at 1, ECF No. 15. Defendants suggested that the TRO was therefore moot. *Id.* On the afternoon of Sunday, February 23, Plaintiffs learned via social media that the government has now transferred additional detainees to Guantánamo.[2] Even assuming the government were to remove this new batch of detainees from Guantánamo before this Court can adjudicate the TRO, Plaintiffs' request for immediate action would not be moot; otherwise the government could continually thwart judicial review.[3]

## FACTUAL BACKGROUND

### A. Detainees at Guantánamo Retain The Right To Pursue Legal Claims.

Detainees who may have final orders of removal still have a right to pursue legal claims. Noncitizens with final orders have available many forms of immigration relief and legal remedies, including motions to reconsider and reopen, 8 U.S.C. §§ 1229a(c)(6)-(7); relief under the Violence Against Women Act, 8 U.S.C. § 1154(a)(1)(A)(iii); Temporary Protected Status, 8 U.S.C. § 1254a; U- and T- visas, 8 U.S.C. §§ 1101(a)(15)(U), (a)(15)(t)(IV); and challenges to unlawful conditions of confinement. Noncitizens with final orders of removal may also seek release from detention, including through federal habeas petitions where deportation is not reasonably foreseeable. *Zadvydas v. Davis*, 533 U.S. 678, 687-89 (2001). Detainees would also likely qualify for a motion to reopen their asylum cases based on changed country conditions, due to the government's publication of their photos, and resulting publication of their names, making them targets in their home country. Suppl. Decl. of Jennifer Babaie ("Suppl. Las Americas Decl.") ¶¶ 4–5, 7–9. The

---

[2]    @US-TRANSCOM,    X.com    (Feb.    23,    2025,    1:14    PM), https://x.com/us_transcom/status/1893726139153105198?s=46&t=T83ZueYlz3A6ljIjd74F_g [https://perma.cc/WV3F-QCAZ] (confirming arrival of new flight of immigrant detainees).

[3] For purposes of the TRO, Plaintiffs do not sustain the requested relief for notice of transfers.

detainees have now been publicly outed as people who sought refuge in the United States; they could therefore face treason-like charges upon return. *Id*. Without access to counsel, the risk of error is grave, including the possibility that the government may mistakenly remove detainees with pending cases, or even claims to U.S. citizenship. Indeed, the government has already had to return at least one person back to the United States, based on a motion to reopen. Decl. of Juan Agudelo ("Agudelo Decl. I") ¶ 9, ECF No. 14-1.

The lack of basic information about immigrants at Guantánamo has hampered Plaintiffs from determining which of their clients had been moved to Guantánamo, and what further legal options were available to them. After the *New York Times* published a list of 53 names of detainees held at Guantánamo,[4] Plaintiffs confirmed that they had, in fact, worked with and engaged in pre-representational consultation with several of these detainees, and determined that the detainees had grounds for further relief. *See* Decl. of Rebecca Lightsey ("Suppl. Am. Gateways Decl."), ¶¶ 3–5; Suppl. Las Americas Decl. ¶¶ 3–9.

Since this case was filed, many more families have confirmed that their family members have been held at Guantánamo, expressed anguish caused by lack of information, raised concern with the false accusations of gang affiliation made by the government, and voiced their desire that they be represented by Plaintiffs. Ruiz Decl. ¶¶ 3, 12–16; Palma Rodriguez Decl. ¶¶ 6–11; Guilarte Tobar Decl. ¶¶ 10–13; Cardiel Bastardo Decl. ¶¶ 10-11; Arapé Valderrama Decl. ¶¶ 10–11; Alviarez Tabares Decl. ¶¶ 6–8; Moreno Rodriguez Decl. ¶¶ 6–8; Guillen Sanchez Decl. ¶¶ 4, 6–8. Currently, there is no way for families to contact detainees held at Guantánamo.

---

[4] Carol Rosenberg and Charlie Savage, *Here Are the Names of 53 Migrants Taken to Guantanamo Bay*, N.Y. Times, Feb. 12, 2025, https://www.nytimes.com/2025/02/12/us/politics/gitmo-migrants-list.html.

**B. The Government Has Blocked Attorney Access At Guantánamo.**

Defendants claim Plaintiffs "made no contact or request to speak" to detainees, and that there is "no record of any detainee making a requested [sic] to speak to counsel prior to filing of this suit." Opp. 37, 16. Yet, in addition to Plaintiffs' letter to Defendants, Plaintiffs reached out multiple times to ICE to contact detainees suspected of being transferred to Guantánamo and were met with no response or told it was not possible to contact them "in transit." Declaration of My Khanh Ngo ¶¶ 10, 14, ECF No. 3-10. Plaintiffs also repeatedly contacted local ICE offices, to no avail. Mot. 7–9; Suppl. Las Americas Decl. ¶¶ 10–15. Since February 23, Plaintiffs have done the same amid reports that the government sent more detainees to Guantánamo. Suppl. Am. Gateways Decl. ¶ 6; Suppl. Las Americas Decl. ¶ 16; Suppl. Decl. of Javier Hidalgo ("Suppl. RAICES Decl.") ¶¶ 2–4.

