## SUPPLEMENTAL DECLARATION OF JENNIFER BABAIE

## LAS AMERICAS IMMIGRANT ADVOCACY CENTER

I, Jennifer Babaie, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center ("Las Americas"). I am submitting this declaration to supplement the original declaration that I submitted in this case, signed February 10, 2025. *See* ECF No. 3-6.

2. Since my last declaration, Las Americas has continued to divert even more resources toward responding to the crisis created by the government's policy of transferring and detaining immigrants from the United States at the U.S. military base at Guantánamo Bay, Cuba. We have also identified clients who we have not been able to assist on time-sensitive aspects of their cases.

**Impact on Las Americas Clients Transferred to Guantánamo**

3. In addition to the tracking we were doing of people whom we had assisted in immigration detention, we were constantly monitoring the situation at Guantánamo in the news. So, after the New York Times published a list of 53 names of people at Guantánamo, we determined that at least four individuals whom we had been working with in a pre-representational capacity before they had been transferred: Jhonatan Alejanro Alviares Armas; Carlos David Palma Osorio; Oswal Yonaiker Huilarte (also listed as Guilarte); and Argelis Jose Mundaray Salazar. Even though all four individuals had final orders to Venezuela, there were aspects of their immigration cases that we were either working on or could have worked on if they had not been transferred to Guantánamo and cut off from all communication. For instance, we were exploring litigation and advocacy options based on the civil rights abuses they suffered while in immigration detention.

4. Mr. Alviares Armas had a particularly compelling case. He has a one-year-old U.S. citizen child with his former partner, a U.S. citizen living in Chicago. He has no criminal history or known gang affiliations. Mr. Alviares Armas was being screened for possible release from custody based on his equities. By the time he was transferred to Guantánamo, I recommended to the staff on our deportation defense team that all post-order Venezuelans be screened for potential eligibility for a motion to reopen based on the changed country circumstances caused by false claims made by the U.S. government that anyone sent to Guantánamo is a criminal and gang member.

5. For Mr. Alviares Armas, we understood from our interview that ICE unfairly accused him of membership in the gang known as Tren de Aragua due to the fact that he has tattoos on his body, despite his explanations to us that these are personal tattoos unrelated to gangs or criminal activity. We also learned that he has been diagnosed with a throat tumor, which when combined with his U.S. citizen child, would have been a flag for us that he merits a petition for release on an order of supervision because his health would decline in detention and he as not receiving appropriate treatment while in custody. The

fact that Mr. Alviares Armas' name was published in a news article about Guantánamo further put him at risk of being harmed by the Venezuelan government.

6. We were also working with Mr. Palma Osorio on a statement regarding his experience in immigration detention at the El Paso Processing Center, where ICE officers abused him. We were consulting with Amnesty International about Mr. Palma Osorio, given Amnesty International's research on abuses of immigrants in the custody of U.S. Immigration and Customs Enforcement (ICE), and had referred his case for possible civil tort litigation with a private law firm willing to take the case on a pro bono basis. Several Las Americas staff met with two representatives of the firm on February 12, 2025, to discuss his complaint, however, Mr. Palma Osorio was transferred to Guantánamo shortly thereafter. We thus were unable to follow up with Mr. Palma Osorio due to our inability to communicate with him after he was transferred. I also believe he would qualify for a motion to reopen, for reasons similar to Mr. Alviares Armas' case.

7. We had interviewed Mr. Huilarte for potential legal assistance, but lost touch with him because he was transferred to Guantánamo. We conducted an interview with his family member, a cousin living in the United States. Mr. Huilarte has a final order, and was unfairly accused by the U.S. government of being a gang member without evidence. His name was also published by the New York Times. After the U.S. government labeled anyone sent to Guantánamo as being the "worst of the worst," similar remarks have been made by the Venezuelan government. Based on my extensive experience and practice of immigration law, I believe Mr. Huilarte must be advised of the functioning of a motion to reopen based on changed circumstances under U.S. immigration law and would benefit from a specific screening as to his eligibility for this form of relief.