During phone calls on February 17 with the three individuals named in the complaint, Decl. of Jennifer Venghaus ("Venghaus Decl.") ¶ 20, ECF No. 14-3, which were provided only as a condition of extending the briefing schedule, detainees confirmed that officers had ignored or rejected their repeated requests for phone calls. Officers told detainees that "this is a terrorist prison and there is no capacity to make calls," and that calls were "not possible." Decl. of Tilso Gomez Lugo ("Gomez Lugo Decl.") ¶ 6; Decl. of Yoiker Sequera, ¶ 6; Decl. of Luis Alberto Castillo Rivera ("Castillo Decl.") ¶ 5. Plaintiff Gomez Lugo and others were so desperate for information and phone calls that they went on a hunger strike. Gomez Lugo Decl. ¶ 5. Plaintiff Luis Alberto Castillo Rivera did not even know he was at Guantánamo until informed by counsel. Castillo Decl. ¶¶ 4–6.

Detainee testimony also directly refutes the accuracy of Defendants' representations regarding attorney access at Guantánamo. For example, Defendants claim that "written notice of counsel is to be posted and distributed to each alien at both Camp VI and the MOC." Agudelo

Decl. I ¶ 12. Defendants also claim that "Detainees may request a legal call with a legal representative by submitting a detainee request form." *Id.* But Plaintiff Castillo reports that he asked officers at Guantánamo "multiple times to speak again with my attorney." Suppl. Decl. of Luis Alberto Castillo Rivera ("Castillo Suppl. Decl.") ¶ 5. The officers, however, simply told him that "it was not possible to make a call." *Id.* Mr. Castillo also reported that although in the evening of Wednesday, February 19, officials distributed papers with information about their rights to speak with an attorney, officers informed detainees that "it did not matter anyways because [they] were going to be promptly deported," and that "there was nothing [they] could do, because [they] had final orders of deportation." *Id.* ¶ 6.

The government has also ignored requests from attorneys on base at Guantánamo for in-person legal visits. On February 17, James Connell, an attorney who has Top Secret/Secure Compartmented Information clearance and represents several law-of-war prisoners at Guantánamo, contacted the government to request an in-person legal visit with immigrant detainees. Decl. of James Connell ("Connell Decl.") ¶¶ 5–9. Mr. Connell followed up on February 20, but has received no response. *Id.* ¶¶ 10–13.

**C. The Government's New Access Protocols Are Not Sufficient.**

The procedures supposedly now in place are deficient and well below those available in U.S. immigration detention facilities, federal prisons, and even military detention at Guantánamo.

**1. Problems For Detainees Who Lack Counsel Upon Arrival At Guantánamo.**

Most detainees held at Guantánamo will not have existing attorney-client relationships. If they were still held in the United States, however, they would have extensive pre-representational access to lawyers with whom they could consult and ultimately retain if they choose. As an initial

matter, the specific location of every immigrant detainee in the United States appears in an online detainee locator at https://locator.ice.gov/odls.[5] Immigrant detainees in the United States have access to legal organizations and attorneys through a variety of means, including ICE's provision of a list of free legal service providers; access to group presentations on their legal rights; the ability to communicate and correspond with legal organizations that conduct presentations and screenings at detention facilities; and access to in-person legal visits seven days a week, including for pre-representational meetings.[6] Moreover, detainees have access to phones during "waking hours," and can make toll-free calls to groups identified on ICE's list of free legal service providers.[7] This access is critical because most detainees lack knowledge of the law, and often lack English proficiency and/or formal education. But because organizations like Plaintiffs routinely visit these facilities and are reachable by phone, detainees can learn their rights, including whether their removal or detention is unlawful, regardless of whether the detainee has a final order. *See* Suppl. RAICES Decl. ¶ 6.

Critically, lawyers need not submit an official form to meet with a detainee at the pre-representational stage, or if they represent the detainee in a non-immigration matter, such as a civil rights issue. Once attorneys agree to represent the detainee in immigration proceedings, they must submit a Form G-28 (Notice of Entry of Appearance). But, as the government recognizes, lawyers will not know whether they wish to represent a detainee, or even whether the detainee needs representation, until after a consultation. Consequently, a G-28 form need not be submitted at this

---

[5] ICE, Attorney Information and Resources, https://www.ice.gov/detain/attorney-information-resources [https://perma.cc/WY79-GM53] ("Locating a Detained Alien").

[6] ICE, Performance-Based National Detention Standards 2011 ("PBNDS") (2016) § 5.7(V)(J) (Visits by Legal Representatives); § 6.4(II) (Legal Rights Group Presentations, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc/C3HZ-8C2Z].

[7] PBNDS § 5.6(III)(V)(A), (D) (Telephones and Telephone Services; Detainee Access).

pre-representational stage to speak with detainees in the United States.[8]

The protocols Defendants claim to have set up at Guantanamo fall woefully short of these established procedures. First, Defendants have refused to state in the ICE online locator whether a detainee is at Guantánamo. Defendants have never provided a reason why they cannot take that simple step, so that lawyers and family members need not guess—and worry—about the detainee's whereabouts. Second, even where legal organizations learn that detainees have been sent to Guantanamo, they cannot contact them without first filing a G-28 Form. *See* Agudelo Decl. I ¶ 14. But no attorney would ever agree to represent someone without first talking to them. That is precisely why a G-28 is not required for pre-representation consultation in U.S. facilities.