8. We also represented Mr. Mundaray Salazar. After his intake, Las Americas was retained for purposes of seeking release due to his eligibility for Temporary Protected Status (TPS). We also assisted with his TPS application. He was granted release, ending our representation of him around November 2023. However, he returned to ICE custody around December 2024. Before we could screen him again for possible services, Mr. Mundaray Salazar was transferred to Guantánamo. Had we been able to communicate with him, we would have also screened for legal relief like release from ICE custody and a motion to reopen based on changed circumstances due to the widespread publicity around people sent to Guantánamo.

9. In summary, Las Americas was working with and would have continued working with individuals who were transferred to Guantánamo. We are especially concerned about the return of these and other individuals to Venezuela given the publication of many of their names and faces, alerting the Maduro regime to the fact that they sought safety in the United States and had spent time in Guantánamo. Based on reviews of country conditions evidence and discussions with persons familiar with Venezuela and the Maduro regime, it is my general understanding that individuals who leave Venezuela to seek safety in the United States may face treason-like charges upon return. This could be a basis for reopening because there is now new evidence about the possibility of torture by the Maduro regime or one of its allies.

**Continued Diversion of Resources and Failed Attempts at Contacting Detainees**

10. Las Americas has continued to expend staff resources and time to respond to the transfers to Guantánamo. We have spent countless hours speaking with folks in fear of transfer and researching updates on the government's use of Guantánamo as an immigration facility, which has delayed our ability to screen and work with new clients.

11. We are also continuing to spend hours trying to piece together the legal pathways available to individuals currently in ICE custody who are post-order of removal by an immigration judge, including those facing indefinite detention and who are eligible for release from ICE custody and reunited with their families, but are now afraid that they will be sent to Guantánamo.

12. Since my first declaration, my staff tried several more times to make contact with our clients at Guantánamo. Because there was no information publicly available about contacting people at Guantánamo, we kept monitoring the ICE online detainee locator, looking up people by their A-numbers. When we did so, the location listed was "Florida" and it instructed us to call the ICE field office in Plantation, FL. Upon calling the number, there was an automated message in English. Although there is a Spanish option, when you try to click on it, it continues in English. The automated message then directs the caller to put in an extension for the person they want to speak with. Since there is no means of us obtaining an extension, we attempted to reach the directory by dialing 1#. However, the automated message again asked for an extension. Since we did not have an extension or a means of obtaining an extension because the directory line did not work, we then received a warning from the automated system that the line will be cut without an entry typed in. A few seconds later, the line was cut. There was no actual or feasible means of reaching a person through the phone number listed on the ICE detainee locator.

13. We made these calls at least three times, including one time trying to reach Mr. Alviares Armas on February 11, around 9:00 a.m. MT.

14. Additionally, since my first declaration, we have had an opportunity to interview Jeferson Escalona, an immigrant detainee who had been transferred to Guantánamo before being returned back to the United States. We determined he had been returned based on our attempts to reach him and others we suspected of transfer to Guantánamo, and as a result of our ongoing legal work with persons in ICE detention, which requires us to frequently check their status in the online ICE locator and while visiting the detention facility. When Las America staff spoke with Mr. Escalona on February 14, he informed us that there was no means of communicating with anyone outside of his cell at Guantánamo, neither by phone nor even with other men in rooms near him, unless he tried to yell under the door. He also described extremely restrictive conditions of confinement, including confinement to a cell for most of the day, except for "rec" time in a small cage within a larger cage in the yard.

15. I have seen the government's declarations in this case, stating there will be procedures for accessing detained immigrants at Guantánamo. However, I have been monitoring ICE's website regularly and still do not see any information regarding protocols for attorney-client communication at Guantánamo.

16. On February 24, after seeing the news of more transfers, Las Americas staff had to put in more time to look through our system and check the ICE detainee locator to look up the locations of our clients and see whether anyone we've worked with might have been included in the most recent round of transfers to Guantánamo. This has become a regular activity that has taken away from our other work and activities.

Executed on this 24 the day of February, 2025 in El Paso, Texas.

*[signature]*

Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center