Third, because Defendants are not allowing rights' presentations, either in person or by video, detainees will not know what rights they have, much less what to do if they want to pursue those rights. Suppl. RAICES Decl. ¶ 6. As shown by the established practice in the United States, these presentations are essential to identifying legal violations. *Id.*

Fourth, although Defendants say they have posted an ABA hotline number that detainees can call to request an attorney, that hotline is useful only if detainees on their own realize they need an attorney, without the benefit of a Know Your Rights presentation. It is not certain that detainees will see the poster. Defendants say they are posting the notice in the common area of Camp 6 and "at the [Migrant Operations Center ("MOC")]" (without specifying where), Venghaus Decl. ¶ 21, but given the extreme restrictions on movement at both, it is unclear whether detainees will actually see any information if not provided the information directly.

Finally, the hotline's hours are extremely limited, and its functionality is unclear. Decl. of Adonia Simpson ¶¶ 4–5. And even assuming the detainee saw the poster and wished to call the

---

[8] PBNDS §§ 5.7(V)(J)(7)-(8) (Pre-Representational Meetings and Form G-28 and Attorney/Client Meetings).

hotline to obtain an attorney, it is unclear how they would do so. Defendants state only that detainees "will be given the opportunity to request a private telephone call . . . to *their lawyers*." Agudelo Decl. I, ¶¶ 15–16 (emphasis added). But it is unclear whether that allows for a call to the hotline when the detainee has not yet secured representation. Detainees have reported that officers have told them that it was not possible to make a call to their attorneys, and that "getting a lawyer did not matter anyways because [they] were going to be promptly deported." Castillo Suppl. Decl. ¶¶ 5–6. Moreover, at the MOC, only five detainees per day can have a phone call, at 20 minutes each. Before the government transferred all the detainees off base on February 20, there were 51 detainees at the MOC, *id*. ¶ 10, meaning that some detainees would have had to wait 10 days just to make a call even to start the process of finding an attorney. And at Camp 6, where many of the detainees are held, it is far from clear what the process would be if detainees wished to call the hotline, even assuming they were aware of it.

### 2. Problems For Represented Detainees.

Even detainees who arrive at Guantánamo with preexisting representation, or who manage to secure representation while at Guantánamo, face significant obstacles. First, as noted, the MOC allows only five detainees a call per day, so a detainee could wait for days or even weeks for a single call. Agudelo Decl. I, ¶ 16. Each call is limited to 20 minutes. *Id*. Given the need for an interpreter in most cases, this will amount to roughly 10 minutes of substantive discussion in practice, obviously insufficient time to establish a relationship with the client and understand the case. And if a follow-up call is necessary, the detainee may have to wait days or weeks more. A full hour of substantive discussion with a client could potentially take months.

At Camp 6, the number and length of calls afforded daily to detainees is unspecified. Detainees are unable to call attorneys from the facility, and instead must notify facility staff that

they wish to speak with counsel. Staff, in turn, will convey this information to counsel, who must then formally file a request with the Department of Defense ("DOD") to speak with their client. Venghaus Decl. ¶ 27. DOD will then coordinate with Camp 6 staff to arrange for a call. While the calls are supposed to be facilitated in a "timely manner," it is not clear how long this process could take in practice. *Id*. Moreover, Defendants have not actually provided any actual instructions, such as phone numbers, email addresses, or webpages with relevant information that, in practice, would enable legal communication with detainees. *Compare with* ICE, Attorney Information and Resources, https://www.ice.gov/detain/attorney-information-resources https://perma.cc/WY79-GM53]. Defendants state that attorneys can request calls with detainees by following instructions on "ICE.gov." *Id*. ¶ 14. But there are no such instructions anywhere on ICE's website.

Second, detainees have no timely way to exchange or sign legal documents. The government has provided no protocol for attorneys to visit detainees that would enable them to exchange documents in person. Venghaus Decl. ¶ 29. The government has issued no specific protocol regarding legal mail, either at Camp 6 or the MOC, but states it will "generally follow the procedures used in the habeas litigation involving law of war detainees." Venghaus Decl. ¶¶ 27-28. Military detainees' mail is delivered within two business days after arrival on base, *see In re Guantanamo Bay Detainee Litig*., 577 F. Supp. 2d 143, 160 (D.D.C. 2008), but Defendants state the immigration detainees' legal mail will only be delivered and sent from Guantanamo to Washington, D.C. on a *weekly* basis. Agudelo Decl. I, ¶ 17. Here, it would take many weeks for an immigrant detainee to receive a draft declaration, send back edits, receive a revised version, and send back a signed version for filing—a task that could be completed in two in-person visits at a facility in the United States. Suppl. RAICES Decl. ¶ 7. And unlike other ICE detention facilities, there is no fax, email, or other means to exchange documents in a timely manner. *See*

ICE, Attorney Information and Resources; Suppl. RAICES Decl. ¶¶ 7–8.

**D.  Detainees Are Held at Guantánamo Based on False Narratives of Public Safety.**

President Trump has instructed the government to detain immigrants at Guantánamo in order to hold what he calls the "worst criminal illegal aliens threatening the American people,"[9] and to "provide additional detention space for high-priority criminal aliens."[10] The government has also widely described migrants detained at Guantánamo as alleged members of Tren de Aragua, a Venezuelan gang.[11] However, as several news outlets have reported, government officials admit that they are sending nonviolent, "low-risk" immigrant detainees who lack serious criminal records or any at all.[12] Multiple families have also spoken out about the government's false accusations of gang membership. *Id.*; *supra* pp. 3-4. Among the three Individual Plaintiffs, Defendants point to no criminal activity other than immigration violations for illegal entry, and cite no support for their allegation that they are "suspected associate[s]" of the gang. Juan Agudelo Decl. ("Agudelo Decl. II") ¶¶ 14, 23, 39, ECF No. 14-2. Defendants also admit in their opposition that many among the 178 detainees were classified by DHS as "low risk." Venghaus Decl. ¶¶ 11-13 (51 "low risk" detainees detained at the MOC).

---

[9] The White House, *Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity* (Jan. 29, 2025), previously located at https://www.whitehouse.gov/presidentialactions/2025/01/expanding-migrant-operations-centerat-naval-station-guantanamo-bay-to-fullcapacity/ [https://perma.cc/ZJA4-KDS2].

[10] Camilo Montoya-Galvez, *U.S. Sending Nonviolent, "Low-Risk" Migrants to Guantánamo, Despite Vow to Detain "the Worst" There*, CBS News (Feb. 12, 2025), https://www.cbsnews.com/news/Guantánamo-bay-migrants-trump.

[11] *Id.*

[12] *See, e.g. id.*; Silvia Foster-Frau et al., *Relatives and Record Cast Doubt on Guantanamo Migrants Being 'Worst of the Worst'*, Washington Post (Feb. 16, 2025), *available at* https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/.

## ARGUMENT

**I.    Plaintiffs Have Standing To Seek The Relief Sought In The Proposed TRO.**

**Injury in Fact.** Despite acknowledging that Plaintiff Organizations have "had to shift resources" in response to the detention of noncitizens at Guantánamo, Opp. 10, Defendants argue that this injury is insufficient.[13] Defendants simultaneously claim that Plaintiffs lack standing because their expenditures were "undertake[n] as a continuation of [the organizations'] core activities" *and also* because they failed to show harm to "already-existing core activities." Opp. 10-11. Defendants cannot have it both ways. When an organization expends resources "to counteract the effects of the defendants' allegedly unlawful acts," it establishes injury. *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011). Here, standing is established because "government action makes it more difficult for [the organizational plaintiffs] to communicate with [] potential client[s], [and they] must expend more resources (financial, logistical, etc.) to reach [those] potential client[s]." *Americans for Immigrant Just. v. DHS*, No. CV 22-3118 (CKK), 2023 WL 1438376, at *7 (D.D.C. Feb. 1, 2023) *("AIJ"); see also* Mot. 7; Suppl. Las Americas Decl. ¶¶ 9-13. Moreover, Plaintiff Organizations have since confirmed that individuals they worked with have been transferred to Guantánamo, frustrating their ability to represent them. Suppl. Am. Gateways Decl, ¶¶ 3-5, 7; Suppl. Las Americas Decl. ¶¶ 3-9.[14]

Nor do Plaintiff Organizations allege setback to mere "abstract social interests." Opp. 9 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Instead, they maintain that Defendants' restrictions on communication with detainees at Guantánamo "directly affect[] and

---

[13] Individual Plaintiffs' family members have been sent to Venezuela.

[14] Defendants' reliance on *Arizona All. for Retired Americans v. Mayes* is misplaced. There, organizational plaintiffs claimed injury because "they will spend resources on education in response to the new law." 117 F.4th 1165, 1181 (9th Cir. 2024). In contrast, the organizational plaintiffs have suffered injuries to their "already-existing core activities."

interfere[]" with their "core [organizational] activities" of providing legal services to clients in detention. *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 395 (2024); *cf. id.* at 394-95 (no standing based solely on engaging in advocacy about preferred policy where core activity was not impacted). If the Organizations are unable to timely and regularly communicate with detainees, then they are "perceptibly impaired [in their] ability to provide [legal] counseling"—a core component of their mission. *Id.* at 395 (quoting *Havens*, 455 U.S. at 379); *see also* Mot. 6-7.

Contrary to what Defendants urge, Opp. 10-11, a complete bar on Plaintiffs' ability to communicate with detainees is not needed to show organizational injury. Conduct that makes it "more difficult for Plaintiff[s] to effectively represent" detained clients is sufficient. *S. Poverty L. Ctr. v. DHS*, No. 18-0760, 2020 WL 3265533, at *13 (D.D.C. June 17, 2020) ("*SPLC*"); *see also Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 40 (D.D.C. 2020). This is especially true with respect to organizations that had assisted detainees *prior* to their transfer to Guantánamo and would have continued working on their cases but for the transfers. Suppl. Las Americas Decl. ¶¶ 3-9; Suppl. Am. Gateways Decl. ¶¶ 3-5, 7.

**Third Party Standing.** Defendants also cannot refute Plaintiffs' third-party standing. Of the three factors—"injury in fact," "a close relation to the third party," and "some hindrance to the third party's ability" to protect their interest—Defendants primarily contest the first and third factors. As explained above, the first factor for Plaintiff organizations is satisfied for the same reasons that they have organizational standing. *See supra* pp. 10-12; *AIJ*, 2023 WL 1438376, at *9.

As to the second factor, Defendants' reliance on *Kowalski* is misplaced, Opp. 14, because the attorneys there asserted claims on behalf of future, criminal defendant clients, a class that "could have been literally any person," as opposed to situations where there is "a far more limited

universe of third parties." *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 36 (D.D.C. 2020) (finding that plaintiffs had a close relationship with their potential *future* LGBTQ patients). Like in *Whitman-Walker*, Plaintiffs' potential clients form a sufficiently limited group of third parties: immigrant detainees at Guantánamo seeking legal services. *See* Compl. ¶ 13.

Defendants claim there is no longer any hindrance to detainees asserting their own rights because of new protocols at Guantánamo. Opp. 14-16. But the hindrance prong "does not require an absolute bar from suit, but some hindrance to the third party's ability to protect his or her own interests." *SPLC*, 2020 WL 3265533, at *14 (cleaned up, citation omitted). As described above, detainees at Guantánamo still face significant difficulties in bringing lawsuits as first party litigants. *See supra* pp. 6-10. These restrictions "prevent sufficient access to judicial process . . . *in fact* hinder[ing]" the rights of third-party detainees. *AIJ*, 2023 WL 1438376, at *11; *see also SPLC*, 2020 WL 3265533, at *14 (finding similar obstacles contributed to the requisite hindrance).

**Next Friend Standing.** Defendants argue that detainees are not inaccessible because they can confer with attorneys under the new policies. Opp. 16-17. But the "limited opportunities" provided to detainees to speak with counsel do not constitute "unimpeded or free access." *Coal. of Clergy, Laws., & Professors v. Bush*, 310 F.3d 1153, 1160-61 (9th Cir. 2002) (cleaned up). As discussed above, Defendants' protocols for attorney access continue to pose barriers that make detainees practically "inaccessibl[e]" and unable to access judicial relief on their own. *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). Defendants do not challenge that Plaintiff Organizations are dedicated to detainees' "best interests." Instead, they take issue with Plaintiffs' reliance on Judge Berzon's concurring opinion in *Coalition of Clergy*, 310 F.3d at 1165-68. Opp. 17. But a court in this District, analyzing next-friend standing under similar circumstances, has adopted Judge Berzon's reasoning. *See Am. C.L. Union Found. ex rel Unnamed U.S. Citizen v. Mattis*, 286

13

F. Supp. 3d 53, 598 (D.D.C. 2017). The Organizations have an established history of concern for the detainees, "tried to meet and confer with the[m]," and have written to Defendants seeking access. *Id.* at 58; Mot. 5-9. Thus, they have "satisfied the 'best interests' prong of the *Whitmore* test." *Mattis*, 286 F. Supp. 3d at 58. Nor are Plaintiffs required to demonstrate a significant relationship. Opp. 17-18. The Supreme Court does not require a showing of a significant relationship as a standalone requirement, *Whitmore*, 495 U.S. at 163-64, nor has the D.C. Circuit adopted it. *See, e.g.*, *Does v. Bush*, No. Civ. A. 05-313 (CKK), 2006 WL 3096685, at *6 (D.D.C. Oct. 31, 2006) ("[T]his circuit has not addressed whether there must be 'some significant relationship' between a 'next friend' and the individual on whose behalf the 'next friend' seeks to act."); *accord Mattis*, 286 F. Supp. 3d at 59-60 (concluding that petitioner satisfied *Whitmore*'s requirements and "does not need to establish a significant or prior relationship").

## II.    Plaintiffs Are Likely To Succeed On The Merits.

### A. Defendants Are Violating Detainees' Right To Seek Habeas Corpus.

Defendants argue that immigrants with final orders of removal have limited rights and that therefore, they correspondingly lose their right to access law and lawyers. The right to counsel is not so limited nor is it subject to the discretion of the detaining authority or its unilateral assessments of the merits of any underlying legal claim. Defendants offer no response to this Court's well-established rule that where individuals have a right to file petitions for writs of habeas corpus, they have the right to meaningful "assistance of counsel." *Al Odah v. United States*, 346 F. Supp. 2d 1, 8 (D.D.C. 2004). Otherwise, "[p]etitioners cannot be expected to exercise this right." *Id*. Immigration law is complex and noncitizens, especially those detained and with limited English proficiency, cannot be expected to understand—let alone vindicate—their rights without the assistance of counsel. *See In re Guantanamo Bay Detainee Continued Access to Couns.*, 892 F.

14

Supp. 2d 8, 28 (D.D.C. 2012) ("In the case of Guantanamo detainees, access to the courts means nothing without access to counsel"). Rather, Defendants argue that the detainees now *do* have access to counsel, so their habeas rights are protected. But as already explained, that access is grossly deficient, and even below the level that military detainees at Guantánamo receive.

### B. Attorney Access Restrictions Violate the Detainees' First Amendment Rights.

Defendants do not contest the well-settled proposition that detained immigrants have a First Amendment right to retain and consult with an attorney. Instead, they attempt to confuse the matter, claiming that the First Amendment does not grant "unfettered free speech rights in this context." Opp. 26. But the cases cited by Defendants are inapplicable to "this context." *Haitian Refugee Ctr., Inc. v. Baker* involved noncitizens who had never entered the U.S. 953 F.2d 1498, 1511-12 (11th Cir. 1992). *Rafeedie v. I.N.S.* acknowledged that immigrants in the U.S. have First Amendment rights to expression, but concluded that there was no unique injury from the chilling effect of a pending deportation proceeding. 880 F.2d 506, 517 (D.C. Cir. 1989). *United States ex rel. Turner v. Williams* addressed whether a statutory category for exclusion from the United States violated the right to free expression. 194 U.S. 279, 292 (1904). Here, by contrast, the government seeks to restrict attorney access to detained noncitizens who have entered the U.S., have cognizable legal claims, and have a right to consult with counsel.

Defendants respond that they have now provided some means for detainees at Guantánamo to contact counsel, and that any remaining limitations are justified by "legitimate penological interests." Opp. 26 (citing *Turner v. Safley*, 482 U.S. 78, 107 (1987)). *Turner*, however, involved the rights of convicted prisoners. Immigrant detainees are civil detainees held pursuant to civil immigration laws. *Zadvydas*, 533 U.S. at 690. Accordingly, the "legitimate penological interests" at issue with convicted prisoners have little or no application to civil detainees. *Benjamin v. Fraser*,

264 F.3d 175, 187 n.10 (2d Cir. 2001); *Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004); *In re Kumar*, 402 F. Supp. 3d 377, 383-84 (W.D. Tex. 2019).

Even under *Turner*, however, the government's restrictions on attorney-client communication violate the detained immigrants' First Amendment rights for all the reasons recounted above. Only up to five people *per day,* for example, are permitted a 20-minute call at the MOC. Such restrictions are "patently inadequate." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989) (rejecting prison phone system allowing one attorney call every two weeks); *Johnson ex rel. Johnson v. Brelje*, 701 F.2d 1201, 1207-08 (7th Cir. 1983) (same, for prison phone system limited to two, 10-minute calls per week); *Johnson v. Galli*, 596 F. Supp. 135, 138 (D. Nev. 1984) (finding once-a-week phone access violates First Amendment).

## C. Defendants Violate Detained Immigrants' Fifth Amendment Substantive Due Process Right Against Punishment.

Defendants do not dispute that immigrants are in civil detention and thus have a substantive due process right not to be punished. Opp. 30. Defendants also agree with the substantive due process test from *AIJ* and *SPLC*. *Id.* at 30-31. Although they point to new protocols developed since Plaintiffs' TRO motion, they do not seriously dispute that Plaintiffs have shown that their attorney access in civil confinement is worse than access in prison. *Id.* at 31. Nor could they, as attorney access at Guantánamo still falls dramatically short of the minimum guarantees provided in immigration facilities in the U.S. and under federal Bureau of Prisons (BOP) policy.

Defendants admit they offer no in-person attorney visits. *Id.* BOP policy, in contrast, mandates in-person visits at all facilities.[15] Immigrants detained at Guantánamo are unable to share

---

[15] Defendants misconstrue Plaintiffs' brief as stating these in-person visits only occur in person "'if available.'" Opp. 31 (quoting Mot. 21). But the BOP regulation states that in-person visits will take place "in a 'private conference room, if available.'" Mot. 21 (quoting 28 C.F.R. § 543.13(a)-(b)). The BOP regulation is unambiguous: a "Warden shall . . . permit visits by the retained, appointed, or prospective attorney of an inmate . . . ." 28 C.F.R. § 543.13(a).

written documents with attorneys, in the way that federal prisoners can. Without in-person visits at Guantánamo "in which documents may be passed between attorney and client[,] . . . it is impossible for an attorney, for example, to secure a signature on a legal document while confidentially discussing that legal document at the same time." *AIJ*, 2023 WL 1438376, at *4. As noted above, the only way to exchange documents at all is by mail, with a week-long delay, requiring several weeks to finalize a declaration. Venghaus Decl. ¶ 27; Suppl. RAICES Decl. ¶ 7 (describing delay). And practical issues with Defendants' measures to implement phone calls render those calls functionally unavailable and worse than those in prisons. *Compare supra* pp. 8-9 (describing limitations on phone calls at Guantánamo), *with* ECF No. 3-10 at 21 (guaranteeing attorney phone calls in federal prisons), *and* ICE, Attorney Information and Resources (guaranteeing attorney phone access in ICE detention). Because attorney access is worse in several respects than that in federal prison (or even at Guantánamo for military detainees and in the U.S. for ICE detainees), the burden shifts to Defendants to show that their restrictions are "rationally related to a non-punitive purpose and . . . not excessive." *AIJ*, 2023 WL 1438376, at *12.

Defendants argue—without evidence—that restrictions on in-person visits "further the government's interest in securing the detention and military facilities at this United States Navy Base." Opp. 31. This purpose cannot justify barring in-person attorney access. Immigrant detainees, of course, are not—or should not be—in military custody. Moreover, the government allows attorneys to visit military detainees on the same base. *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d at 158; ECF No. 3-11, ¶¶ 8-15. And, as noted, Defendants did not even permit a visit by an attorney with security clearance who was already on the base. Connell Decl. ¶¶ 9-13. Nor can this purpose justify restrictions on phone access or electronic sharing of documents. And regardless, this "bare assertion" of a supposed justification "will not suffice" to

carry the government's burden. *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004); *accord Torres v. DHS*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019).

A due process violation is further established because "alternative and less harsh methods are available" to provide attorney access that would "equally serve the institution's legitimate interests." *AIJ*, 2023 WL 1438376, at *12. Although law-of-war restrictions do not apply to immigrant detainees, and would be patently unlawful if they did, Plaintiffs' opening brief set out measures available to military detainees on the base that have served Defendants' national security interests. Mot. 22. Defendants' decision not to provide—even at a minimum—the protections available to military detainees violates substantive due process.

### D. Defendants Violate Detainees' Statutory Right To Counsel.

Defendants argue that the right to counsel under the Immigration and Nationality Act (INA) does not extend to the current detainees, because that statutory and regulatory right to counsel extends to noncitizens in "removal proceedings" and not to claims made by individuals with final orders of removal. Opp. 32. But noncitizens with final orders have the statutory right to representation in proceedings to reconsider or reopen those orders. The statutory section governing "removal proceedings," 8 U.S.C. § 1229a, establishes the right of noncitizens to file motions to reconsider based on legal or factual errors, and motions to reopen based on, inter alia, changed circumstances, lack of notice, and extraordinary circumstances. *See* 8 U.S.C. §§ 1229a(c)(6), 1229a(c)(7). Adjudications of such motions are undoubtedly "proceedings for deciding the inadmissibility or deportability of [a noncitizen]," 8 U.S.C. 1229a(a)(1). *See, e.g.*, 8 U.S.C. § 1229a(c)(6)(A) (providing that motions may be filed to "reconsider a decision that the [noncitizen] is removable"); 8 U.S.C. § 1229a(c)(7)(B) (providing that motions to reopen "shall state the new facts that will be proven at a hearing").

18

As Defendants acknowledge, the INA guarantees the right to counsel, at no expense to the government, "[i]n *any* removal proceeding before an immigration judge and in any appeal . . . from any such removal proceedings." 8 U.S.C. § 1362 (emphasis added); *see also* 8 C.F.R. § 1003.16(b) ("The [noncitizen] may be represented in proceedings before an Immigration Judge . . . ."). Proceedings on motions to reopen, reconsider, or rescind are plainly such proceedings. The section governing removal proceedings reinforces this right by providing that "[i]n *proceedings under this section* . . . the [noncitizen] shall have the privilege of being represented, at no expense to the Government, by counsel of the [noncitizen]'s choosing . . . ." 8 U.S.C. § 1229a(b)(4)(A) (emphasis added). "This section" refers to 8 U.S.C. § 1229a, which contains the provisions for reopening, rescinding, or reconsidering removal orders, demonstrating that the statutory right to counsel extends to the right to file such motions. Moreover, individuals with final orders of removal have the right to request that counsel assist them in seeking release where they have been detained beyond the statutory 90-day removal period. *See* 8 C.F.R. § 241.4(h)(2) (providing that noncitizen "may be assisted by a person of his or her choice," subject to security concerns and agency discretion).[16] None of Defendants' cases say otherwise.

Defendants also assert that some detainees were issued expedited removal orders and argue that the right to counsel does not apply in such proceedings. Because Defendants did not provide access to the Guantánamo detainees, there is no way for Plaintiffs to know the precise posture of the detainees' cases. In any event, courts have understandably recognized the role for counsel in expedited removal proceedings, especially if noncitizens have expressed a fear of persecution or

---

[16] Defendants rely on *Garcia Uranga v. Barr*, No. 20-3162-JWL, 2020 WL 4334999 (D. Kan. July 28, 2020), to assert that the INA affords no right to counsel after the conclusion of removal proceedings, Opp. 32, but that court reached a much narrower conclusion: it held that counsel need not be present at a 90-day Post Order Custody review, but acknowledged that noncitizens can seek assistance of counsel to contest ICE's custody decisions. *Id.* at *8.

torture. For example, *Rosa v. McAleenan*, 583 F. Supp. 3d 850 (S.D. Tex. 2019), which Defendants cite, Opp. 32, acknowledged that those in expedited removal proceedings "must be notified of the right to contact an individual, including counsel" for their credible fear screening. *Id.* at 882; *see also* 8 U.S.C. § 1225(b)(1)(B)(iv) (providing for the right to "consult with a person or persons" of one's choosing prior to the interview or any review thereof). Defendants' other cases do not suggest that the government may deny meaningful access to counsel. *See Rosa*, 583 F. Supp. 3d at 882; *Las Americas Immigr. Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 30 (D.D.C. 2020) (holding that it was reasonable for the agency to conclude that access protocols in CBP custody provided noncitizens "with a legally sufficient opportunity to consult with others, including a lawyer. . . .").

### E. Defendants' Restrictions On Attorney Access Violate The Plaintiff Organizations' First Amendment Rights.

The government's restrictions on the Plaintiff Organizations' ability to provide counsel to detainees at Guantánamo also violates the First Amendment. Defendants' assertion that Plaintiffs made no attempt to speak with detainees prior to filing the litigation is patently untrue. Opp. 27. Plaintiff Organizations also provided counsel to several detainees prior to their transfer and repeatedly attempted to locate these individuals. *Supra* p. 3-4. Plaintiff Organizations only confirmed some detainees' identities and location after the *New York Times* published its list. Suppl. Am. Gateways Decl., ¶¶ 4-6; Suppl. Las Americas Decl. ¶¶ 3-9. Since the filing of this case, at least eight additional families have requested that Plaintiffs provide counsel to their family members. *Supra* p. 3.

Defendants do not dispute that policies that unreasonably impede communication between attorneys and incarcerated people violate an attorney's First Amendment rights. *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (citation omitted). As the D.C. Circuit noted in *Ukrainian-American*, "the [F]irst [A]mendment guarantees [attorneys] their right to be free of governmental

20

restraints on 'political expression' and that right is violated if the Government affirmatively interferes with constitutionally protected litigation as a form of political expression." 893 F.2d 1374, 1380 (D.C. Cir. 1990) . Defendants mistakenly assert that *Ukrainian-American* supports their position but there the plaintiff sought the government's assistance in furnishing information to "each person seeking asylum" from a "Soviet or East Bloc" country. *Id.* at 1377. Plaintiffs here do not request the government's affirmative help to recruit clients but instead challenge facility restrictions on attorney-client communication with people who want their services. *Compare id.*, *with* pp. 3-4 (citing declarations of Plaintiffs and families).

Defendants further argue that the Plaintiff Organizations have failed to show prejudice or injury. But neither attorneys nor their clients must do so to prevail in a First Amendment claim. Defendants confuse First Amendment doctrine with claims related to prisoners' right of access to courts. "[T]he actual injury requirement applies to access-to-courts claims but not to free speech claims." *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008); *Jones v. Brown*, 461 F.3d 353, 359-60 (3d. Cir. 2006) (same). Even so, any injury requirement would only be required of individual prisoners, not organizations. *Lewis v. Casey*, 518 U.S. 343, 350 (1996) (describing harm suffered "by a particular individual or class of individuals."). Plaintiffs have also shown that these restrictions have hampered detainees' ability to pursue claims for humanitarian protection, punitive conditions of confinement, and challenges to unlawful detention. *Supra* pp. 2-3.

## III.    The Balance of Equities and Public Interest Support Granting the TRO.

Defendants assert that the balance of equities favors keeping restrictions on attorney-client communication, because an injunction would undermine discretion over detention resources and removal priorities. Opp. 33. However, "it is not within [the government's] 'discretion' to decide whether it will be bound by the law." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 176 (D.D.C. 2015).

Where access to counsel is obstructed, the violation of constitutional rights outweighs the government's generalized claims of administrative burden. *See SPLC*, 2020 WL 3265533, at *33. Defendants also fail to provide any legitimate justification for why basic attorney access measures would uniquely interfere with removal operations. *Id. at* *31. In fact, Defendants do not explain how granting detainees the ability to consult with counsel would impose *any* burden on their ability to process cases lawfully. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (government interests do not justify violations of constitutional rights).

The irreparable harm caused by these restrictions is concrete and evident—it has already been experienced by individuals detained at Guantánamo. Legal access barriers have prevented detainees from filing motions to reopen, requesting stays of removal, or presenting new claims for protection—critical steps given the risk of erroneous deportation without any guardrails. *See, e.g.,* Suppl. Las Americas Decl. ¶¶ 3-9; *see also Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding that removal to a country where one faces harm constitutes irreparable injury).

## CONCLUSION

For the reasons stated above and in Plaintiffs' Motion, the Court should issue a Temporary Restraining Order.

Dated: February 24, 2025

Respectfully submitted,

/s/ Lee Gelernt

Eunice H. Cho (D.C. Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th floor
Washington, DC 20005
(202) 546-6616
echo@aclu.org

Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz*
Noor Zafar*
Omar C. Jadwat*
Wafa Junaid*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org
wjunaid@aclu.org

My Khanh Ngo*
Kyle Virgien*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org
nsmith@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon*
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, Floor 7
New York, NY 10012
T: (212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

Deepa Alagesan (D.D.C. Bar No. NY0261)
Kimberly Grano (D.D.C. Bar No. NY0512)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (516) 838-7044
dalagesan@refugeerights.org
kgrano@refugeerights.org

Attorneys for Plaintiffs-Petitioners

*Pro bono representation certificates
forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: February 24, 2025                          <u>Respectfully Submitted,</u>

<u>*/s/ Lee Gelernt*</u>
 Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Attorney for Plaintiffs–Petitioners*